# IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

(1) **KIZZIE SIMMS,** individually and as
Special Administrator of the Estate of
Gregory Neil Davis,

               **Plaintiff,**

vs.

(1) **BOARD OF COUNTY
COMMISSIONERS FOR
OKLAHOMA COUNTY;**

(2) **BOARD OF TRUSTEES FOR THE
OKLAHOMA COUNTY CRIMINAL
JUSTICE AUTHORITY;**

(3) **GREG WILLIAMS,** individually,

(4) **RONALD ANDERSON,**

(5) **LT. FNU MORRIS**

(6) **CPL. FNU KALLOS**

(7) **MARY MULANAX,**

(8) **HANK HARVEY,**

(9) **THEARTRY DEAN,**

(10) **TIFFANY CARTER,**

(11) **CHELSIE ANDERSON-DEPEE,**

(12) **JOHN/JANE DOES 1-5**

(13) **TURN KEY HEALTH CLINICS,
LLC**

(14) **WILLIAM COOPER, D.O.**

(15) **SANARIA OKONGOR, LPC**

(16) **MISTY WILLIAMS, LPN**

(17) **ALICIA IRVIN, Ph.D.**

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAR 1 5 2023

RICK WARREN
COURT CLERK
109 _____

Case No. **CJ-2023-1421**

EXHIBIT 3

**(18) GINGER SAGE, RN**

**(19) SINEAD EASTMAN, RN**

**(20) BETTY HORN, RN**

**(21) JESSICA HALLOCK, LPN,**

**(22) AMANDA MERRIOTT, RN**

**(23) JOHN/JANE DOES 6-10,**

                        **Defendants.**

## COMPLAINT

COMES NOW Plaintiff, Kizzie Sims ("Plaintiff"), individually and as Special Administrator of the Estate of Gregory Neil Davis ("Gregory"), for her causes of action against Defendants, Board of County Commissioners of Oklahoma County ("County"), Board of Trustees for the Oklahoma County Criminal Justice Authority ("Trust"), Greg Williams ("Administrator"), Ronald Anderson ("Anderson"), Lt. FNU Morris ("Morris"), Cpl. FNU Kallos ("Kallos"), Mary Mulanax ("Mulanax"), Hank Harvey ("Harvey"), Theartry Dean ("Dean"), Tiffany Carter ("Carter"), Chelsie Anderson-Depee ("Depee"), Turn Key Health Clinics, LLC, ("Turn Key"), William Cooper ("Cooper"), Sanaria Okongor ("Okongor"), Misty Williams ("Williams"), Alicia Irvin ("Irvin"), Matthew Guerra ("Guerra"), Ginger Sage ("Sage"), Sinead Eastman ("Eastman"), Betty Horn ("Horn"), Jessica Hallock ("Hallock"), Amanda Merriott ("Merriott"), and John/Jane Does 1-10, alleges and states as follows:

## THE PARTIES

1.  Decedent Gregory was a citizen and resident of Oklahoma County, Oklahoma, at all times material hereto. Gregory died in Oklahoma County, Oklahoma on August 12, 2021.

2

EXHIBIT 3

2. Plaintiff, is the daughter of Gregory, and was appointed Special Administrator of the Estate of Gregory Neil Davis on September 21, 2021, in Oklahoma County District Court Case No. PB-2021-1339.

3. Defendant County is and was at all times relevant hereto responsible for the operation of the Oklahoma County Detention Center ("OCDC"), operated in Oklahoma County.

4. County is and was at all times relevant hereto responsible for the training and supervision of Defendants Trust, Administrator, Anderson, Mulanax, Harvey, Dean, Okongor, Okongor, Williams, Irvin, and Guerra.

5. At all times relevant hereto, County and its officers/employees were acting under color of state law.

6. County was further responsible for the supervision of Defendant Turn Key in its role as County's contractor for provision of medical care at the detention center.

7. Defendant Trust was at all times relevant hereto responsible for the operation of the OCDC, operated in Oklahoma County.

8. Trust was at all times relevant hereto responsible for the training and supervision of Defendants Administrator, Anderson, Morris, Kallos, Mulanax, Harvey, Dean, Carter, and Depee.

9. At all times relevant hereto, Trust and its officers/employees were acting under color of state law.

10. County delegates final decision-making authority to Trust to establish policy with regards to operation of the OCDC, including the detention and medical care for physically ill and/or mentally ill detainees.

3

EXHIBIT 3

11. The policies, practices and customs, promulgated, created, implemented and/or utilized by Trust represent the official policies and/or customs of County with regards to operation of the OCDC.

12. Trust was further responsible for the supervision of Defendant Turn Key in its role as County's contractor for provision of medical care at the detention center.

13. Defendant Administrator was at all times relevant hereto the Jail Administrator of the OCDC responsible for the operation of the OCDC.

14. Administrator was at all times relevant hereto responsible for the training and supervision of Defendants Anderson, Morris, Kallos, Mulanax, Harvey, Dean, Carter, and Depee.

15. Administrator is sued in both his individual capacity and in his official capacity for acts performed while he was the Jail overseeing the OCDC.

16. At all times relevant herein, Administrator was acting under the color of law and within the course and scope of his employment with County.

17. County delegates final decision-making authority to Administrator to establish policy with regards to operation of the OCDC, including the detention and medical care for physically ill and/or mentally ill detainees.

18. The policies, practices and customs, promulgated, created, implemented and/or utilized by Administrator represent the official policies and/or customs of County with regards to operation of the OCDC.

19. Administrator was further responsible for the supervision of Defendant Turn Key in its role as County's contractor for provision of medical care at the detention center.

20. Defendant Anderson was, at all times relevant hereto, a Detention Officer at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

4

EXHIBIT 3

21. Defendant Anderson engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of County, Trust, or Administrator.

22. Defendant Morris was, at all times relevant hereto, a Detention Officer at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

23. Defendant Morris engaged in the conduct complained of under color of law and within the scope of his/her employment as agent and representative of County, Trust, or Administrator.

24. Defendant Kallos was, at all times relevant hereto, a Detention Officer at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

25. Defendant Kallos engaged in the conduct complained of under color of law and within the scope of his/her employment as agent and representative of County, Trust, or Administrator.

26. Defendant Mulanax was, at all times relevant hereto, a Detention Officer at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

27. Defendant Mulanax engaged in the conduct complained of under color of law and within the scope of his/her employment as agent and representative of County, Trust, or Administrator.

28. Defendant Harvey was, at all times relevant hereto, a Detention Officer at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

29. Defendant Harvey engaged in the conduct complained of under color of law and within the scope of his/her employment as agent and representative of County, Trust, or Administrator.

30. Defendant Dean was, at all times relevant hereto, a Detention Officer at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

31. Defendant Dean engaged in the conduct complained of under color of law and within the scope of his/her employment as agent and representative of County, Trust, or Administrator.

EXHIBIT 3

32. Defendant Carter was, at all times relevant hereto, a Detention Officer at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

33. Defendant Carter engaged in the conduct complained of under color of law and within the scope of her employment as agent and representative of County, Trust, or Administrator.

34. Defendant Depee was, at all times relevant hereto, a Detention Officer at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

35. Defendant Depee engaged in the conduct complained of under color of law and within the scope of her employment as agent and representative of County, Trust, or Administrator.

36. Defendants John/Jane Does 1-5 were, at all times relevant hereto, Detention Officers at the Oklahoma County Jail, employed by and/or working for County, Trust, or Administrator.

37. Defendants John/Jane Does 1-5 engaged in the conduct complained of under color of law and within the scope of their employment as agents and representatives of County, Trust, or Administrator.

38. Defendant Turn Key is a private Oklahoma Limited Liability Company that is independently contracted by County to provide medical services at the OCDC.

39. Defendant Turn Key engaged in the conduct complained of under color of law and within the scope of its contract with County.

40. Defendant Turn Key was at all times relevant hereto responsible for the training and supervision of Defendants Okongor, Williams, Irvin, Guerra, Sage, Eastman, Horn, Hallock, and Merriott.

41. Defendant Cooper was at all times relevant hereto the Medical Director for Turn Key and for the Oklahoma County Jail.

6

EXHIBIT 3

42. Defendant Cooper engaged in the conduct complained of under color of law and within the scope of his role with Turn Key and the Oklahoma County Jail.

43. Defendant Cooper was at all times relevant hereto responsible for the training and supervision of Defendants Okongor, Williams, Irvin, Guerra, Sage, Eastman, Horn, Hallock, and Merriott.

44. Defendant Cooper was at all times relevant hereto responsible for overseeing the provision of medical services to detainees in the Oklahoma County Jail.

45. Defendant Cooper was at all times relevant hereto responsible for creating, updating, reviewing, and revising the policies and procedures for the provision of medical services inside the Oklahoma County Jail.

46. Defendant Okongor was, at all times relevant hereto, an employee of Turn Key working at the OCDC.

47. Defendant Okongor engaged in the conduct complained of under color of law and within the scope of her employment for Turn Key.

48. Defendant Williams was, at all times relevant hereto, an employee of Turn Key working at the OCDC.

49. Defendant Williams engaged in the conduct complained of under color of law and within the scope of her employment for Turn Key.

50. Defendant Irvin was, at all times relevant hereto, an employee of Turn Key, serving as the Director of Psychological Services for Turn Key and for the Oklahoma County Jail.

51. Defendant Irvin was at all times relevant hereto responsible for the training and supervision of Defendant Okongor.

7

EXHIBIT 3

52. Defendant Irvin engaged in the conduct complained of under color of law and within the scope of her employment for Turn Key.

53. Defendant Guerra was, at all times relevant hereto, an employee of Turn Key working at the OCDC.

54. Defendant Guerra engaged in the conduct complained of under color of law and within the scope of his employment for Turn Key.

55. Defendant Sage was, at all times relevant hereto, an employee of Turn Key working at the OCDC.

56. Defendant Sage engaged in the conduct complained of under color of law and within the scope of her employment for Turn Key.

57. Defendant Eastman was, at all times relevant hereto, an employee of Turn Key working at the OCDC.

58. Defendant Eastman engaged in the conduct complained of under color of law and within the scope of her employment for Turn Key.

59. Defendant Horn was, at all times relevant hereto, an employee of Turn Key working at the OCDC.

60. Defendant Horn engaged in the conduct complained of under color of law and within the scope of her employment for Turn Key.

61. Defendant Hallock was, at all times relevant hereto, an employee of Turn Key working at the OCDC.

62. Defendant Hallock engaged in the conduct complained of under color of law and within the scope of her employment for Turn Key.

EXHIBIT 3

63. Defendant Merriott was, at all times relevant hereto, an employee of Turn Key working at the OCDC.

64. Defendant Merriott engaged in the conduct complained of under color of law and within the scope of her employment for Turn Key.

65. Defendants John/Jane Does 6-10 were, at all times relevant hereto, employees of Turn Key working at the OCDC.

66. Defendants John/Jane Does 6-10 engaged in the conduct complained of under color of law and within the scope of their employment for Turn Key.'

67. Defendants Anderson, Morris, Kallos, Mulanax, Harvey, Dean, Carter, Depee, and John/Jane Does 1-5 are collectively referred to herein as "the Jailer Defendants".

68. Defendants Okongor, Williams, Irvin, Guerra, Sage, Eastman, Horn, Hallock, Merriott, and John/Jane Does 6-10 are collectively referred to herein as "Turn Key Medical Staff".

## JURISDICTION AND VENUE

69. Plaintiff incorporates all previous allegations and statements herein.

70. This action arises from an incident that occurred in Oklahoma County, Oklahoma.

71. This Court has jurisdiction over the parties hereto, jurisdiction over the subject-matter hereof, and venue is proper.

## FACTUAL BACKGROUND

### *Detention and Death of Gregory*

72. Gregory was brought to the Oklahoma County jail by the Oklahoma City Police Department on August 3, 2021, to be held as a pretrial detainee on a charge for indecent exposure and was observed to be in the midst of an obvious mental health crisis by the arresting officer(s).

9

EXHIBIT 3

73. At the time of his arrival at the Oklahoma County Jail, Gregory had not been convicted of any crime.

74. Upon Gregory's arrival at the jail, Turn Key, and Defendant Williams, did not perform a medical evaluation of Gregory claiming that his mental health status prevented them from obtaining answers to their intake questions.

75. However, nothing else was done as far as a medical intake on Gregory, including not even taking his vital signs.

76. Pursuant to the Oklahoma Jail Standards, OAC 310:670-5-8(2), intake screenings shall be performed on all inmates immediately upon admission to the facility and before being placed in the general population or housing area. An inmate whose screening indicates a significant medical or psychiatric problem shall be observed frequently by the staff consistent with the facility's policy and the identified need until the appropriate medical evaluation has been completed.

77. At no point during Gregory's detention at the Oklahoma County Jail did any appropriate medical professional perform a medical evaluation of Gregory, as found by the Oklahoma State Department of Health ("OSDH") in their subsequent investigation and inspections at the Oklahoma County Jail.

78. Based on OAC 310:670-5-8(2), Gregory was required to be under frequent observation the entire time he was present in the jail.

79. Despite this requirement, the Jailer Defendants did not "frequently observe" Gregory during his detention through either sight checks or monitoring the 24-hour video surveillance in his cell; the Jailer Defendants specifically did not check on Gregory during the final few days of his life,

10

EXHIBIT 3

while he was beating on the door, attempting hundreds of phone calls, and crying out for medical help, until approximately 6:45 a.m. on August 12th, just before his easily-preventable death.

80. Even without the special status requiring "frequent observation" Gregory was to still be checked on with at least an hourly sight check, as well as a sight check as a part of the inmate count at the beginning of each detention officer shift.

81. Further, during the final four days of Gregory's life, the Jailer Defendants ignored Gregory's cries and pleading for medical help.

82. Further, no medical personnel, including Defendants Turn Key Medical Staff and Cooper observed, checked, or attempted to evaluate Gregory medically during his detention.

83. In fact, Gregory's medical records from Turn Key for his time at the Oklahoma County Detention Center reflect that his vital signs were never taken during the entire 9 days he was present in the jail.

84. Based on his mental health status on August 3, 2021, an appointment was created for Gregory to be seen by a mental health provider on August 5, 2021.

85. Pursuant to OAC 310:670-5-8(7), because Gregory was held for forty-eight hours, he was required to undergo a medical examination performed by licensed medical personnel, which means a psychiatrist, medical doctor, osteopathic physician, physician's assistant, registered nurse, licensed practical nurse, emergency medical technician at the paramedic level, or clinical nurse specialist.

86. Despite the order to be seen by a mental health provider, which was marked as the highest priority, Gregory's appointment to be seen by a mental health provider was further delayed until August 6, 2021.

11

EXHIBIT 3

87. The appointment was rescheduled from August 5, 2021, to August 6, 2021, by Defendant Irvin, with full knowledge that Gregory was obviously in a state of psychosis and had not received a full medical intake evaluation, had not even had his vital signs checked, or received any treatment of any kind.

88. Gregory was finally seen by Defendant Okongor, a licensed professional counselor, on August 6, 2021, noting that he was suffering signs of psychosis, but ultimately Okongor made no treatment recommendations or took any actions other than to recommend follow-up in a few days.

89. Again, no actual medical intake was performed nor were any vital signs checked.

90. Defendant Okongor, as a licensed professional counselor, was not qualified to perform any medical evaluation of Gregory and was not included in the explicit list of providers who shall perform a medical evaluation under 310:670-5-8(7).

91. Further, Defendant Okongor, as an LPC, is not authorized or qualified to provide any medical or psychiatric evaluation, treatment, or assessment.

92. Gregory was seen again on August 9, 2021, by Okongor, and was again noted to still be suffering from psychosis.

93. Again, no treatment recommendations or any other actions were taken, no actual medical intake was performed, vital signs checked, nor was any referral to an appropriately qualified medical professional made..

94. Again, Defendant Okongor, as a licensed professional counselor, was not qualified to perform any medical evaluation of Gregory and was not included in the explicit list of providers who shall perform a medical evaluation under 310:670-5-8(7).

12

EXHIBIT 3

95. Due to the severity of Gregory's psychosis – and the fact that it had been an ongoing episode since the night of August 3, 2021 – Gregory should have been referred to see a psychiatrist or transferred to another facility where Gregory could be seen by a psychiatrist, physician, or other licensed medical provider as defined in 57 O.S. § 4.1(3).

96. For at least the final few days of his life – from August 9th through August 12th – inmates in nearby cells heard Gregory beating at his cell door, crying, and begging for medical help but no one came to assist him, to give him help, provide him medical care, refer him to an appropriate level medical provider, or to refer him to a facility actually capable of providing the level of psychiatric and medical care Gregory was obviously in need of.

97. During at least the final few days of his life – from August 9th through August 12th the Jailer Defendants, each assigned to perform sight checks on Gregory's cell for at least one shift during that period, did not perform any sight checks on Gregory, which were required to be performed at a minimum every thirty minutes, and thus Gregory's pleas for medical assistance went unanswered by the Jailer Defendants or any other Defendant as a result of the Jailer Defendants' individual failures to report Gregory's pleas and obvious need for treatment to any medical staff.

98. In the alternative, while Gregory was beating at his cell door, crying, and begging for help, the Jailer Defendants each individually performed sight checks in that area for at least one shift during the period from August 9th through August 12th, and completely ignored Gregory's obvious psychosis and lack of treatment/evaluation, his obvious medical needs, suffering and pleas for help, and never sent any medical personnel to check on him or perform a medical

13

EXHIBIT 3

evaluation. The Jailer Defendants each either wholly ignored Gregory's cries of pain and pleas for help or simply assumed he was faking with no justification for such belief.[1]

99. In the alternative, the Jailer Defendants each individually observed Gregory's obvious psychiatric/mental health state and need for treatment, his deteriorating medical condition, and heard his cries and pleas for help, during at least one shift during Gregory's detention from August 3rd through August 12th, and reported such pleas and obvious need for treatment to each of Defendants Turn Key Medical Staff during that timeframe. Following that notice, each of Defendants Turn Key Medical Staff, Turn Key and Defendant Cooper, chose not to perform any follow-up to check on Gregory, to evaluate his condition, to provide him any treatment, provide him access or referral to an appropriate medical provider capable of assessing/treating his condition, and/or failed to refer him to another facility actually capable of handling Gregory's psychiatric and/or medical needs.[2]

100.   In the alternative, the Jailer Defendants each individually observed Gregory's obvious psychiatric/mental health state and need for treatment, his deteriorating medical condition, and heard his cries and pleas for help, during at least one shift during Gregory's detention from August 3rd through August 12th, and reported such pleas and obvious need for treatment to each of Defendants Turn Key Medical Staff during that timeframe. Following that notice, each of

---

[1] Without discovery or access to jail staffing and medical staffing rosters and records, Plaintiff is unable to provide the specific date and time of each shift the Jailer Defendants were assigned to such post/role during Gregory's ten-day detention and is unable to provide the specific date and time of each shift each of the Turn Key Medical Staff defendants were assigned to monitor and/or provide care for Gregory. Plaintiff makes these allegations to the best of her knowledge without such documents, information, and knowledge which is solely in the possession of Defendants County, Trust, Administrator, Cooper, the Jailer Defendants, Turn Key, Cooper, and Turn Key Medical Staff.
[2] Plaintiff incorporates footnote 1 herein.

EXHIBIT 3

Defendants Turn Key Medical Staff individually checked on Gregory and were aware of and documented his condition, that he needed to be seen by a psychiatrist, that he needed a higher-level medical provider to examine and assess his ongoing and worsening complaints of abdominal pain and physical deterioration, and/or documented that Gregory needed to be transferred to another facility actually capable of handling Gregory's psychiatric and/or medical needs, but chose not to take any action to provide such care, treatment, access, or transfer.

101.    In the alternative, the Jailer Defendants each individually observed Gregory's obvious psychiatric/mental health state and need for treatment, his deteriorating medical condition, and heard his cries and pleas for help, during at least one shift during Gregory's detention from August 3rd through August 12th, and reported such pleas and obvious need for treatment to each of Defendants Turn Key Medical Staff during that timeframe. Following that notice, each of Defendants Turn Key Medical Staff individually checked on Gregory and were aware of and documented his condition, that he needed to be seen by a psychiatrist, that he needed a higher-level medical provider to examine and assess his ongoing and worsening complaints of abdominal pain and physical deterioration, and/or documented that Gregory needed to be transferred to another facility actually capable of handling Gregory's psychiatric and/or medical needs, but Gregory never received such treatment from any appropriately qualified medical provider as Defendants Turn Key and Cooper deliberately ignored such documentation and needs.[3]

---

[3] Plaintiff incorporates footnote 1 herein

15

**EXHIBIT 3**

102.    During his detention, Gregory attempted to make 870 phone calls from his cell but was unable to complete a single one due to being provided the wrong pin number and being placed in the wrong cell.

103.    Gregory was placed in the wrong cell due to being misclassified by the jail's inmate classification staff.

104.    In the alternative, Gregory was not misclassified, but instead was placed in the wrong cell due to known ongoing mismanagement of the classification and housing assignment roles within the Oklahoma County Detention Center.

105.    Defendants County, Trust, and Administrator were each aware of the ongoing problems of the classification and housing assignment roles within the Oklahoma County Detention Center and were aware of the serious risk that an inmate in need of serious medical and/or psychiatric care – as such needs are highly prevalent amount the incarcerated population – would be placed in a non-medical observation cell when in fact that inmate was in need of medical observation and met the appropriate criteria for housing in a medical observation cell, and that such misclassification/incorrect housing assignment could and would likely result in an inmate with known serious medical and/or psychiatric needs would not be provided appropriate supervision and frequent observation and would not be provided access to obviously needed medical care and/or higher-level medical providers.

106.    Despite this knowledge of ongoing problems and the knowledge of the serious risk of harm posed by these classification and housing assignment problems, none of Defendants County, Trust, or Administrator took any steps to rectify such problems, to supervise, evaluate, or otherwise monitor the classification and housing assignment process in order to prevent or

16

EXHIBIT 3

rectify misclassification or wrong housing assignments, and/or failed to provide remedial training to jail staff regarding classification and housing assignments specifically pertaining to inmates with serious medical and/or psychiatric needs.

107.   All calls in the Oklahoma County Jail are monitored, and each of the Jailer Defendants were individually aware of the calls Gregory attempted to make during his detention.

108.   Many of the calls Gregory attempted were to the medical emergency line by dialing # 0 and/or 911[4] on the intercom system.

109.   Each of the Jailer Defendants was assigned to monitor the intercom system during at least one shift throughout Gregory's ten-day detention, and heard Gregory's please for medical attention and ignored them, did not notify any other jailers of his pleas for medical help, and did not notify any of Defendants Turn Key Medical Staff, Turn Key, or Cooper.

110.   In the alternative, the Jailer Defendants each failed to actually attend to or monitor the emergency intercom system during their shift(s) assigned to that post during Gregory's detention, leaving Gregory's requests for emergency medical assistance to go unanswered.[5] Instead, each of the Jailer Defendants individually chose to ignore their assigned responsibilities and monitoring of the emergency intercom system and ignored the known risk that an inmate in need of serious medical and/or psychiatric care would have their requests for emergency care go unanswered resulting delays or denials of treatment and serious risk of harm and/or death of

---

[4] Based on OSDH investigations and OCDC documents, it is unclear – apparently even to detention officers and jail staff – whether the in-cell phone/intercom system for reporting of emergency needs required inmates/detainees to dial #0 or 911 to obtain emergency medical care.

[5] Plaintiff incorporates footnote 1 herein.

EXHIBIT 3

such inmates. Instead, each of the Jailer Defendants were individually on their personal cell phones, doing puzzles, and/or reading books during their shift monitoring the intercom system.

111.    In the alternative, the Jailer Defendants each individually heard Gregory's pleas for medical attention during their shift(s) assigned to monitor the intercom system and reported such pleas and obvious need for treatment to each of Defendants Turn Key Medical Staff during that timeframe. Following that notice, each of Defendants Turn Key Medical Staff, Turn Key and Defendant Cooper, chose not to perform any follow-up to check on Gregory, to evaluate his condition, to provide him any treatment, provide him access or referral to an appropriate medical provider capable of assessing/treating his condition, and/or failed to refer him to another facility actually capable of handling Gregory's psychiatric and/or medical needs.[6]

112.    In the alternative the Jailer Defendants each individually heard Gregory's pleas for medical attention during their shift(s) assigned to monitor the intercom system and reported such pleas and obvious need for treatment to each of Defendants Turn Key Medical Staff during that timeframe. Following that notice, each of Defendants Turn Key Medical Staff individually checked on Gregory and were aware of and documented his condition, that he needed to be seen by a psychiatrist, that he needed a higher-level medical provider to examine and assess his ongoing and worsening complaints of abdominal pain and physical deterioration, and/or documented that Gregory needed to be transferred to another facility actually capable of handling Gregory's psychiatric and/or medical needs, but chose not to take any action to provide such care, treatment, access, or transfer.[7]

---

[6] Plaintiff incorporates footnote 1 herein.
[7] Plaintiff incorporates footnote 1 herein.

18

EXHIBIT 3

113.    In the alternative the Jailer Defendants each individually heard Gregory's pleas for medical attention during their shift(s) assigned to monitor the intercom system and reported such pleas and obvious need for treatment to each of Defendants Turn Key Medical Staff during that timeframe. Following that notice, each of Defendants Turn Key Medical Staff individually checked on Gregory and were aware of and documented his condition, that he needed to be seen by a psychiatrist, that he needed a higher-level medical provider to examine and assess his ongoing and worsening complaints of abdominal pain and physical deterioration, and/or documented that Gregory needed to be transferred to another facility actually capable of handling Gregory's psychiatric and/or medical needs, but Gregory never received such treatment from any appropriately qualified medical provider as Defendants Turn Key and Cooper deliberately ignored such documentation and needs.[8]

114.    Alternatively, the in-cell intercom/phone system for reporting emergency medical needs in Gregory's cell was not functioning, leaving Gregory no way to request medical care unless a detention officer or medical staff were physically present in his housing pod to hear his screams and cries for help.

115.    Gregory's cell is under 24-hour video surveillance which is supposed to be monitored by jail staff at all times.

116.    During Gregory's detention from August 3rd through 12th, the Jailer Defendants were each individually assigned to monitor the video surveillance cameras, including video of Gregory in his cell, for at least one shift each during that timeframe. Even though Gregory could be seen

---

[8] Plaintiff incorporates footnote 1 herein.

EXHIBIT 3

beating on his door, crying and screaming for days before his death and each of the Jailer Defendants individually saw Gregory's actions and understood that he was in obvious need of medical attention, each of the Jailer Defendants failed to send anyone to check on Gregory or notify medical staff that he appeared to be in distress while watching the video surveillance cameras.[9]

117.    In the alternative, the Jailer Defendants each failed to actually attend to or monitor the surveillance cameras during their shift(s) assigned to that post during Gregory's detention, leaving Gregory's pleas for emergency medical assistance to go unanswered and his obvious psychosis and deteriorating medical condition to go ignored.[10] Instead, each of the Jailer Defendants individually chose to ignore their assigned responsibilities and monitoring of the surveillance cameras and ignored the known risk that an inmate in need of serious medical and/or psychiatric care would have their obvious, observable need for emergency care go without response resulting delays or denials of treatment and serious risk of harm and/or death of such inmates. Instead, each of the Jailer Defendants were individually on their personal cell phones, doing puzzles, and/or reading books during their shift monitoring the surveillance cameras.

118.    In the alternative, each of the Jailer Defendants individually saw Gregory's condition and actions, understood that he was in obvious need of medical attention, and subsequently notified other detention officers of Gregory's distress, but those detention officers either chose not to check on Gregory even once or, due to mismanagement and/or understaffing of the Oklahoma

_____

[9] Plaintiff incorporates footnote 1 herein.
[10] Plaintiff incorporates footnote 1 herein.

EXHIBIT 3

County Detention Center, those officers were unable to check on Gregory due to being called to fulfill other job positions, leaving no one to monitor for or respond to inmates in need of emergency psychiatric and/or medical care on Gregory's floor or in his housing pod.[11]

119.    In the alternative, each of the Jailer Defendants individually saw Gregory's actions and condition and understood that he was in obvious need of medical attention. Each of the Jailer Defendants individually notified Defendants Turn Key Medical Staff, Turn Key, and Cooper, of Gregory's distress and apparent need for medical and psychiatric care, but Defendants Turn Key Medical Staff, Turn Key, and Cooper each individually chose not to respond or check on Gregory,  chose not to conduct a medical evaluation with full knowledge that *no one* had ever performed a medical screening or evaluation of Gregory, chose not to provide any proper psychiatric treatment to Gregory, failed to refer him to an appropriate level of medical/psychiatric professional, and failed to refer Gregory to an outside facility actually capable of providing needed medical and/or psychiatric treatment to Gregory, all with full knowledge that non-medically-trained detention officers recognized and reported a serious medical need – evidenced by Gregory's days of repeated pleas for medical assistance due to severe abdominal pain and clear deteriorating physical condition – and psychiatric need for treatment and that his psychosis had been documented for days.[12]

120.    In the alternative, each of the Jailer Defendants individually saw Gregory's actions and understood that he was in obvious need of medical attention and notified each of Defendants Turn Key Medical Staff, Turn Key, and Cooper, individually of Gregory's distress and apparent

---

[11] Plaintiff incorporates footnote 1 herein.
[12] Plaintiff incorporates footnote 1 herein.

EXHIBIT 3

need for medical care, but Defendants Turn Key Medical Staff, Turn Key, and Cooper each individually chose not to respond or check on Gregory, chose not to conduct a medical evaluation with full knowledge that *no one* had ever performed the a medical evaluation or screening of Gregory, chose not to provide any proper psychiatric and medical treatment to Gregory, failed to refer him to an appropriate level of medical/psychiatric professional, and failed to refer Gregory to an outside facility actually capable of providing needed medical and/or psychiatric treatment to Gregory, all with full knowledge that non-medically-trained detention officers recognized and reported a serious medical need – evidenced by Gregory's days of repeated pleas for medical assistance due to severe abdominal pain and clear deteriorating physical condition – and psychiatric need for treatment and that his psychosis had been documented for days.

121.    In the alternative each of the Jailer Defendants individually saw Gregory's actions and understood that he was in obvious need of medical attention and notified each of Defendants Turn Key Medical Staff, and in turn, each of Defendants Turn Key Medical Staff individually checked on Gregory and were aware of and documented his condition, that he needed to be seen by a psychiatrist, that he needed a higher-level medical provider to examine and assess his ongoing and worsening complaints of abdominal pain and physical deterioration, and/or documented that Gregory needed to be transferred to another facility actually capable of handling Gregory's psychiatric and/or medical needs, but Gregory never received such

EXHIBIT 3

treatment from any appropriately qualified medical provider as Defendants Turn Key and Cooper deliberately ignored such documentation and needs.[13]

122.  The morning of August 12, 2021, at approximately 6:45 a.m., Gregory was reportedly observed in his cell to be in need of emergency medical attention by Defendants Anderson and Morris.

123.  Defendants Anderson and Morris were called to respond to a different emergency medical call but, despite having radios and subjective knowledge that Gregory needed medical attention, they told no one else about Gregory's need at 6:45 a.m. or at any time for the next two hours and fifteen minutes.

124.  In the alternative, Defendants Anderson and Morris notified each of the other Jailer Defendants of Gregory's need for medical attention, but those officers chose to disregard that need and not do anything to check on him or alert medical staff of Gregory's needs for medical attention.

125.  In the alternative, Defendants Anderson and Morris notified Defendants Turn Key Medical Staff of Gregory's need for medical attention and that information was disregarded and jail medical staff, alleged to be each of Defendants Turn Key Medical Staff[14] chose to ignore such report of Gregory's emergency medical needs.

126.  At approximately 8:00 a.m., Gregory was found unresponsive in his cell with his eyes open.

127.  At that time, jail staff removed Gregory from his cell and left him in the floor of the hallway outside of his cell in view of other inmates housed in that pod.

---

[13] Plaintiff incorporates footnote 1 herein.
[14] Plaintiff incorporates footnote 1 herein.

23

EXHIBIT 3

128.   Approximately an hour later, jail staff returned with medical staff.

129.   Jail staff then placed paper over the windows of the surrounding cells so inmates could not see what was going on.

130.   Jail staff and medical staff purportedly attempted CPR to no success.

131.   At approximately 9:17 a.m. EMSA was called and Gregory was transported to the hospital where he was pronounced dead.

132.   Gregory died of a perforated duodenal ulcer – a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

133.   Oklahoma law requires that a medical intake/screening be performed by a physician, psychiatrist, doctor of osteopathy, physician assistant, registered nurse, licensed practical nurse, emergency medical technician at the paramedic level, or a clinical nurse specialist.

134.   During the time from August 3 through August 12, 2021, Gregory was only seen by a licensed professional counselor two times despite having been identified as having an ongoing psychotic episode.

135.   Alternatively, as alleged herein, Gregory was observed by other medical staff, including each of Defendants Turn Key Medical Staff individually, and was understood by each of those persons to be in need of obvious psychiatric care and serious medical care given his continuing complaints of severe and worsening abdominal pain and his obviously deteriorating physical/medical condition.

136.   There were multiple medical professionals on staff and present in the Oklahoma County Jail during the time of Gregory's detention.

24

**EXHIBIT 3**

137.   Despite the requirements and obvious need for frequent observation of Gregory, no medical professional ever attempted to perform a medical evaluation of Gregory.

138.   In the alternative, during that same timeframe, Gregory was not seen by any physician or licensed medical professional and no medical intake was ever performed.

### Ongoing Problems, Policies, Procedures, and Customs of the Oklahoma County Detention Center

139.   Prior to the formation of Trust, the problems at the Oklahoma County Detention Center were long known.

140.   Since its construction in 1991, the Oklahoma County Detention Center has been riddled with problems. Many of those issues, including but not limited to overcrowding, understaffing, inadequate security and supervision, wide-spread unreasonable use of force by staff, inadequate access to medical care, and deficient housing, sanitation and environmental protections continue to threaten the health and well-being of inmates confined there today.

141.   The unconstitutional conditions at the OCDC are so well-known and publicized that none of Defendants Board, Trust, Administrator, Turn Key or Cooper could, with a straight face, deny actual awareness.

142.   At least five (5) highly credible groups have studied and documented necessary reforms to bring the OCDC into constitutional compliance:

   a.   Oklahoma County Grand Jury Report ( 1995),[15]

---

[15] On March 27, 1995, a Grand Jury was formed to investigate the ongoing problems in the OCDC. On October 27, 1995, the Grand Jury issued its Partial Report and noted that leaving pods unsupervised, a practice that continues even today, "should terminate immediately." Oklahoma County has not followed these recommendations.

25

EXHIBIT 3

    b.  Primary 9 Jail Committee, (2002),

    c.  Jail Funding Task Force (2003-07),[16]

    d.  Department of Justice, (Ongoing), and

    e.  ADAC Report.

143.    On July 31, 2008, the United States Department of Justice, Civil Rights Division, (DOJ) concluded a more than five (5) year investigation into the OCDC to "ensure that conditions at the Jail meet federal constitutional requirements." (U.S. DOJ, Re: Investigation of the Oklahoma County Jail and Jail Annex, Oklahoma City, Oklahoma, July 31, 2008, p. 1)(hereinafter "DOJ Report).

144.    The report summarized the conclusions of the DOJ as follows:

> Having completed the fact-finding portion of our investigation, we conclude that certain conditions at the Jail violate the constitutional rights of detainees confined there. As detailed below, we find that the Jail fails to provide for detainees': (1) reasonable protection from harm; (2) constitutionally required mental health services; (3) adequate housing, sanitation and environmental protections; and (4) protection from serious fire-safety risks.

(DOJ Report, p. 2)

145.    As used in the DOJ Report, the term "detainees" includes both pre-trial detainees and post-adjudication inmates. (See, DOJ Report, Fn. 2).

---

[16] In the wake of the defeat of the 2003 ballot measure for a new jail, the County formed a Jail Funding Task Force to propose solutions to the Jail funding problems. On March 30, 2007, the Jail Funding Task Force received a report from Bill Gamos, then of The Facility Group. The Board members were given a survey regarding opinions for renovation and expansion of the Jail. Chairman Vaughn collected the surveys and prepared a report of the results. The survey results indicated that those responding were in favor of adopting "all or part" of Gamos' recommendations. Oklahoma County has not followed those recommendations.

EXHIBIT 3

146.    The DOJ Report analyzed conditions at the OCDC in light of Fourteenth and Eighth Amendment standards. (DOJ Report, p. 3).

147.    A copy of this DOJ Report was sent to Defendant County by sending it to John Whetsel, Oklahoma County Sheriff in 2008, as well as the Oklahoma County District Attorney and the United States Attorney for the Western District. As such, Defendant County was on notice and aware of the constitutional deficiencies addressed by the DOJ Report.

148.    Furthermore, in their preparations to assume control and administrative responsibilities for the Oklahoma County Detention Center, Defendants Trust and Administrator received and reviewed a copy of the DOJ Report by at least July of 2020.

149.    Further, Defendants Turn Key and Cooper, in their preparations to begin providing medical services at the Oklahoma County Detention Center received and reviewed a copy of the DOJ Report by at least July of 2020.

150.    The documented shortage of staff at the jail has contributed to a lack of control over and supervision of the prisoners at the OCDC, including leaving no jail staff to observe, hear, or respond to inmates' emergency medical needs.

151.    Defendant BOCC entered into a memorandum of understanding with the Department of Justice in 2009 that required the Oklahoma County to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance. As of August 2021, Oklahoma County had not complied with the requirements of its memorandum of understanding with the Department of Justice.

152.    From 2009 to February 2021, there have been eighty-four (84) deaths at the OCDC. The average annual death rate was 3.3 per 1,000 inmates, more than double the national average.

27

EXHIBIT 3

(The Frontier, Oklahoma County promised to fix its jail more than 10 year ago, but deaths and staffing issues continue, published February 21, 2021).

153.    From 2016 to March 2019, approximately thirty-five (35) inmates died in the OCDC.

154.    From 2016 through 2019, the jail had 40 deaths and an average annual mortality rate of 4.77 deaths per 1,000 inmates. The national average is 1.46 deaths per 1,000 inmates.

155.    In 2016, the DOJ threatened to file litigation against Oklahoma County regarding the ongoing unsafe conditions at the jail. These unresolved conditions, along with the longstanding and well-known lack of staffing and supervision at the OCDC, caused the denial of medical and psychiatric care to Gregory.

156.    County policy makers and elected officials have known about the unconstitutional conditions at the OCDC that caused injuries to Gregory for over twenty years. *See,* Adult Detention Advisory Committee's ("ADAC") Initial Report to Oklahoma County Board of County Commissioners.

157.    The ADAC, which included some of the most respected members of the community, prepared a report pointedly stating that "all these [above] groups have recommended that the County take action. Unfortunately, the County has chosen to take no substantive action. Perhaps that is a result of a lack of resources or a lack of political will. The Committee believes neither is an acceptable explanation. These issues have been studied over and over again, yet 13 years after the Grand Jury report the County has taken no action on any of these groups' recommendations. Lack of money is no excuse for continued violation of detainees' Constitutional rights ... "

28

EXHIBIT 3

158.    In its conclusion, the ADAC was frank about the relationship between the OCDC and County policymakers in recognizing that "we ought to be ashamed of ourselves" and Oklahoma "County has received it's warning."

159.    The County has failed to respond, time and again, as this tortured commentary on the state of affairs at the OCDC remains true today. And, in Gregory's case, the failure to respond resulted in severe and preventable injuries.

160.    In February 2019, Oklahoma County Special Judge Geary Walke stated that Oklahoma County's mental health court will no longer keep its participants awaiting treatment in the custody of the jail. Instead they will be released on their own recognizance.

161.    Judge Walke is quoted as saying "Unfortunately, our jail is not the sort of place that we can consider a safe place for our people."

162.    The Federal Bureau of Prisons removed all federal detainees from the OCDC in 2008 because of the dangers posed by the conditions at OCDC.

163.    Numerous news and internet articles also made Defendants County, Trust and Administrator aware prior to July 2020 of the unreasonable conditions at the OCDC, for example:

"Over the past 15 years, the 13-story jail, in Oklahoma City has had many alleged problems, from unsanitary conditions to negligent care of inmates, poor medical care, and outright abuse of inmates. A clerical worker at the jail posted a YouTube video claiming inmates had been beaten right in front of her." (Business Insider, The stories coming out of this Oklahoma jail are horrifying, February 25, 2015).

29

**EXHIBIT 3**

164. The Annual Adopted Budget, Oklahoma County, Oklahoma, Fiscal Year 2016-2017 reveals hundreds of thousands of dollars diverted away from adequately funding the Oklahoma County Detention Center in favor of purchasing various non-essential items, including **$62,245** for "Culture and Recreation," **$35,550** in "membership fees," **$150,000** in "outside legal fees," **$69,888** in travel for the Sheriff's department, **$5,200** in travel for commissioner Johnson, **$6,500** in travel for commissioner Maughan, and **$7,422** in travel for commissioner Vaughn.

165. The **$336,805-plus** spent in violation of the BOCC's constitutional obligation would cover annual maintenance costs for the Oklahoma County Detention Center video surveillance system.

166. Audits have also determined that the Sheriff's office failed to fund jail operations in favor of spending on vehicles.

167. Among the "key findings" in the 2016 Investigative Audit of the Sheriffs Office was the discovery of "[a]pproximately $900,000 [] spent on the purchase of Sheriff vehicles during a time when other obligations of the Sheriff's Office were not being met."

168. The decision by these policymakers to fund luxuries before correcting constitutional deficiencies reflects a well-entrenched indifference to the ongoing conditions at the Oklahoma County Detention Center, and is continued to this day by Defendant County, even after the operation of the Oklahoma County Detention Center has been transferred to Defendant Trust.

169. Either the County failed to adequately fund the Sheriff's office to fulfill its constitutional duty to provide a facility that was adequate for the safekeeping of inmates, or Sheriff's office

30

EXHIBIT 3

squandered taxpayer money on luxuries instead of correcting the deficiencies that have existed for more than 20 years.

170.    Defendant County and Defendant Trust have continued this policy and practice of underfunding the Oklahoma County Detention Center and continue to maintain its known inadequate and dangerous practices and conditions.

171.    Alternatively, Defendant County has continued this practice by underfunding Trust which in turn causes underfunding of the Oklahoma County Detention Center and causes the continuation of known inadequate and dangerous practices and conditions.

172.    Upon information and belief, County, Trust, and Administrator reviewed and know about each of these findings and conclusions by at least July of 2020.

173.    Despite being aware of the unconstitutional conditions at the Oklahoma County Detention Center and a pattern and practice of failing to provide adequate medical and mental health care, Defendants County, Trust, and Administrator deliberately disregarded the substantial risk of serious harm that existed prior to and on or about August 12, 2021, to detainees/inmates, including Gregory, as a result of the unconstitutional conditions at the Oklahoma County Detention Center.

174.    Despite notice and opportunity to correct these deficiencies, and despite assurances that deficiencies would be corrected in fact, Defendants County, Trust, and Administrator continued to understaff and underfund the jail, resulting in the failure to supervise inmates and to provide timely access to emergency medical and mental health care, and continuing the known risk of harm to inmates posed by those conditions.

Trust Created in 2019

EXHIBIT 3

175.  Trust was officially created, with the swearing in of the Trustees on June 10, 2019, and began preparations to take over control of the Oklahoma County Jail in July of 2020.

176.  In August of 2019, the Oklahoma County Jail was provided notice that an inspection had been performed by the Oklahoma State Department of Health and that the jail was found to be out of compliance with multiple requirements of the Oklahoma Jail Standards.

177.  The OSDH found that, in regard to the investigation into the death of an inmate, required hourly sight checks had repeatedly not been performed, with one staff member even admitting to falsifying the sight check logs to hide the fact that the checks had not been done as required.

178.  In response to this notice of violation, then-Sheriff Taylor and the jail responded that:

   a.  All incidents of staff not completing sight checks were being handled through disciplinary process;

   b.  A new procedure has been implemented for staff to contact the Camera Ops post during sight checks to ensure accountability;

   c.  The Detention Center's sight check policy was reviewed annually and training on sight checks takes place during pre-service training and during annual in-service training.

179.  On April 6, 2020, the Jail was again notified that it was found to be out of compliance with the Oklahoma Jail Standards.

180.  The OSDH found that the Jail had failed to report a serious suicide attempt resulting in death to the OSDH as required by the Oklahoma Jail Standards.

181.  The OSDH further found that the Jail failed to have working intercom systems in several cells on multiple floors. These intercom systems are required so that an inmate may request emergency assistance if needed.

32

**EXHIBIT 3**

182.   In response to these noted deficiencies, then-Sheriff Taylor and the Jail responded that:

   a.   The policy regarding maintenance and operation of the intercom systems were available for staff unrestricted;

   b.   Staff are instructed to complete a work order and move inmates to cells with working phones/intercoms, if a cell is found to have a system that is not working.

183.   Trust was made aware of these violations prior to assuming control of the Jail in July 2020, via being provided copies of the communications and documentation from both the OSDH and the Detention Center's responses.

Trust Assumes Control - July 2020

184.   On July 1, 2020, Trust officially took over control of the Oklahoma County Jail and appointed Administrator to oversee the operations of the jail.

February 4-5, 2021, Inspection Findings:

185.   During an unannounced inspection of the Oklahoma County Jail on February 4-5, 2021, the OSDH found that the jail regularly fails to perform and document hourly sight checks of inmates.

186.   The OSDH found that hourly sight checks on inmates were missed in multiple units at least seven times between May 23, 2020, and January 22, 2021.

187.   The OSDH also found that on at least seven different occasions between October 20, 2020, and February 4, 2021, fifteen-minute sight checks, used for inmates under critical medical, psychological, or suicidal observation, were not performed at all; averaging missed sight checks of these critical observation inmates every 15 days.

33

EXHIBIT 3

188.   Further the OSDH found, during a record review for one unit, that in a unit requiring sight checks on the inmates every 30 minutes, sight checks were not performed three times in January 2021 alone.

189.   The OSDH even found that for one cell only one hourly sight check was performed for an entire day, meaning 23 hourly sight checks went missed and ignored.

190.   Interviews with inmates in units on the 12th and 13the floors, with the 12th floor being where Gregory was housed, found that inmates seldom see staff presence in their units and that when they do it is very brief.

191.   Even in the juvenile unit, the OSDH found that hourly sight checks went completely unperformed and undocumented the entire day of February 4, 2021.

192.   The OSDH also found that the windows of cells on the 2nd, 4th, 6th, 8th, 10th, 12th, and 13th floors were obscured from scratches on the surface of the window, allowing for 50% visibility, making it impossible to have "clear visibility within close proximity" as required for properly performed sight checks.

193.   Further, the OSDH found a history of the Oklahoma County Jail hiding serious inmate incidents from the OSDH, including:

   a.   On July 23, 2020, the Jail failed to notify the OSDH about an inmate requiring transfer to an outside medical facility;

   b.   During the calendar year 2021, the Oklahoma County Jail failed to notify the OSDH regarding forty (40) serious injuries of inmates requiring transfer to an outside medical facility.

34

EXHIBIT 3

194.    The OSDH also found, through numerous interviews with inmates housed in various units,

that their phone calls for assistance often went unanswered and ignored.

195.    The OSDH found that the Oklahoma County Jail staff was so undertrained for their job,

that many did not know where the intercom Duress/Emergency calls even went to, with many

staff members saying it rings to the medical unit while jail administration stated those calls go to

"Camera Ops" – the 24-hour video surveillance station.

196.    The OSDH even found, through interviews with staff, that some phone systems did not

even work.

197.    The OSDH also found that the jail was inadequately staffed such that it resulted in missed

sight checks due to jailers performing such tasks as clinical escort, feeding other units, assisting

in counts, and escort of medical staff.

198.    The OSDH found, through interviews with jailers, that having to perform multiple duties in

several units on a floor cause lapses in inmate supervision and required sight checks.

199.    The OSDH also found that the jail repeatedly failed, at least 10 times, to perform 15-minute

sight checks on suicidal inmates during the period from July 24, 2020, through February 4, 2021.

200.    The OSDH also found that the Oklahoma County Jail failed to conduct all required 30-

minute sight checks for two units on February 4, 2021.

201.    These findings were presented to Administrator, Trust, and County on March 30, 2021.

Response to March 30, 2021 Statement of Deficiencies

202.    In response to the March 30, 2021, letter setting out the deficiencies pertaining to sight

checks at the Oklahoma County Jail, Administrator responded identifying the corrective actions

Administrator, Board, and Trust would be taking to rectify those deficiencies, stating:

EXHIBIT 3

a. That since the inspection date, February 4, 2021, Shift Supervisors have been reviewing the sight check policy and requirements during the shift briefing;

b. The Shift Supervisor and Captains conduct daily review of the logbooks for sight checks being completed;

c. That officers have been told to notify their supervisor if a sight check cannot be performed due to another required job task and have been told to submit an incident report explaining why the sight check was missed;

d. That Shift Supervisors will make every effort to assign another officer to perform the sight check;

e. That the full definition of sight check has been reinforced with staff as described in jail policy;

f. That the jail had obtained and had begun replacing the scratched cell windows obscuring offers clear visibility during sight checks.

203.    However, the policy statement pertaining to sight checks, cited by Administrator in his response letter, references a policy that is dated May 24, 2021 – after this inspection.

204.    In response to the March 30, 2021, letter setting out the deficiencies pertaining to the Oklahoma County Jail's cover-ups and/or failures to report serious injuries to inmates requiring transfer to an outside medical facility, Administrator responded identifying the corrective actions Administrator, Board, and Trust would be taking to rectify those deficiencies, stating that the Jail's investigations division and/or Chief of Security Captain have been assigned to report all serious injuries requiring transfer to an outside medical facility to the OSDH no later than one working day per this standard, via emailing the Detention Facility Incident Report to the OSDH.

EXHIBIT 3

205.   In response to the March 30, 2021, letter setting out the deficiencies pertaining to 24-hour inmate supervision at the Oklahoma County Jail, Administrator responded identifying the corrective actions Administrator, Board, and Trust would be taking to rectify those deficiencies, stating:

    a.   All inmate Duress/Emergency calls are answered at the Camera Ops post;

    b.   Camera Ops staff will notify the officer assigned to the floor and pod of an answered call for an immediate response;

    c.   That staff are purportedly informed of this during new hire training, daily briefings, and informed by shift supervisors and administration.

206.   In response to the March 30, 2021, letter setting out the deficiencies pertaining to observation of inmates who present a medical or psychiatric risk, Administrator responded identifying the corrective actions Administrator, Board, and Trust would be taking to rectify those deficiencies, stating:

    a.   All staff are purportedly trained on this policy during cadet training and have access to the policy;

    b.   Sight checks are conducted according to the inmate's classification and assigned floor/cell assignment;

    c.   Sight checks are conducted by the assigned staff and shift supervisors;

    d.   Sight checks are documented in logbooks and/or sight check observation sheets/form if applicable;

    e.   That since the inspection date, February 4, 2021, Shift Supervisors have been reviewing the sight check policy and requirements during the shift briefing;

37

**EXHIBIT 3**

   f.   The Shift Supervisor and Captains conduct daily review of the logbooks for sight checks being completed;

   g.   That officers have been told to notify their supervisor if a sight check cannot be performed due to another required job task and have been told to submit an incident report explaining why the sight check was missed;

   h.   That Shift Supervisors will make every effort to assign another officer to perform the sight check;

   i.   That the full definition of sight check has been reinforced with staff as described in jail policy;

   j.   That the jail had obtained and had begun replacing the scratched cell windows obscuring offers clear visibility during sight checks.

207.   Trust was aware of these notices of violations as a part of its oversight role pertaining to the Jail and was sent a copy of the report outlining the violations found at the Oklahoma County Jail.

<u>Death of an inmate with mental health needs – April 13, 2021</u>

208.   On April 13, 2021, an inmate at the Oklahoma County Detention Center, Christa Sullivan, died after being denied medical and psychiatric treatment.

209.   A review of Ms. Sullivan's records noted that she had been in long-term need of psychiatric care that the Oklahoma County Detention Center – and Defendant Turn Key – failed to provide, despite knowing of her obvious need for care.

210.   Ms. Sullivan's medical records showed that on November 5, 2020, she received a medical referral for transfer due to "medical and psychiatric necessity," and that record also stated that

38

EXHIBIT 3

she "is continuing to decline physically due to severe mental illness and has become unfit to continue at Oklahoma County Detention Center" and "is at extremely high risk for complications including sudden death."

211.    Ms. Sullivan additional referral notices for the same problems on December 30, 2020, January 5, 2021, and March 3, 2021.

212.    Ms. Sullivan's records documented that she weighed 142 pounds when she arrived at the facility on April 27, 2020, and that her weight significantly declined from that point, with weights of: 124 pounds on June 28, 2020, 121 pounds on October 30, 2020, 119 pounds on December 5, 2021, and 115 pounds on March 23, 2021.

213.    Ms. Sullivan's medical records from the Oklahoma County Detention Center – and Defendant Turn Key – further revealed that there was no documentation of any follow-up care to Ms. Sullivan related to her repeated referrals for outside medical and psychiatric care before her death on April 13, 2021.

214.    The OSDH conducted its investigation into Ms. Sullivan's death on June 25, 2021.

215.    Defendants County, Trust and Administrator were all notified of this death and the findings of the subsequent investigation by the OSDH after the investigative report was delivered to the Oklahoma County Detention Center on July 12, 2021.

May 2021 – Dave Parker Investigation

216.    Defendants Trust and Administrator hired a consultant, Dave Parker, to come into the Oklahoma County Detention Center to evaluate their operations and provide feedback as to how operations could be improved in the Oklahoma County Detention Center.

39

EXHIBIT 3

217.    During his visits to the jail in May 2021, Mr. Parker observed the following widespread

problems within the jail:

   a.    When questioning staff, many did not even comprehend the Detention Center's policies

         and when questioned how they learned their jobs, most indicated that they learned by

         word of mouth from coworkers – *not supervisors*. Most staff interviewed knew where to

         locate policy binders but had no idea if they were current. Some had even signed the

         document in the policy binder that they read and understood the policies while admitting

         that they were not confident in knowing or understanding the content.

   b.    Training curriculum in the jail was outdated, with a specific lack of training for dealing

         with inmates with mental health issues – like Gregory. Mr. Parker further criticized the

         jail's policy of using online training that has no way to measure staff understanding and

         comprehension of the material. Further, Parker found that little to no in-service training

         was performed by supervisors.

   c.    There was a complete failure of assigning job duties and roles within the jail, and a

         complete lack of supervision, to the extent that supervisors within the jail created and

         maintained their own "empires" wherein only certain tasks those jailers were assigned to

         perform would actually be performed, with no continuity or consistency in the way things

         were done across the jail, causing multiple units to perform some tasks but not other

         required tasks and that such tasks were performed wholly differently within each

         "empire." Parker went so far as to suggest that, as of May 2021, likely all jail incidents in

         the preceding 12 months could have been prevented if everyone in the jail had the same

         training.

EXHIBIT 3

d. That inmates are often brought into the jail and bypass the Classification officer and process entirely, depriving them of the opportunity to be housed in the correct category of cell, which could include heightened medical observation or mental health needs. Parker even found that employees had little understanding of the classification process and could not explain why things were done the way they were.

e. The jail often relies on staff not trained as detention officers to perform inmate supervision roles, such as monitoring cameras of dayrooms. Parker criticized this practice because those non-detention officer staff members do not have the capabilities to respond to an emergency if one is observed – other than calling someone who might be on another floor to come and respond.

f. Parker directly challenged and disputed the narrative that the jail's issues arise from understaffing, and instead placed the blame on mismanagement, poor facilities, and widespread lack of training and supervision of staff at multiple levels.

g. Parker found officers and their supervisors were making medical decisions – not medical staff.

h. Parker repeatedly observed jail employees engaged in other activities that divert their attention away from their jobs, such as cellphones, books, puzzles, and artwork.

i. That sight checks were not taking place consistently and that jailers were relying on a "wand" which they insert in a hole for the wand to read how many people are in a cell without ever actually looking in the cell to ensure inmates are safe and not in need of emergency attention.

41

EXHIBIT 3

218.    Parker also observed an inmate brought into the jail and going through the classification process. Parker saw the inmate arrive at intake at 9:50 a.m. on May 4th. The booking officers could not locate a record for the inmate, so he was moved to a bench in that area. Parker saw no further action taken. On May 6th, Parker returned and followed up on that inmate with the Classification officer on duty. That officer could not produce a current record regarding the intake and classification of the inmate. Parker found the inmate in a cell and found out that he had only arrived in a cell that very morning.

June 2021 OSDH Inspection Findings:

219.    The OSDH performed an unannounced inspection of the Jail in June, 2021.

220.    OSDH found the jail in violation of requirements pertaining to inmates with behavioral/mental health issues.

221.    The jail was required to include items such as behavioral observation, including state of mind and mental status, in an inmate's medical reception information.

222.    During that inspection, the OSDH found that on June 24, 2021, the jail had failed to perform any medical or mental health intake of at least one inmate, designated inmate # 2 in the inspection report, during the entirety of the inmate's detention at the jail in violation of the Oklahoma Jail Standards.

223.    The investigators also found that the same inmate was involved in a use of force incident in the booking area on June 24, 2021, but no detention staff nor medical staff performed any medical intake or immediate physical screening of that inmate after the use of force.

42

EXHIBIT 3

224.   The OSDH also found that the jail repeatedly failed to perform required inmate counts at each shift change on June 17th, 18th, 19th, 20th, 21st, 22nd, and 23rd of 2021. The counts were not performed during the shift changes at three separate times on those days.

225.   Further, the OSDH found that the jail failed to perform and document the required minimum of three inmate counts in every 24-hour period during the period from June 17-June 23, 2021, with two days where only two counts were performed, four days where only one count was performed, and one day where no count was performed and documented.

226.   During these inmate counts, one major role of jail staff is to ensure that each inmate is alive and breathing before being counted.

227.   Further, the OSDH found that there were numerous cell windows obscured by scratches, which impedes the ability of jail staff to "ensure a positive presence of a living, breathing, human body" during counts.

228.   OSDH also found that the Jail was repeatedly out of compliance with the requirement to perform at least one hourly sight checks on all inmates.

229.   Specifically, the OSDH found that after reviewing 25 different unit logbooks, all 25 logbooks revealed that sight checks were not performed nor documented.

230.   Additionally, review of the 13th floor D unit – an area which requires 30-minute sight checks for inmate safety – logbook revealed that not all of the sight checks were performed and documented as required on June 19-22, 2021.

231.   Further, OSDH's review of the fifteen observation sheets from June 18-23, 2021, for the inmates housed in the Observation and/or Suicide Watch area, requiring 15-minute sight checks

43

EXHIBIT 3

revealed that 83 sight checks were missed during that 6-day period with gaps in checks ranging from 30 minutes to four hours.

232.    OSDH's review of video from the male booking cells, requiring 30 minute sight checks, revealed that 12 sight checks were missed during a single day on June 24, 2021.

233.    OSDH's review of the logbook for unit 13 Charlie – where juvenile male inmates are housed – found that of the 24 hourly sight checks required to be performed on June 20, 2021, ten of them were not performed at all, with gaps in checks ranging from 30 minutes to four hours, in violation of the Oklahoma Jail Standards.

234.    Review of the unit 13 Charlie logbook also revealed that, during the period from June 20-23, 2021, 30-minute sight checks were not being performed or documented as required by the Oklahoma County Detention Center policy 4310.02 "Sight Checks".

235.    Further, OSDH reviewed the observation sheet for one juvenile female detainee and found that during a single 4.5 hour period, 4 hourly sight checks were not performed at all, in violation of the Oklahoma Jail Standards.

236.    Further, 30-minute sight checks required for the same inmate under Oklahoma County Detention Center policy 4310.02 "Sight Checks" were not being performed or documented.

237.    OSDH interviews with several juvenile male inmates stated they only see staff in the pod during mealtime, meaning no sight checks were being performed.

238.    Review of the logbook for unit 13 Adam – where inmates require 30-minute sight checks – revealed that not all of the checks were performed and documented for June 21-23, 2021.

239.    Review of the logbook for unit 13 Baker – where inmates require 15-minute sight checks – revealed that not all of the sight checks were performed and documented for June 19-22, 2021.

44

EXHIBIT 3

240.  Interviews with several inmates on floors 12 and 13 indicated that there was no jail staff presence in those units on a regular basis.

241.  Oklahoma County Detention Center policy 4310.02 "Sight Checks" requires that the Camera Ops post will be notified of sight checks for camera observation and accountability – but OSDH discovered that only a few sight checks were noted in the Camera Ops log with no indication of the type of sight check (15-minute, 30-minute, or hourly) on June 17th-23rd.

242.  OSDH also found that windows on the 2nd, 4th, 6th, 8th, 10th, 12th, and 13th floors were still scratched with less than 50% visibility despite Administrator and Trust's response to the March 30th inspection, wherein the Administrator and Trust stated they would be replacing those windows. The scratched windows prevent adequate sight checks on inmates.

243.  OSDH also found that three cells adjacent to cell number 8 in unit 4 Charlie had holes knocked out of the concrete walls, allowing inmates to move between all four cells. Five inmates were observed in that cell number 8 with black eyes.

244.  OSDH also found that the Administrator and Trust failed to develop and implement written policies pertaining to medical examinations of inmates involved in a use of force incident as required by the Oklahoma Jail Standards.

245.  In fact, when OSDH asked to see the written policy on use of force in the jail, Administrator could not even provide one.

246.  OSDH also found that Administrator and Trust failed to develop and implement written policies regarding the use of restraints within the jail.

247.  In fact, when OSDH asked to see the written policy on use of restraints in the jail, Administrator could not even provide one.

45

EXHIBIT 3

248.   During the March 30, 2021, inspection, the jail was found to have failed to report serious injuries to inmates which were life-threatening or requiring transfer to an outside medical facility; Administrator and Trust responded to that finding of deficiency, representing that the Jail's investigations division and/or Chief of Security Captain have been assigned to report all serious injuries requiring transfer to an outside medical facility to the OSDH no later than one working day per this standard, via emailing the Detention Facility Incident Report to the OSDH.

249.   During this June 2021 inspection, the jail was still found to be committing the same violations of failing to report such serious injuries to OSDH as required.

250.   OSDH requested the facility's Admission and Release records, called a FIT log, which pertains to the medical conditions of inmates when admitted and if released due to injury or medical condition – but Administrator and Trust failed to produce them for the period from June 7-23, 2021, indicating the records did not exist.

251.   OSDH, reviewing March 5, 2021, records, found that the jail failed to notify OSDH regarding an inmate who required transfer to an outside medical facility.

252.   OSDH's review of records for June 18, 2021, revealed that the jail failed to notify OSDH of another inmate requiring transfer to an outside medical facility.

253.   OSDH interviews with staff revealed that several inmates with serious injuries have been transferred to an outside medical facility since the previous February 5, 2021, inspection.

254.   Records reviewed during the period from February 6, 2021 through June 23, 2021, revealed that 215 inmates were transferred to an outside hospital for treatment.

255.   Review of records of reports to OSDH regarding inmates requiring transfer to an outside hospital for treatment found that during that same period, only two (2) were reported to OSDH.

46

EXHIBIT 3

256. OSDH also found that the jail failed to report serious suicide attempts to OSDH, with records revealing that multiple inmates had been transferred to outside medical facilities due to serious suicide attempts but that not a single one of those attempts was reported to OSDH as required.

257. OSDH found the jail was not in compliance with the requirements to provide 24-hour supervision of inmates, with inspection revealing that the intercom system – used for inmates to request emergency assistance – in at least two cells within the Womens Holding Pod were not working.

258. Interviews with several inmates found that those inmates had not seen or read the Inmate Handbook – required to be provided to each inmate – and were completely unaware they could dial 911 on the intercom for an emergency.

259. Inspection found that in multiple housing pods there were no Inmate Handbooks displayed as required.

260. Testing of the Emergency Reporting phone system was conducted using 0# in several inmate housing pods and were found to not be working.

261. Testing of the Emergency Reporting phone system was conducted using 911 in several inmate housing pods and were found to not be working.

262. Interviews with several inmates found that their calls for assistance have gone unanswered or their phones/intercoms did not work.

263. Interviews with staff revealed that many phones and/or intercom systems throughout the facility were not working, despite Administrator and Trust's previous representations that all

47

EXHIBIT 3

systems would be and had been fixed in response to the March 30 notice of deficiencies identifying this same problem.

264.    Review of the staff roster for June 19-20, 2021, revealed that from 6 p.m. on the 19th through 6:00 a.m. on the 20th, one whole floor had no officer assigned to it.

265.    OSDH found that the jail was out of compliance with requirements regarding supervision of inmates, with staff and inmates reporting that there is no detention officer on duty at all times in each housing pod where inmates are confined, in violation of the Oklahoma Jail Standards.

266.    OSDH's observations, interviews, and record reviews revealed that the jail failed to ensure sufficient staffing to perform all assigned functions relating to security, custody, and supervision of inmates. This finding was noted as a Repeat Deficiency.

267.    OSDH found that on June 12th, 13th, 23rd, and 24th, 2021, wound care, medical rounds, and even medication pass in at least four pods were not conducted at all – with a notation of "no escort staff available."

268.    Records reviews found that in the month of June 2021, at least 7 outside medical appointments were missed due to no staff escort.

269.    Interviews with several detention officers reported that being required to perform additional duties on multiple floors admittedly resulted in minimal direct inmate supervision in the pods, missed sight checks, late meals, lack of medical care, and poor sanitation.

270.    OSDH observed an inmate cuffed to a bar in the hallway of the 8th floor, who stated he was waiting to be seen by medical and had been waiting a long time.

271.    Jail staff even reported to OSDH that clothing exchange is not conducted weekly.

48

EXHIBIT 3

272.   Review of the Central Control Log for June 17-23, 2021, revealed that inmates counts are not conducted at the beginning of each shift change as required.

273.   Pursuant to Oklahoma County Detention Center policy 4310.02, juvenile inmates are to be directly supervised by staff with sight checks every thirty minutes. Inspectors observed that at the time of inspection the Juvenile pod was not staffed at all. Further, review of the unit 13 Charlie – a juvenile unit – logbook revealed that sight checks are not conducted every thirty minutes.

274.   OSDH also found the jail in violation of the Oklahoma Jail Standard requirement to have written policies and procedures to provide adequate health care in the jail, including emergency medical services.

275.   In fact, the specific Jail Standard at issue – OAC 310:670-5-8(1) requires Administrator to develop the facility's health care plan with the assistance of the designated medical authority for the jail – in this case Defendants Cooper and Turn Key.

276.   OSDH found the jail out of compliance with this standard because, when requested, the facility administrator could not provide the policies and procedures for medical and healthcare services which should have included emergencies, sick call, clinical referrals, and medication.

277.   OSDH also found the jail in repeated violation of OAC 310:670-5-8(2) pertaining to the observation of inmates who are at risk medically and/or psychiatrically.

278.   Specifically, OSDH found the jail out of compliance with the obligation to perform an intake screening on all inmates immediately upon admission to the facility and before being placed in the general population or housing area. Going further, the jail was required to frequently observe

49

EXHIBIT 3

an inmate whose screening indicates a significant medical or psychiatric problem until the appropriate medical evaluation had been completed.

279.    OSDH's review of records for inmates on suicide watch, requiring 15-minute sight checks revealed sight checks were not documented every 15 minutes for June 19-23, 2021.

280.    OSDH's review of records for pods 12 and 13 Adam, for inmates on increased observation, requiring 30-minute sight checks, revealed sight checks were not documented every 30 minutes for June 19-23, 2021.

281.    Jail staff reported to OSDH that pods on the 12th and 13th floors are observation pods and require 15-minute and 30-minute sight checks.

282.    Video review of sight checks for the male booking cell area, requiring 30-minute sight checks, revealed 12 sight checks were missed on June 24, 2021, alone.

283.    Defendants County, Trust, and Administrator were all notified of this death and the findings of the subsequent investigation by the OSDH after the investigative report was delivered to the Oklahoma County Detention Center on July 13, 2021.

Death of an inmate on June 24, 2021

284.    On June 24, 2021, an inmate was found deceased in Mens Holding cell # 5. The inmate had been booked into the jail at 12:58 a.m. on June 24, 2021 for driving under the influence and resisting arrest. The inmate was combative during the booking process and was restrained and moved to cell # 5 in the booking area. The inmate was found dead in that cell at approximately 3:26 p.m. that same day.

EXHIBIT 3

285.    Records from the Oklahoma County Detention Center indicated that periodic sight checks had been performed on the inmate. However, the Medical Examiner estimated that the inmate had actually been deceased for 8 hours.

286.    Video review of that booking area, where sight checks are required every 30 minutes, revealed that 12 sight checks were missed on that date between 1:17 a.m. and 4:23, p.m.

287.    Defendants County, Trust, and Administrator were all notified of this death and the findings of the subsequent investigation by the OSDH after the investigative report was delivered to the Oklahoma County Detention Center on July 12, 2021.

October 22, 2021, Inspection Findings:

288.    On October 22, 2021, after Gregory's death, the OSDH returned to the Oklahoma County Jail for another unannounced inspection including investigation into Gregory' death.

289.    OSDH found the jail and Defendant Turn Key in violation of the Oklahoma Jail Standards, which require that all policies and procedures required to be maintained by the Oklahoma Jail Standards – including such policies and procedures as those put in place for medical evaluation, observation, and treatment of inmates – are required to have a signature page that reflects the signature of the responsible official and the date that official adopted the policy as well as dates that review of the policy and/or procedure were completed.

290.    Specifically, OSDH found the jail and Defendant Turn Key in violation of this requirement because at the time of this inspection, the Turn Key Health Policy, number OCDC-A-05, titled "Health Services Policy and Procedure Manual" was last reviewed on August 31, 2018. The policy states that it should be reviewed by the Medical Director (Defendant Cooper), Health Services Administrator, and the Facility Administrator (Administrator) annually. At that point in

EXHIBIT 3

time, the policy had not been reviewed for over three years. At the time of Gregory's death, that policy had not been updated, revised, or even reviewed by Defendant Turn Key, Defendant Cooper, nor Defendant Administrator for nearly three years.

291.    Jail and/or medical staff confirmed that the Turn Key Health Policy, number OCDC-A-05, titled "Health Services Policy and Procedure Manual" was in fact last reviewed on August 31, 2018.

292.    OSDH further found the Jail repeatedly failed to perform medical and mental health screenings of inmates. This was a finding of a repeat deficiency.

293.    Specifically, OSDH found the jail in violation of the "Health Services Policy and Procedure, Receiving Screening", number OCDC-E-02, which states that a medical and mental health screening is performed on all inmates upon arrival at the facility to ensure that emergent and urgent health care needs are met.

294.    A review of records for specifically pertaining to Gregory revealed that a medical and mental health screening was not performed before Gregory was placed in the mental health pod. The Pre-Booking Screening form had even indicated that Gregory needed a full medical evaluation.

295.    OSDH also found that there was no record or proof of any medical and mental health screening for three other inmates, admitted to the facility on October 20, 2021, who remained in booking holding cells at 12:30 p.m. on October 21, 2021.

296.    OSDH also found that 8 booking records out of 15 reviewed denoted that a medical and mental health screening was not performed until the next day, ranging from 8 to 19 hours after the inmate's admission to the facility.

52

EXHIBIT 3

297.    A review of records for another inmate revealed that a medical and mental health screening was not performed for 47 hours after the inmates' admission to the facility.

298.    A review of records for another inmate, who reported complaints of difficulty breathing, revealed that even with those complaints, a medical and mental health screening was not performed until 18 hours after the inmate's admission to the facility.

299.    OSDH also found, in a repeat violation from previous inspections, that the Oklahoma County Detention Center was not providing the Inmate Handbook to new detainees at intake as required. The Inmate Handbook contains such important information as how to request medical care and how to report emergencies in need of assistance or medical care.

300.    OSDH found that the Handbook was not posted in the housing pods within the jail as required.

301.    Further, OSDH observed that inmates held in the male and female booking cells were not provided copies of the Handbook.

302.    OSDH's review of records found that an average of 50 to 125 inmates are housed in each pod, with only ten tablets containing the Inmate Handbook available within each pod far below the required accessibility of the Handbook to inmates.

303.    OSDH interviews with several inmates confirmed that they have not received a copy of nor had access to the inmate handbook.

304.    OSDH's interview with staff found that inmates do not receive an orientation to the Jail, despite the fact that the Jail's policies and the Inmate Handbook stating that inmates shall receive initial orientation within five (5) days of reception into the facility.

53

EXHIBIT 3

305.    OSDH further found that the Jail was in repeat violation of the requirement to perform proper inmate counts at the beginning of each shift change.

306.    As noted by OSDH, one purpose of these counts is to ensure that each inmate is living and breathing.

307.    OSDH's review of Central Control Logs for October 18-21, 2021, found that no inmate counts were conducted at the beginning of each shift change at all for those days.

308.    In fact, OSDH's review revealed that no inmate counts at all were done on the 20th and 21st of October.

309.     In fact, review of count forms provided for October 18-21, 2021, revealed that only one count was being performed each day.

310.    OSDH also found that many windows in the cell doors still had significant scratches on them seriously limiting the visibility into the cell and preventing staff from ensuring they see a living, breathing, human being at each count and sight check. The Jail had previously reported that they would replace the scratched windows, but it had not been completed at the time of this inspection.

311.    OSDH further found that numerous cells had lights that were covered or were not working, which also prevents staff from ensuring they see a living, breathing, human being at each count and sight check.

312.    The Jail was yet again found to be in violation of the requirements surrounding hourly sight checks of inmates.

313.    OSDH found that cell door windows on the 2nd, 4th, 6th, 8th, 10th, 12th, and 13th floors were obscured by scratches on the window, leaving less than 50% visibility and obstructing the

54

EXHIBIT 3

requirement to have clear visibility within close proximity of an inmate while performing sight checks. These are the same floors and windows identified in the March 2021 notice of violations and in the July 2021 notice of violations that still had not been fixed despite Administrator's prior representations to OSDH that the Jail had purchased new windows and would be replacing those that were scratched.

314.    OSDH found that these obscured windows put staff in violation of the Jail's training curriculum approved by OSDH which states that trainees will know how to properly conduct, document, and report sight checks to the Camera Ops post with the requirement that officers must be positive they see a living, breathing, human being before counting the inmate or completing the sight check.

315.    OSDH's review of records for inmates on suicide watch, requiring 15-minute sight checks, revealed that sigh checks were not documented for every 15 minutes on October 22, 2021.

316.    OSDH also found that sight checks could not be properly performed in several cells due to the cells having little to no light.

317.    OSDH review of records found that of the 22 inmates in 13 Baker housing pod, which require 15-minute sight checks, the sight check Observation Sheets showed missing sight checks for all 22 inmates, with the gaps between checks ranging from 30 minutes to 4 hours.

318.    OSDH review of records found that of the 13 inmates in 13 Charlie housing pod, requiring 15-minute sight checks, the sight check Observation Sheets had missing sight checks for all 13 inmates with the gaps ranging from 15 minutes to 30 minutes.

319.    OSDH's review of records of 186 15-minute Observation Sheets for male inmates revealed that 136 of those forms had missing sight checks, with gaps in the sight checks ranging from 30

55

EXHIBIT 3

minutes to 9 hours. 56 of the forms did not even have a start or end date to record the days those checks were happening or were missed.

320.    OSDH's review of records for the 13 Adam housing pod, for inmates on increased observation requiring 30-minute sight checks, revealed that sight checks were not performed and documented every 30 minutes for October 21, 2021. Three sight checks were missed completely.

321.    OSDH's review of records for the 13 Charlie housing pod, for inmates on increased observation requiring 30-minute sight checks, revealed that sight checks were not performed and documented every 30 minutes for October 21st and 22nd, 2021. Ten sight checks were missed completely.

322.    OSDH's review of 4 unit logbooks revealed that hourly sight checks were not being performed and documented as required in all 4 logbooks.

323.    Several of the logbooks reviewed had log entries denoting the reason for the missed sight checks including: Roving, Medicine Pass, Trash, Running Rec, Recon, "Face to Face", Feeding Pods, Use of Force, Incident in Booking, Court, Clinic, Classification, EMSA, No One Available, Assisting with Movement, Pulled, Paperwork, and Missed Check.

324.    An interview with a staff member revealed that a bid had been obtained to replace the damaged cell windows interfering with sight checks.

325.    OSDH also found significant problems with jail staff even having clear understanding of what their post orders were in the jail.

56

EXHIBIT 3

326.    OSDH's request for post order "Acknowledgement of Review" forms for six staff members for the their current assigned posts, found that they did not review and acknowledge that they understood their post duties as noted in the post order or duty assignment.

327.    Further, OSDH's request for documentation for all 2021 post order "Acknowledgement of Review" forms, revealed that only one post Acknowledgment of Review form was provided, which denoted staff signatures of review only from June 10-August 9, 2021. Staff confirmed that these forms were the only "Acknowledgement of Review" forms from all posts in the entire jail for 2021 to the date of inspection. Ultimately, this means that out of 295 days that had passed in 2021, only one post of the numerous posts throughout the jail had completed Acknowledgement of Review forms and even then, only for 61 days.

328.    OSDH also found the jail was repeatedly out of compliance with the requirement to report serious injury to inmates requiring transfer to an outside medical facility to the OSDH within one day of the injury occurrence.

329.    Specifically, the "fit log", a record of whether inmates' medical conditions require treatment at an outside medical facility, for July 2021 revealed that the Jail failed to notify OSDH of 11 inmates who sustained an injury bad enough to require transfer to an outside medical facility.

330.    The fit log for August 2021, the month that Gregory died in the jail due to not receiving any medical care at all, revealed that the jail had failed to notify OSDH of 7 inmates who sustained an injury bad enough to require transfer to an outside medical facility.

331.    The fit log for September 2021 revealed that the jail failed to notify OSDH of 5 inmates who sustained an injury bad enough to require transfer to an outside medical facility.

EXHIBIT 3

332.    The fit log entries for October 2021 were incomplete, not even documenting the reason that inmates required a transfer to an outside medical facility.

333.    Yet, when staff were interviewed, they claimed to OSDH that life-threatening incidents were being reported.

334.    OSDH also found the jail to be in repeat deficiency regarding standards requiring that staff shall provide 24-hour supervision of inmates.

335.    OSDH's inspection found that in the Women's Holding Pod, two cells had no working intercom or phone in the cell.

336.    Further, OSDH found that in the inmate housing pods, there were bright yellow signs with instructions to dial 0 for Access to Health Care. Yet, when inspectors tested the system by dialing 0, it did not work.

337.    OSDH also tested the intercom in Women's holding cell 1 by dialing 0 for emergency response and the system did not work.

338.    OSDH tested the intercom in Women's holding cell 1 for an emergency response a second time by dialing 0#. Twice the call went to an automated message that was more than a minute long. On the third attempt a staff member finally answered the phone after the long automated message finished playing.

339.    OSDH then tested the phones by dialing both "0" and "0#" in 24 different cells spread across multiple floors and multiple different housing pods, and none of the phone/intercom systems worked for that emergency reporting number.

340.    OSDH's review of the phones in three other cells found the phones broken, with one even having exposed wiring.

EXHIBIT 3

341.   OSDH's review of the Camera Operations Log for October 20, 2021, revealed that staff conducting camera sweeps were not even viewing all of the housing pods in the jail during each shift. Some sweeps were found to only have lasted 2 minutes.

342.   Review of that same Camera Operations Log for October 20, 2021, also revealed that one camera sweep was purportedly conducted for 28 housing pods in 6 minutes.

343.   OSDH's review of the "Staff Assignment and Inspection Report" for one shift from October 20-21, 2021, revealed only ten detention staff were assigned to cover the seven floors consisting of 24 housing pods with a total of 1690 inmates. This boils down to one detention staff member for every 169 inmates. Additionally, of the seven floors, 4 of them only had one detention staff member assigned.

344.   Further review of that same Staff Assignment and Inspection Report found that the ten detention officers assigned to supervise the 1690 inmates, were all assigned as "rovers" with no officer specifically assigned to any of the 24 housing pods, which include suicide prevention, mental health, critically ill, restrictive housing, and closer observation.

345.   OSDH reviewed an incident report relating to Gregory's death, noting that two staff members spoke to Gregory in housing pod 12 David, Cell # 19, at 6:45 a.m. on August 12, 2021, and determined that he needed to be seen by medical. However, both staff then left to respond to a call for a medical emergency. Another staff member reported returning to check on Gregory at 9:03 a.m. and found him unresponsive.

346.   OSDH also found that Gregory attempted to make 870 phone calls, however his assigned pin number did not work due to him being housed in the wrong cell.

59

EXHIBIT 3

347.   OSDH also found supervision and sight checks by jail staff were so poor that inmates had in one cell had attached two pieces of paper to the wall to conceal the removal of grout from around an 8x16 inch concrete block.

348.   An inmate in the Women's Holding Pod reported staff are rarely present in the pod and that the intercom in her cell did not work. OSDH staff watched the inmate push the intercom button and confirmed it did not work.

349.   One jail staff member reported to OSDH that many phones throughout the facility were not working.

350.   Another staff member even reported to OSDH that the intercom system throughout the facility does not work and is not being used.

351.   The staff member assigned to the Women's Holding Pod reported to OSDH that they are not always in the pod because they have other duties assigned in the booking area when a female is admitted into the facility.

352.   OSDH also found the jail in repeat violation of OAC 310:670-5-3(c) which requires that detention officer posts shall be located and staffed to monitor all inmate activity either physically or electronically and close enough to the living areas to immediately respond to emergency situations, that a detention officer shall be on duty at all times at each location where inmates are confined or the observation shall be conducted by closed circuit TV, and that the location shall be equipped with an intercommunication system that terminates in a location that is staffed twenty-four (24) hours a day and is capable of providing an emergency response.

353.   OSDH found the jail in repeat violation of this standard, supported by:

EXHIBIT 3

a.  OSDH observed, on October 21, 2021, that Women's Holding Pod cells # 4 and # 4 did not have a working intercom or a phone in the cell;

b.  Bright yellow signs stating "Access to Health Care" were observed posted in the inmate pods with instructions to dial zero (0) for a life-threatening emergency; however dialing zero (0) did not work;

c.  Testing to report an emergency was performed on the phone located in cell # 1 of the Women's Holding Pod, by dialing zero (0), but it did not work;

d.  Another test to report an emergency was performed on the phone located in cell # 1 of the Women's Holding Pod, by dialing "0#". Two of those tests resulted in an automated message over one minute long with no answer and a third test again got the automated message but was finally answered by jail staff after the automated message had played in full again.

e.  When testing the phones with "0" and "0#" in 24 different cells spread throughout different floors and housing pods, none of them worked.

f.  Observed the phone located in 4 David housing pod, cell # 50 was broken with exposed wires and did not work.

g.  Observed the phone located in 10 Charlie housing pod, cells # 15 and # 20 were broken and did not work.

h.  Review of the Camera Operations Log for October 20, 2021, revealed not all of the housing pods are being viewed during camera sweeps conducted during each shift. Camera sweeps lasted from two (2) minutes to forty-four (44) minutes.

61

**EXHIBIT 3**

i.  The Camera Operations Log for October 20, 2021, revealed a camera sweep was performed for 28 housing pods and was completed in six (6) minutes, from 3:00 p.m. to 3:06 p.m.

j.  The Camera Operations Log for October 20, 2021 revealed a camera sweep was performed for 8 housing pods and was completed in two (2) minutes, from 10:30 a.m. to 10:32 a.m. This equates to 15 seconds per housing pod.

k.  The "Inmate Handbook" dated May 27, 2021, instructs inmates to report emergencies by dialing # 0 or 911;

l.  Sight checks were repeatedly missed, with reasons for missing sight checks listed as: Roving, Medicine Pass, Trash, Running Rec, Recon, "Face to Face", Feeding Pods, Use of Force, Incident in Booking, Court, Clinic, Classification, EMSA, No One Available, Assisting with Movement, Pulled, Paperwork, and Missed Check.

m.  On one date, ten detention staff were assigned to cover seven floors containing 1690 inmates, with four floors having one assigned "rover" each and three floors with two "rovers" each. No officer was assigned to any of the 24 housing pods, which include suicide prevention, mental health, critically ill, restrictive housing, and closer observation.

n.  The specific failure to provide medical care to Gregory when he was found to be in clear need of medical attention at approximately 6:45 a.m. on August 12, 2021.

o.  Inmates reported detention officers were rarely in their housing pods and their intercoms systems in their cells did not work.

p.  A staff member reported that many phones throughout the facility were not working,

354.  OSDH found the jail still in violation of requirements for supervising inmates, including:

62

EXHIBIT 3

a. Pieces of paper being observed attached to a cell wall to hide inmates' removal of grout around a concrete block in the cell wall.

b. Light fixtures in several cells were either not working or obscured by objects placed over them.

c. The existence of holes in multiple cell walls large enough for inmates to pass objects through.

d. Multiple inmate counts were still being missed entirely.

e. Frequent sight checks of inmates on suicide watch were not being completed.

f. Sight checks for inmates on 15-minute sight checks were not being completed.

g. Sight checks of inmates requiring 30-minute sight checks were not being completed.

h. Regular one-hour sight checks were not being completed.

i. Three inmates who had been in the jail since October 20, 2021, had no record of any medical and mental health screening being performed.

j. Multiple mental health and medical screenings were being delayed and not performed timely.

355.   Currently there is even an ongoing investigation by the Oklahoma Multicounty Grand Jury into the conditions and practices of the Oklahoma County Detention Center while under the control and authority of Administrator and Trust.

### *Ongoing Problems, Policies, Procedures, and Customs of Defendant Turn Key*

356.   Prior to Gregory's death, Turn Key had a pattern and practice of providing deficient healthcare to inmates/detainees across many jails where Turn Key was the contracted for medical provider, with such failures including failing to provide access to needed mental

63

EXHIBIT 3

health/psychiatric care, failure to escalate inmate/detainee medical/mental health needs to appropriate level healthcare providers, failing to conduct medical screenings/intakes on inmates/detainees known to be suffering serious mental health/psychiatric issues, and failing to transfer inmates/detainees to outside medical facilities who could actually provide the necessary care to inmates/detainees whom Turn Key – and its employees – were aware were unable to be properly treated in the current jail facility.

357.    In addition to the other Oklahoma County Detention Center instances of Turn Key failing to provide proper care, medical evaluations, and referrals for inmates with mental health issues, Turn Key had a pattern of failing to provide medical evaluations and medical and mental health care to inmates with serious medical/mental health needs prior to Gregory's detention:

   a.  On November 7, 2019, Lorri Tedder was detained at the Rogers County Jail and was experiencing an obvious, known mental health/psychiatric crisis. Jail medical staff – employed by Defendant Turn Key – failed to perform any mental health or medical evaluation of Tedder, failed to provide Tedder any mental health/psychiatric treatment, and failed to refer her to an appropriate higher-level provider or to an outside facility actually capable of assessing and treating Tedder. Instead, she was left in the jail in a condition and scenario in which the use of force by jailers was an obvious and likely outcome, posing a risk to the health and safety of Tedder. Tedder died after being subjected to excessive force in response to her combative nature caused by her psychosis and delusions.

   b.  In June 2016, Turn Key failed to conduct an initial health assessment on an inmate in the Garfield County Jail and the inmate was booked without prescribed medications for heart

64

EXHIBIT 3

disease, hypertension, coronary artery disease and depression. As a result, the inmate started experiencing hallucinations and exhibiting delusions. Instead of appropriate medical and mental health treatment, the inmate was placed in a restraint chair where he remained until his death two days later. Throughout that time, Turn Key's employee(s) in the jail provided no medical or mental health care, did not refer the inmate to an appropriately qualified higher level provider, or refer him to a facility actually capable of providing needed mental health care and medical care.

c. In June 2017, Turn Key and its employee(s) failed to perform a medical evaluation or provide any medical or mental health treatment to an inmate who could not sit still or appropriately answer questions during an attempted intake and who was suffering from hallucinations. Instead, Turn Key and its employee(s) left the inmate in the jail with no treatment, no referral to a higher-level provider, no medical evaluation, and no referral to an outside facility actually capable of evaluating and treating the inmate. Instead, he was left in the jail in a condition and scenario in which the use of force by jailers was an obvious and likely outcome, posing a risk to the health and safety of the inmate. The inmate died after being subjected to excessive force in response to his combative nature caused by his condition and hallucinations.

d. On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that

EXHIBIT 3

other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

e.  In 2018, an inmate died of suicide in the Tulsa County Jail after his clear signs of depression and deteriorating mental condition went ignored and not evaluated by Turn Key and its employee(s) working in the jail. The inmate exhibited serious signs of depression and suicidal behavior, but was provided no mental health screening, no mental health treatment, no referral to a higher-level provider capable of treating the inmate, and no designation of the inmate as a suicide risk.

f.  In May 2020, an inmate at the Saline County Detention Center in Arkansas, a facility where Turn Key is the contracted medical provider, filed suit for Turn Key's persistent and ongoing failure to provide him mental health care and access to appropriate and necessary mental health specialists for a period of at least two months.

g.  In 2017, at the Pulaski County jail in Arkansas, where Turn Key is the contracted medical services provider, an inmate suffering from psychosis was detained for days without a medical evaluation and eventually deteriorated and died – without any mental health care or medical care – of an untreated medical condition,, in part due to the lack of medical evaluation and lack of treatment for her psychosis. Further, the inmate was not referred to an appropriate higher level provider capable of evaluating and/or treating her

66

EXHIBIT 3

psychosis, nor was she referred to an outside facility actually capable of evaluating and treating her medical and mental conditions.

358.   Further examples of Turn Key's longstanding deficient healthcare system and practices include:

   a.   In 2009, Lacee Danielle Marez was detained at the Cleveland County Jail. ESW Correctional Healthcare, now Turn Key Health Clinics, LLC, was the jail medical provider at the time. Marez, then 21, was taken into custody for missing a court appearance and allegedly struck her head on a concrete floor during a struggle with jail staff, causing a traumatic brain injury. Left in a holding cell for three days, Marez went into a coma and also suffered a heart attack, leading her to live in a permanent vegetative state. Marez repeatedly asked for medical treatment over a period of several days. She began vomiting, urinating on herself, and laying lethargic on her cell bed. A critical care physician at Norman Regional Hospital wrote in a report filed with the court that jail medical staff neglected to treat Marez after a head injury. "Lack of medical care during this time indicates either direct disregard or inadequate recognition of this woman's progressive and ultimately nearly fatal illness," the doctor wrote.

   b.   In 2011, when Turn Key was still known as ESW Correctional Healthcare, Curtis Gene Pruett, 36, died in a holding cell at the Cleveland County Jail in October. He died after jail staff ignored his repeated pleas for emergency medical attention. Pruett was booked into the jail after police arrested him on suspicion of public intoxication. Pruett told jail staff that he had high blood pressure and that he was in severe pain, but they ignored his requests. Surveillance video showed Pruett doubled over clutching his

EXHIBIT 3

chest at the jail, but ESW's nurse told him he was faking his condition. Pruett died of a heart attack.

c.  In November 2014, Robert Autry nearly died while detained at the Cleveland County Jail after Turn Key employees ignored repeated complaints regarding a sinus infection Mr. Autry had contracted. Sinus infections were extremely dangerous and potentially life-threatening for Mr. Autry due to a prior traumatic brain injury. This information was disclosed to Turn Key and its employees and yet the obvious signs of a sinus infection in Mr. Autry were ignored until he nearly died and ultimately had to have brain surgeries to save his life.

d.  In 2015, Turn Key failed to schedule a psychological appointment with a doctor for James Jordanoff to regulate his medications and get the medications he had actually been prescribed for over two months.

e.  In April 2016, Austin Vance died after being detained at the Cleveland County Jail. Vance died due to complications of excited delirium after he was denied medical care despite his obvious symptoms and his statements to arresting officers that he had taken Adderall. Instead of medical treatment, Vance was placed in a restraint chair and covered with a hood and remained there until he was found unresponsive. He was pronounced dead at the hospital shortly after.

f.  In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to the profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where

68

EXHIBIT 3

he died within hours. Cleveland County jailers were aware of the same symptoms and performed wholly inadequate, less than 1-second-long sight checks of Mr. Kessee throughout the last hours of his life. The Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

g. In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees wholly ignored the obvious and severe worsening of his condition, inclusive of extreme edema and swelling (so bad at points the inmate could not see due to facial and eye swelling), fluid weeping from his legs, urinary incontinence, and clear signs of infections of the weeping wounds on his legs including skin sloughing off of his leg. The inmate required use of a wheelchair and had mobility issues caused by his condition and fatigue related to that condition. After he died, that inmate was found to also have significant pressure ulcers on his perineum. Turn Key and its employees failed to properly treat the inmate's obviously worsening condition (with nursing staff failing to follow orders from higher level providers entirely), failed to refer him for evaluation and treatment by an appropriately qualified higher level provider, and failed to refer him to an outside facility actually capable of caring for the inmate and his serious condition, decline, and needs.

h. Throughout the period from June through October 2019, an employee of Turn Key, and other Turn Key medical personnel at the Cleveland County Jail failed to take any steps to obtain past medical and treatment information for an inmate who notified

69

EXHIBIT 3

them of two chronic health conditions – HIV and hypertension. That inmate, Bryan Davenport, was not seen by a physician, physicians' assistant, or nurse practitioner for nearly a month after his arrival at the jail. Throughout that time, Davenport provided the names of his providers, his need for his HIV medications, and the names of those medication. When Turn Key's employee nurse finally saw Davenport, she informed him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring Davenport to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15 per visit.

i.  An El Reno man died in 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensible under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

j.  A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints – over several days – of breathing problems were disregarded by responsible staff, and he lost consciousness.

k.  Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness

70

EXHIBIT 3

and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He was forced to lay in his own urine and feces because the jail staff told Smith he was faking his paralysis and refused to help him.

l. In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is 54-year-old gentlemen who had a very complicated history... [H]e was involved in being struck by a car while riding bicycle several weeks ago... *He ended up finding himself in jail and it was during this time in jail that he had very significant deterioration in his neurologic status. [I]t s obvious that he likely developed beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated until he was nearly completely quadriplegic.* (emphasis added)

m. Mayfield v. Briann, U.S. District Court for the Eastern District of Arkansas, Case No. 16-cv-736-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

n. Moore v. Briann, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-115-BRW, wherein Turn Key was alleged to have ignored an inmates' worsening

71

EXHIBIT 3

hip pain and disfunction for eleven months, leading to difficulty walking and constant severe pain.

o. Wedsted v. Lowerily, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-263-BSM, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

p. Sawyers v. Edwards, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-17-52-HE, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of Sawyers, a plaintiff whom had underwent emergency back surgery after an auto accident who had been transported to the Canadian County Detention Center. The Turn Key staff received the medical records including Plaintiff's prescriptions and was also informed of the required two-week follow-up appointment, but failed to correctly administer Plaintiff's medications and failed to take Plaintiff to the required two-week follow-up appointment— which resulted in Plaintiff removing his own original dressing from surgery after five weeks. Plaintiff filed multiple requests for grievances and after two transfers saw his doctor for the follow-up visit eighty-nine days after surgery.

q. Sam v. Virden, et al., U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-415-TCK-FHM, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Sam, a detainee at Osage County Jail, who shattered his patella. Turn Key staff only provided ibuprofen and a medical request form to Sam two days later. After being detained at the Osage County Jail, Sam shattered his patella in a jail cell and then he was placed in isolation in order for the jail staff to "keep an

EXHIBIT 3

eye on him." Three days later he received an x-ray and received no medical attention for ten days in which then only receives a knee brace. This was proceeded by another sixteen days of no medical attention, which resulted in the transfer of custody and led to an ultimate knee surgery.

r.   Smith v. Board of County Commissioners of Muskogee County, U.S. District Court for the Eastern District of Oklahoma, Case no. 17-CV-90-KEW, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Smith, a cancer patient who had prostate cancer that had metastasized to his spine and pelvic bone causing him to undergo intensive and aggressive radiation and other treatments. After being detained at the Muskogee County Jail, Smith developed symptoms such as severe pain in his back and chest, numbness and a frost-bite feeling in his chest that spread down to his feet, ultimately turning into numbness and permanent paralysis. Despite the obvious symptoms of severe medical distress, Turn Key failed and refused to provide adequate medical care or transport Smith to a hospital. Only upon bonding out of the jail did Smith receive adequate treatment; however, his paralysis was permanent.

s.   Foutch v. Turn Key Health, LLC, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-431-GKF-mjx, wherein Turn Key was alleged to have failed and refused to provide access to a physician for Foutch and failed and refused to place him under medical observation despite shortness of breath, difficulty breathing, and coughing up blood. Turn Key was further alleged to have failed to provide Foutch with the prescribed number of breathing treatments from an

73

EXHIBIT 3

examining physician, and to have failed to provide any medical care as Foutch's condition obviously worsened over several days until Foutch was found unresponsive in his cell after foaming at the mouth and coughing up blood. Foutch was pronounced dead 2 minutes after arrival at a hospital.

t.   Sanders v. Creek County Board of County Commissioners, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM, wherein Turn Key was alleged to have ignored and failed to provide medical care to decedent Sanders despite noting that she had been suffering from diarrhea and her mental state had been rapidly declining for two to three weeks. Turn Key failed to seek appropriate medical care for Sanders until the 35th day after she entered the Creek County Jail, when they transported her to the hospital fully incapacitated and on the brink of death. At the hospital, Sanders was diagnosed with severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, and other serious conditions. Sanders died the day after arrival at the hospital.

u.   Allen v. Maruf, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-00863-SWW-JTR, wherein Turn Key was alleged to have refused to provide Allen, a jail detainee in Pulaski County Regional Detention Center, with medications that he had took since February of 2017 for degenerative bones, knee problems, disc problems, and also to keep the Plaintiff's arms, hands, legs, and feet from going numb that was prescribed by the Plaintiff's Doctor at the VA Hospital. Turn Key also denied the approval of a walking cane to prevent the plaintiff from falling.

EXHIBIT 3

v. Ellis v. Brown, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-545, wherein Turn Key was alleged to have denied medications for the plaintiff's diagnosed neuropathy, instead only providing medication for heartburn based on the Turn Key nurse's statements that she knew that was all the plaintiff's condition was.

w. Yancy v. Turn Key Health, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-455, wherein Turn Key was alleged to have denied access to appropriate medical care with existing medical condition involving internal bleeding despite obvious signs of medical need including significant amount of blood in stool causing the plaintiff prolonged pain from his conditions.

x. Alexander v. Pulaski County, Arkansas, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-0046-BSM, wherein the inmate was alleged to have been 100% disabled, and suffered sickle cell anemia, asthma, and rheumatoid arthritis, conditions which were alleged to have been disclosed to Turn Key. The inmate was alleged to have been cold, shaking and had been throwing up. Turn Key's nurse was alleged to have disregarded calls for medical help by the inmate and deputies, including denying plaintiff her "asthma pump." On December 14, 2016, allegedly as a result of Turn Key's deliberate indifference to the inmate's medical needs, the inmate began convulsing and having difficulty breathing. The inmate died as a result.

y. McDonald v. Carpenter, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein Turn Key was alleged to have been deliberately

75

EXHIBIT 3

indifferent to an inmate's anxiety medication needs, leading to elevated anxiety and an attempted suicide.

z. Royston v. Board of County Commissioners of the County of Bryan, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-265-RAW, wherein Turn Key was alleged to have failed to provide 24-hour access to a physician or midlevel provider for the Bryan County jail, failed to conduct a medical intake screening, failed to provide any care from a mental health provider, physician, midlevel provider, or a registered nurse despite obvious signs of medical distress, and failed to provide medical care after Royston hit her head against a concrete wall and despite obvious signs of injury all over Royston's body. Royston ultimately fell into a coma for several days.

aa. Bowen v. Ring, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein plaintiff alleged he was severely beaten by an officer during his arrest. At the jail, Turn Key was alleged to have been deliberately indifferent to obvious signs of severe brain injury and to have delayed medical care which was alleged to have resulted in permanent brain damage. Turn Key was alleged to have poorly trained and equipped its LPN to deal with critical, but predictable medical emergencies, commonly encountered in a jail setting.

bb. Thompson v. Turn Key Health Clinics, LLC, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5092-PKH, wherein Turn Key was alleged to have refused to administer plaintiff's prescription medications and refused to treat plaintiff's broken bones.

EXHIBIT 3

cc. Buchanan v. Turn Key Health Clinics, LLC, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-171-RAW, wherein Turn Key was alleged to have failed and refused to provide medical observation, evaluation or access to medical care despite Buchanan's paralysis in his left arm beginning the day after his arrival at the Muskogee County Detention Center. Four days later Buchanan developed paralysis in his right arm. Despite these obvious signs of medical distress, Turn Key did not move him to medical observation, schedule an appointment with a physician, or even check his vitals. Turn Key was alleged to essentially have provided no care to Buchanan even days later when Buchanan suffered paralysis of both legs as well. Turn Key medical staff was alleged to have failed and refuse to provide appropriate and immediate medical assistance when a Turn Key nurse finally evaluated Buchanan and noted his paralysis. Nine hours after that evaluation, another Turn Key nurse evaluated Buchanan and finally sent him to the hospital where he was diagnosed with quadriplegia and a cervical epidural abscess. Buchanan suffered permanent injury and paralysis as a result of Turn Key's failures.

dd. Avery v. Turn Key Health Clinics, LLC, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5075-PKH, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

ee. Sanders v. Gifford, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-712, wherein Turn Key was alleged to have repeatedly given Sanders another inmate's medication, resulting in seizures, vomiting, and pain to the Plaintiff.

77

EXHIBIT 3

ff. Nabors v. Humphrey, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-664, wherein Turn Key was alleged to have given inmate wrong amount of seizure medication, resulting in seizures and a busted lip. Inmate was ultimately taken to hospital twice, and had physical therapy prescription for trouble walking. Turn Key was alleged to have only provided a cane with no physical therapy.

gg. Lee v. Holladay, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with an anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

hh. Davis v. Pulaski County, Arkansas, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-643-JM, wherein Turn Key was alleged to have deliberately disregarded plaintiff's severe medical condition by failing to provide plaintiff with necessary insulin causing a significant drop in plaintiff's blood sugar which caused plaintiff injuries, including a broken ankle which had to be surgically repaired with hardware.

ii. Causey v. Pulaski County Medical, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-305, wherein Turn Key was alleged to have denied proper prescribed pain medications to partially paralyzed inmate with multiple injuries and chronic conditions. Turn Key was alleged to have failed to provide corrective

78

EXHIBIT 3

footwear for inmate with injury to left foot, resulting in a fall and his left foot healing improperly.

jj. Winningham v. Roberts, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-706, wherein Turn Key was alleged to have failed to provide treatment to inmate reporting a separated shoulder joint and/or broken clavicle after falling out of bunk bed.

kk. Bowlds v. Turn Key Health, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-726-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Bowlds, a pretrial detainee at the Logan County Detention Center, when they refused to allow him access to the dentist—which resulted in acute pain. Bowlds experienced an extreme headache which lasted twenty-four hours due to a chipped tooth which allegedly left an exposed nerve. Turn Key only gave Bowlds the option to complete several treatments of medication prior to even being considered to see a dentist— which can take up to ninety days, unless Bowlds paid for the dentist visit with his own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

## CAUSES OF ACTION

## COUNT I: DELIBERATE DISREGARD OF SERIOUS MEDICAL NEEDS IN VIOLATION OF 42 U.S.C. § 1983

359.    Under the Eighth Amendment of the United States Constitution, inmates held in American prisons have a fundamental right to prison conditions that do not constitute "cruel and unusual

EXHIBIT 3

punishment."

360.    An arrestee and pretrial detainee, such as Gregory, who has not been convicted of a crime is at least "entitled to the degree of protection against denial of medical attention which applies to convicted inmates" under the Eighth Amendment. *Martinez v. Begg*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985); *Howard v. Dickerson*, 34 F.3d 978, 981 (10th Cir. 1994)).

361.    The Tenth Circuit Court of Appeals applies the Eighth Amendment's "deliberate indifference" standard to determine whether a pretrial detainee has been deprived of medical attention to such a degree that his or her constitutional rights are violated. See *Id.*

362.    In *Martin v. Board of County Commissioners of County of Pueblo*, 909 F.2d 402 (10th Cir. 1990), the Tenth Circuit denied qualified immunity as a defense to an alleged violation of this standard, holding that *Garcia* had clearly established that pretrial detainees share the same protection from deliberate indifference to serious medical needs as convicted inmates.

363.    The Tenth Circuit has recognized that mental health issues fall under "serious medical needs" and that the failure to provide mental health services can constitute deliberate indifference to serious medical needs. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002); *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2017).

364.    The total failure of the Jailer Defendants, Turn Key Medical Staff, and Cooper to provide Gregory with psychiatric care and medical care given the clear severity of his psychosis and his ongoing complaints of worsening severe abdominal pain and deterioration of his physical condition during the last few days of his life violated Gregory's fundamental rights guaranteed

80

EXHIBIT 3

under the U.S. Constitution to be free from deprivation of medical care constituting cruel and unusual punishment.

365.    The severity of Gregory's symptoms of mental health crisis at the time he was first detained and up to the point he was found unresponsive were so great in magnitude that even a lay person would have recognized the fact that he required treatment by a medical professional.

366.    Specifically, such obvious symptoms included severe delusions and incoherence.

367.    Further, the severity of Gregory's declining condition in the last few days of his detention – and life – with persistent complaints of worsening severe abdominal pain, abdominal distension, and his obviously deteriorating physical condition were so great in magnitude that even a lay person would have recognized the fact that he required treatment. This is highlighted by the fact that two non-medically-trained detention officers did in fact recognize that Gregory required medical attention on the morning of his death.

**Defendant Cooper**

368.    Defendant Cooper was at all times relevant hereto, the responsible physician and the Responsible Health Authority at the Oklahoma County Jail who was responsible for the provision of care to Gregory and responsible for overseeing lower-level providers and nursing staff – including Defendants Williams, Guerra, Sage, Eastman, Horn, Hallock, and Merriott – in the provision of care to Gregory.

369.    Defendant Cooper is alleged to have acted with deliberate indifference in his personal participation in the provision – or failure to provide – care to Gregory and in his role as supervisor of the other medical staff involved in the treatment of Gregory.

EXHIBIT 3

370.    Gregory suffered from a sufficiently serious condition which presented a substantial risk of harm and suffering to Gregory – psychosis – and which also presented a heightened risk that other, medical issues may go undiagnosed due to Gregory's psychosis if left untreated because he could not clearly communicate medical needs; Gregory further suffered serious harms including a perforated duodenal ulcer, abdominal pain, internal bleeding, death, loss of chance of survival and/or life expectancy, and unnecessary, prolonged, and increased pain and suffering through the substantial pain and suffering Gregory endured as a result of his worsening condition – the perforated duodenal ulcer.

371.    Defendant Cooper was aware that Oklahoma law requires that all detainees at the Oklahoma County Jail receive a medical screening at intake to check for serious medical and mental health conditions.

372.    Defendant Cooper was aware that disregarding such medical intakes creates a substantial risk of harm to detainees by completely depriving them of any opportunity to be screened and treated for serious, potentially life-threatening medical conditions, and constitutes a complete abdication of his duties as the supervising physician overseeing Gregory's care.

373.    Further, Defendant Cooper was aware of the ongoing psychosis Gregory was suffering for at least 6 days prior to his death, with no treatment being provided whatsoever.

374.    Defendant Cooper was also aware that untreated mental health issues, such as an episode of psychosis, can prevent detainees from being able to clearly communicate their medical needs.

375.    In fact, this risk is so pervasive and well-known that Oklahoma law requires an inmate exhibiting a significant psychiatric problem shall be observed frequently by jailers and/or jail medical staff until the appropriate medical evaluation has been completed.

82

EXHIBIT 3

376.   As the supervising physician overseeing Gregory's care, Cooper was aware, through his review of Gregory's medical chart and records, that Gregory was not seen by any medical professional or any appropriate mental health professional during the entirety of his detention from August 3, 2021, through August 12, 2021.

377.   Despite his awareness of Gregory's ongoing psychosis and the substantial risk of serious medical issues going unreported by Gregory due to his psychosis, Cooper did nothing to provide or oversee the provision of care to Gregory.

378.   During Gregory's detention at the Oklahoma County Jail, Cooper never once examined or visited Gregory to assess his condition and the ongoing lack of medical evaluation and treatment for Gregory.

379.   During Gregory's detention at the Oklahoma County Jail, Cooper reviewed the medical records generated by Turn Key staff as a part of his role as the supervising or responsible physician overseeing the provision of care to Gregory.

380.   Cooper knew that:

   a.   Gregory was suffering a serious psychotic episode lasting at least 6 days during his detention,

   b.   Turn Key's subordinate medical and mental health staff completely failed to obtain an evaluation or treatment of and for Gregory by a psychiatrist, physician, or other licensed medical professional, as defined by 57 O.S. § 4.1(3),

   c.   Turn Key's subordinate medical staff completely failed to monitor or assess Gregory's medical condition as required by Oklahoma law,

83

EXHIBIT 3

d. Cooper, as the medical director for Turn Key and the designated medical authority for the Oklahoma County Jail, and Turn Key do nothing to assess the skills and competencies of new-hire nursing staff, including Defendants Turn Key Medical Staff, to determine their fitness and competency for the correctional healthcare role and environment and ability to perform the medical functions asked of them, as testified to in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP, on February 8, 2021,

e. LPC's including Defendant d Okongor, who were relied on to provide the majority of care to Gregory were not trained medical professionals, and who were relied on to be gatekeeping medical/mental health officials controlling Gregory's access to higher level providers or outside medical care had little to no training or guidance on when or what conditions and symptoms warrant contacting a higher level provider or sending Gregory for outside hospital or specialist care,

f. LPNs, including Defendants Williams, Hallock, and John/Jane Does 6-10, who were relied on to provide the majority of medical care – if any was provided – to Gregory and who were expected to be the gatekeeping medical officials controlling Gregory's access to higher level providers or outside medical care had little to no training or guidance on when or what conditions and symptoms warrant contacting a higher-level provider or sending Gregory for outside hospital or specialist care,

g. Cooper, as the medical director for Turn Key, does not provide any resource or actual training to LPNs, including Defendants Williams, Hallock, and John/Jane Does 6-10,

84

EXHIBIT 3

regarding when a condition warrants contacting a higher-level provider or outside medical care for detainees,

381.     Despite having the knowledge set forth above, Cooper never evaluated Gregory, never took any steps to order further evaluation or increased care for Gregory despite his obviously serious condition and complaints, and his risk of death, never gave any orders to any lower-level provider to rectify the obvious deficiencies in the care provided to Gregory prior to his death, and never referred Gregory for outside specialty or hospital care despite his worsening condition in the period from August 3, 2021, through Gregory's death on August 12, 2021.

382.     Cooper also chose not to take any steps to supervise the care provided to Gregory to ensure that it complied with the standard of care for patients with an ongoing, prolonged psychotic episode, that orders were being followed by lower-level staff, or that necessary emergency or specialty care was obtained as needed.

383.     Cooper's decision not to act in any way despite having the knowledge set forth above, was the result of his deliberate indifference to the well-being of Gregory and all detainees at the Oklahoma County Jail.

384.     In the alternative, Cooper made the decision not to review any medical records pertaining to Gregory, despite his role as supervising/responsible physician and the legal requirements that he supervise the care provided to Gregory.

385.     Cooper was aware of the high prevalence of mental health problems and psychosis among the inmate population.

85

EXHIBIT 3

386.    Further, Cooper was aware that inmates in the jail rely solely on Turn Key, Cooper, and his subordinates, for the provision of medical care and mental health/psychiatric care for serious needs.

387.    Cooper was aware that failing to perform a medical intake, failing to review records for inmates under his care, and failure to monitor the actions of lower-level providers under his direction in regards to providing medical care to Gregory and other inmates, created an unnecessary and substantial risk of harm to Gregory and those inmates by depriving them of access to medical care in the event of needed care.

388.    Cooper's decision not to review any medical records or take any action to oversee the actions of lower-level medical providers in the provision of care to Greogry, was the result of Cooper's deliberate indifference to the well-being and health of Gregory.

389.    As a result of Cooper's deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

390.    As a result of Cooper's deliberate indifference, Gregory suffered prolonged psychosis, a perforated duodenal ulcer, abdominal pain, internal bleeding, death, loss of chance of survival and/or life expectancy, and unnecessary, prolonged, and increased pain and suffering through the substantial pain and suffering Gregory endured as a result of his worsening condition – the perforated duodenal ulcer.

EXHIBIT 3

391.    As a result of Cooper's deliberate indifference, Gregory died prematurely because he was denied appropriate medical evaluation, psychiatric evaluation, medical care, psychiatric care, and monitoring of his condition.

**Defendant Irvin**

392.    Defendant Irvin was, at all times relevant hereto, a psychologist with Turn Key serving as the Director of Psychological Services over all facilities in which Turn Key operates throughout multiple states, including the Oklahoma County Detention Center.

393.    Defendant Irvin was responsible for overseeing lower-level providers such as Defendant Okongor, in the provision of care to Gregory.

394.    Defendant Irvin is alleged to have acted with deliberate indifference in her personal participation in the provision – or failure to provide – care to Gregory and in her role as supervisor of other psychological staff involved in the treatment of Gregory and her personal failure to refer Gregory – or provide him access – to a properly qualified higher-level provider capable of evaluating, assessing, and treating Gregory.

395.    Gregory suffered from a sufficiently serious condition which presented a substantial risk of harm and suffering to Gregory – psychosis – and which also presented a heightened risk that other, medical issues may go undiagnosed due to Gregory's psychosis if left untreated; Gregory further suffered serious harms including a perforated duodenal ulcer, abdominal pain, internal bleeding, death, loss of chance of survival and/or life expectancy, and unnecessary, prolonged, and increased pain and suffering through the substantial pain and suffering Gregory endured as a result of his worsening condition – the perforated duodenal ulcer.

87

**EXHIBIT 3**

396.    Defendant Irvin was aware of the serious psychiatric condition Gregory was experiencing and was diagnosed with – psychosis – through her access to Gregory's medical chart and records, the indication upon reception of Gregory that he was having a psychotic episode which was entered into his medical chart and records by Defendant Williams on August 4, 2021, Defendant Irvin's own decision to reschedule an appointment for Gregory to be seen by an appropriate mental health professional from August 5, 2021, until August 6, 2021 – three days since his arrival at the Jail – and from her review of Gregory's chart and records where Defendant Okongor noted Gregory was suffering from psychosis.

397.    Despite her awareness of this serious psychiatric condition, and the risk that it would prevent appropriate medical evaluation and medical treatment of Gregory while left untreated, Defendant Irvin did nothing to provide or oversee the provision of care to Gregory other than delay his initial appointment by an additional day, despite knowledge of Defendant Williams' entry in Gregory's record indicating that no medical evaluation had been performed on Gregory due to his psychotic state.

398.    During Gregory's detention at the Oklahoma County Jail, he was never seen by any mental health provider above a licensed professional counselor – individuals who have no medical training and are not appropriate providers to perform medical intakes or evaluations of detainees in jails nor are appropriate providers to evaluate or treat Gregory for his obvious, serious psychotic condition under the Oklahoma Jail Standards.

399.    Despite her awareness of this serious psychiatric condition, and the lack of evaluation or treatment by any appropriate physician or licensed medical provider, Defendant Irvin did nothing to provide for or oversee the provision of care to Gregory, including not referring

EXHIBIT 3

him to a proper licensed medical professional for treatment and/or evaluation as necessitated by his serious condition and required under the Oklahoma Jail Standards.

400.    During Gregory's detention at the Oklahoma County Detention Center, Defendant Irvin never once examined or visited Gregory to assess his condition and the ongoing course of treatment – or lack thereof – to Gregory for his known, serious, condition.

401.    During Gregory's detention at the Oklahoma County Jail, Defendant Irvin reviewed the records generated by Turn Key staff as a part of her role as the director of psychological services and as indicated by her involvement in delaying Gregory's access to a mental health evaluation and a medical evaluation until over 48 hours after Gregory had arrived at the Oklahoma County Jail.

402.    Irvin knew that:

   a. Gregory was not able to undergo a medical intake assessment due to his psychosis,

   b. An untreated psychotic episode can prevent a proper medical evaluation and the reporting of medical issues the detainee is suffering from,

   c. Gregory was only seen by an LPC – not a licensed medical professional under the Oklahoma Jail Standards - two times during the nine days he was in the Oklahoma County Jail, with no referral for psychiatric services or evaluation,

   d. Irvin, as the Director of Psychological Services for Turn Key, does nothing to assess the skills and competencies of lower-level psychological staff, including Defendants Okongor and Okongor, who were expected to – and did – provide the majority of mental health care to Gregory,

89

EXHIBIT 3

e. Irvin, as the Director of Psychological Services for Turn Key, does not provide any resource or actual training to LPCs, including Defendants Okongor and Okongor, regarding when a detainee's condition warrants contacting a higher-level provider, a psychiatrist, or outside medical or mental health care,

f. Irvin was not qualified to perform a medical assessment of Gregory as a psychologist, because she knew such task was (1) outside her scope of practice, her education, and her training, (2) clearly required to be performed by a physician or licensed medical professional, as defined in 57 O.S. § 4.1(3), which a psychologist is not; further, Irvin knew she was not qualified to perform such tasks – and that the LPCs under her direction were not qualified to perform such tasks – through her extensive experience working in correctional facilities,

403. Despite having the knowledge set forth above, Irvin never evaluated Gregory, never took any steps to order further evaluation or increased care for Greggory despite his obviously, serious continuing psychosis, never gave any orders to any lower-level provider to rectify the obvious deficiencies in the care provided to Gregory prior to his death, and never referred Gregory to a psychiatrist or for outside specialty or hospital care despite his continuing psychosis from at least August 3, 2021, through August 9, 2021.

404. Irvin also chose not to take any steps to supervise the care provided to Gregory to ensure that it complied with the standard of care for patients enduring psychosis, that orders were being followed by lower-level staff, and that necessary psychiatric, emergency, or specialty care was obtained as needed.

90

EXHIBIT 3

405.    Irvin's decision not to act in any way despite having the knowledge set forth above, was the result of her deliberate indifference to the well-being of Gregory and all detainees at the Oklahoma County Jail.

406.    In the alternative, Irvin made the decision not to review any medical/mental health records pertaining to Gregory, despite her role as Director of Psychological Services and her role in delaying Gregory's appointment for access to mental health care from August 5, 2021, to August 6, 2021.

407.    Irvin's decision not to review any records or take any action to oversee the actions of lower-level medical providers in the provision of care to Gregory, was the result of Irvin's deliberate indifference to the well-being and health of Gregory.

408.    As a result of Irvin's deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

409.    As a result of Irvin's deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

410.    As a result of Irvin's deliberate indifference, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendant Okongor**

91

EXHIBIT 3

411.    Defendant Okongor was, at all times relevant hereto, an LPC with Turn Key who saw Gregory twice while he was detained in the Oklahoma County Jail.

412.    Gregory suffered from a sufficiently serious condition which presented a substantial risk of harm and suffering to Gregory – psychosis – and which also presented a heightened risk that other, medical issues may go undiagnosed due to Gregory's psychosis if left untreated; Gregory further suffered serious harms including a perforated duodenal ulcer, abdominal pain, internal bleeding, death, loss of chance of survival and/or life expectancy, and unnecessary, prolonged, and increased pain and suffering through the substantial pain and suffering Gregory endured as a result of his worsening condition – the perforated duodenal ulcer.

413.    Defendant Okongor was aware of the prolonged psychotic episode that Gregory was suffering due to the note entered in his file requesting mental health treatment by Turn Key employee Misti Williams and through her own observation and notes entered pertaining to that observation on August 6, 2021.

414.    Despite her awareness of Gregory's serious condition, Okongor only saw Gregory two times while detained – August 6, 2021, and August 9, 2021.

415.    Furthermore, Okongor was aware, due to the note entered by Turn Key employee Misti Williams, that a medical assessment of Gregory had not been performed prior to August 6, 2021, due to his psychotic state and inability to answer medical questions.

416.    Despite observing his ongoing psychosis – lasting at least six days while Gregory was detained – and despite knowing that a medical evaluation and assessment of Gregory could not be performed until his psychosis was treated, Okongor did nothing beyond merely visit

92

EXHIBIT 3

Gregory and enter notes regarding his condition. No treatment of any kind was provided and no referral was entered for psychiatric or outside hospital care.

417.    Despite having the knowledge set forth above, Okongor's decision not to enter any referral for psychiatric care or outside hospital care was the result of her deliberate indifference to the well-being of Gregory and all detainees at the Oklahoma County Jail.

418.    As a result of Okongor's deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

419.    As a result of Okongor's deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

420.    As a result of Okongor's deliberate indifference, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendant Williams**

421.    Defendant Williams was employed by Turn Key at the Oklahoma County Jail during Gregory's detention as an LPN.

422.    Defendant Williams was directly involved in the care – or lack thereof – of Gregory during his detention.

423.    Defendant Williams observed Gregory on multiple occasions and was aware of:

93

EXHIBIT 3

a. Gregory's ongoing psychosis,

b. The failures of all staff involved in the treatment of Gregory to refer him for appropriate psychological and/or outside hospital care,

c. The fact that no medical evaluation of Gregory was done at intake,

d. The fact that no medical evaluation of Gregory was performed during the entirety of his detention from August 3, 2021, until his death on August 12, 2021,

e. The fact that no order was ever put in for Gregory to be seen by a physician or other licensed medical professional as defined in 57 O.S. § 4.1(3) despite his serious condition and lack of medical intake,

f. The fact that Gregory was screaming for medical attention for four days before his death,

g. The fact that untreated psychosis can interfere with the performing of a medical intake on a detainee which can result in serious medical issues going unreported, undiagnosed, and/or untreated.

424. Despite this awareness, Williams failed to ever refer Gregory for appropriate psychiatric care or for outside hospital/specialty care despite the fact that the only times he had been seen by any jail medical or mental health staff was by Defendant Okongor, an LPC, on August 6th and August 9th.

425. Despite her awareness of Gregory's ongoing psychosis and the serious risk to his health, Williams never made another attempt to perform a medical intake assessment of Gregory at any time after August 4, 2021, when she put in a note for mental health personnel to see Gregory.

EXHIBIT 3

426.    Despite her awareness of Gregory's ongoing psychosis and lack of medical assessment, Williams never put in an order for Gregory to be seen by any physician or licensed medical professional as defined in 57 O.S. § 4.1(3).

427.    These actions and failures to act, with knowledge of Gregory's serious condition and the substantial risks to his health and safety posed by the ongoing psychosis, the failure to perform a medical intake assessment, and the information set forth above, constitute deliberate indifference to the obvious risks to Gregory's health and safety.

428.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

429.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

430.    As a result of these deliberately indifferent actions and failures to act, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendant Sage**

431.    Defendant Sage was employed by Turn Key at the Oklahoma County Jail during Gregory's detention as an RN.

95

EXHIBIT 3

432.   Defendant Sage was directly involved in the care of – or lack thereof – Gregory during his detention.

433.   Defendant Sage observed Gregory on multiple occasions and was aware of:

   a.   Gregory's ongoing psychosis,

   b.   The failures of all staff involved in the treatment of Gregory to refer him for appropriate psychological and/or outside hospital care,

   c.   The fact that no medical evaluation of Gregory was done at intake,

   d.   The fact that no medical evaluation of Gregory was performed during the entirety of his detention from August 3, 2021, until his death on August 12, 2021,

   e.   The fact that no order was ever put in for Gregory to be seen by a physician or other licensed medical professional as defined in 57 O.S. § 4.1(3) despite his serious condition and lack of medical intake,

   f.   The fact that Gregory was screaming for medical attention for four days before his death,

   g.   The fact that untreated psychosis can interfere with the performing of a medical intake on a detainee which can result in serious medical issues going unreported, undiagnosed, and/or untreated.

434.   Despite this awareness, Sage failed to ever refer Gregory for appropriate psychiatric care or for outside hospital/specialty care despite the fact that the only times he had been seen by any jail medical or mental health staff was by Defendant Okongor, an LPC, on August 6th and August 9th.

EXHIBIT 3

435.    Despite her awareness of Gregory's ongoing psychosis and the serious risk to his health, Sage never made an attempt to perform a medical intake assessment of Gregory at any time after August 4, 2021, when Defendant Williams tried and ultimately put in a note for mental health personnel to see Gregory.

436.    Despite her awareness of Gregory's ongoing psychosis and lack of medical assessment, Sage never put in an order for Gregory to be seen by any physician or licensed medical professional as defined in 57 O.S. § 4.1(3).

437.    These actions and failures to act, with knowledge of Gregory's serious condition and the substantial risks to his health and safety posed by the ongoing psychosis, the failure to perform a medical intake assessment, and the information set forth above, constitute deliberate indifference to the obvious risks to Gregory's health and safety.

438.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

439.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

97

EXHIBIT 3

440.   As a result of these deliberately indifferent actions and failures to act, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendant Eastman**

441.   Defendant Eastman was employed by Turn Key at the Oklahoma County Jail during Gregory's detention as an RN.

442.   Defendant Eastman was directly involved in the care of – or lack thereof – Gregory during his detention.

443.   Defendant Eastman observed Gregory on multiple occasions and was aware of:

  h.   Gregory's ongoing psychosis,

  i.   The failures of all staff involved in the treatment of Gregory to refer him for appropriate psychological and/or outside hospital care,

  j.   The fact that no medical evaluation of Gregory was done at intake,

  k.   The fact that no medical evaluation of Gregory was performed during the entirety of his detention from August 3, 2021, until his death on August 12, 2021,

  l.   The fact that no order was ever put in for Gregory to be seen by a physician or other licensed medical professional as defined in 57 O.S. § 4.1(3) despite his serious condition and lack of medical intake,

  m.   The fact that Gregory was screaming for medical attention for four days before his death,

98

EXHIBIT 3

n. The fact that untreated psychosis can interfere with the performing of a medical intake on a detainee which can result in serious medical issues going unreported, undiagnosed, and/or untreated.

444. Despite this awareness, Eastman failed to ever refer Gregory for appropriate psychiatric care or for outside hospital/specialty care despite the fact that the only times he had been seen by any jail medical or mental health staff was by Defendant Okongor, an LPC, on August 6th and August 9th.

445. Despite her awareness of Gregory's ongoing psychosis and the serious risk to his health, Eastman never made an attempt to perform a medical intake assessment of Gregory at any time after August 4, 2021, when Defendant Williams tried and ultimately put in a note for mental health personnel to see Gregory.

446. Despite her awareness of Gregory's ongoing psychosis and lack of medical assessment, Eastman never put in an order for Gregory to be seen by any physician or licensed medical professional as defined in 57 O.S. § 4.1(3).

447. These actions and failures to act, with knowledge of Gregory's serious condition and the substantial risks to his health and safety posed by the ongoing psychosis, the failure to perform a medical intake assessment, and the information set forth above, constitute deliberate indifference to the obvious risks to Gregory's health and safety.

448. As a result of these deliberately indifferent actions and failures to act, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied

99

EXHIBIT 3

appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

449.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

450.    As a result of these deliberately indifferent actions and failures to act, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendant Horn**

451.    Defendant Horn was employed by Turn Key at the Oklahoma County Jail during Gregory's detention as an RN.

452.    Defendant Horn was directly involved in the care of – or lack thereof – Gregory during his detention.

453.    Defendant Horn observed Gregory on multiple occasions and was aware of:

   o.  Gregory's ongoing psychosis,

   p.  The failures of all staff involved in the treatment of Gregory to refer him for appropriate psychological and/or outside hospital care,

   q.  The fact that no medical evaluation of Gregory was done at intake,

   r.  The fact that no medical evaluation of Gregory was performed during the entirety of his detention from August 3, 2021, until his death on August 12, 2021,

100

EXHIBIT 3

     s.   The fact that no order was ever put in for Gregory to be seen by a physician or other licensed medical professional as defined in 57 O.S. § 4.1(3) despite his serious condition and lack of medical intake,

     t.   The fact that Gregory was screaming for medical attention for four days before his death,

     u.   The fact that untreated psychosis can interfere with the performing of a medical intake on a detainee which can result in serious medical issues going unreported, undiagnosed, and/or untreated.

454.    Despite this awareness, Horn failed to ever refer Gregory for appropriate psychiatric care or for outside hospital/specialty care despite the fact that the only times he had been seen by any jail medical or mental health staff was by Defendant Okongor, an LPC, on August 6th and August 9th.

455.    Despite her awareness of Gregory's ongoing psychosis and the serious risk to his health, Horn never made an attempt to perform a medical intake assessment of Gregory at any time after August 4, 2021, when Defendant Williams tried and ultimately put in a note for mental health personnel to see Gregory.

456.    Despite her awareness of Gregory's ongoing psychosis and lack of medical assessment, Horn never put in an order for Gregory to be seen by any physician or licensed medical professional as defined in 57 O.S. § 4.1(3).

457.    These actions and failures to act, with knowledge of Gregory's serious condition and the substantial risks to his health and safety posed by the ongoing psychosis, the failure to

EXHIBIT 3

perform a medical intake assessment, and the information set forth above, constitute deliberate indifference to the obvious risks to Gregory's health and safety.

458.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

459.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

460.    As a result of these deliberately indifferent actions and failures to act, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendant Hallock**

461.    Defendant Hallock was employed by Turn Key at the Oklahoma County Jail during Gregory's detention as an RN.

462.    Defendant Hallock was directly involved in the care of – or lack thereof – Gregory during his detention.

463.    Defendant Hallock observed Gregory on multiple occasions and was aware of:

      v.  Gregory's ongoing psychosis,

EXHIBIT 3

w. The failures of all staff involved in the treatment of Gregory to refer him for appropriate psychological and/or outside hospital care,

x. The fact that no medical evaluation of Gregory was done at intake,

y. The fact that no medical evaluation of Gregory was performed during the entirety of his detention from August 3, 2021, until his death on August 12, 2021,

z. The fact that no order was ever put in for Gregory to be seen by a physician or other licensed medical professional as defined in 57 O.S. § 4.1(3) despite his serious condition and lack of medical intake,

aa. The fact that Gregory was screaming for medical attention for four days before his death,

bb. The fact that untreated psychosis can interfere with the performing of a medical intake on a detainee which can result in serious medical issues going unreported, undiagnosed, and/or untreated.

464.    Despite this awareness, Hallock failed to ever refer Gregory for appropriate psychiatric care or for outside hospital/specialty care despite the fact that the only times he had been seen by any jail medical or mental health staff was by Defendant Okongor, an LPC, on August 6th and August 9th.

465.    Despite her awareness of Gregory's ongoing psychosis and the serious risk to his health, Hallock never made an attempt to perform a medical intake assessment of Gregory at any time after August 4, 2021, when Defendant Williams tried and ultimately put in a note for mental health personnel to see Gregory.

103

EXHIBIT 3

466.    Despite her awareness of Gregory's ongoing psychosis and lack of medical assessment, Hallock never put in an order for Gregory to be seen by any physician or licensed medical professional as defined in 57 O.S. § 4.1(3).

467.    These actions and failures to act, with knowledge of Gregory's serious condition and the substantial risks to his health and safety posed by the ongoing psychosis, the failure to perform a medical intake assessment, and the information set forth above, constitute deliberate indifference to the obvious risks to Gregory's health and safety.

468.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

469.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

470.    As a result of these deliberately indifferent actions and failures to act, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendant Merriott**

471.    Defendant Merriott was employed by Turn Key at the Oklahoma County Jail during Gregory's detention as an RN.

EXHIBIT 3

472.     Defendant Merriott was directly involved in the care of – or lack thereof – Gregory during his detention.

473.     Defendant Merriott observed Gregory on multiple occasions and was aware of:

cc. Gregory's ongoing psychosis,

dd. The failures of all staff involved in the treatment of Gregory to refer him for appropriate psychological and/or outside hospital care,

ee. The fact that no medical evaluation of Gregory was done at intake,

ff. The fact that no medical evaluation of Gregory was performed during the entirety of his detention from August 3, 2021, until his death on August 12, 2021,

gg. The fact that no order was ever put in for Gregory to be seen by a physician or other licensed medical professional as defined in 57 O.S. § 4.1(3) despite his serious condition and lack of medical intake,

hh. The fact that Gregory was screaming for medical attention for four days before his death,

ii. The fact that untreated psychosis can interfere with the performing of a medical intake on a detainee which can result in serious medical issues going unreported, undiagnosed, and/or untreated.

474.     Despite this awareness, Merriott failed to ever refer Gregory for appropriate psychiatric care or for outside hospital/specialty care despite the fact that the only times he had been seen by any jail medical or mental health staff was by Defendant Okongor, an LPC, on August 6th and August 9th.

EXHIBIT 3

475.    Despite her awareness of Gregory's ongoing psychosis and the serious risk to his health, Merriott never made an attempt to perform a medical intake assessment of Gregory at any time after August 4, 2021, when Defendant Williams tried and ultimately put in a note for mental health personnel to see Gregory.

476.    Despite her awareness of Gregory's ongoing psychosis and lack of medical assessment, Merriott never put in an order for Gregory to be seen by any physician or licensed medical professional as defined in 57 O.S. § 4.1(3).

477.    These actions and failures to act, with knowledge of Gregory's serious condition and the substantial risks to his health and safety posed by the ongoing psychosis, the failure to perform a medical intake assessment, and the information set forth above, constitute deliberate indifference to the obvious risks to Gregory's health and safety.

478.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

479.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

106

EXHIBIT 3

480.    As a result of these deliberately indifferent actions and failures to act, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendants John/Jane Doe 6-10**

481.    Defendants John/Jane Doe 6-10 were employed by Turn Key at the Oklahoma County Jail during Gregory's detention as LPNs.

482.    Defendants John/Jane Doe 6-10 were directly involved in the care of – or lack thereof – Gregory during his detention.

483.    Defendants John/Jane Doe 6-10 observed Gregory on multiple occasions and were aware of:

  jj. Gregory's ongoing psychosis,

  kk. The failures of all staff involved in the treatment of Gregory to refer him for appropriate psychological and/or outside hospital care,

  ll. The fact that no medical evaluation of Gregory was done at intake,

  mm.  The fact that no medical evaluation of Gregory was performed during the entirety of his detention from August 3, 2021, until his death on August 12, 2021,

  nn. The fact that no order was ever put in for Gregory to be seen by a physician or other licensed medical professional as defined in 57 O.S. § 4.1(3) despite his serious condition and lack of medical intake,

  oo. The fact that Gregory was screaming for medical attention for four days before his death,

107

EXHIBIT 3

> pp. The fact that untreated psychosis can interfere with the performing of a medical intake on a detainee which can result in serious medical issues going unreported, undiagnosed, and/or untreated.

484.    Despite this awareness, Defendants John/Jane Doe 6-10 failed to ever refer Gregory for appropriate psychiatric care or for outside hospital/specialty care despite the fact that the only times he had been seen by any jail medical or mental health staff was by Defendant Okongor, an LPC, on August 6th and August 9th.

485.    Despite their awareness of Gregory's ongoing psychosis and the serious risk to his health, Defendants John/Jane Doe 6-10 never made an attempt to perform a medical intake assessment of Gregory at any time after August 4, 2021, when Defendant Williams put in a note for mental health personnel to see Gregory.

486.    Despite their awareness of Gregory's ongoing psychosis and lack of medical assessment, Defendants John/Jane Doe 6-10 never put in an order for Gregory to be seen by any physician or licensed medical professional as defined in 57 O.S. § 4.1(3).

487.    These actions and failures to act, with knowledge of Gregory's serious condition and the substantial risks to his health and safety posed by the ongoing psychosis, the failure to perform a medical intake assessment, and the information set forth above, constitute deliberate indifference to the obvious risks to Gregory's health and safety.

488.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including continued psychosis, abdominal pain, and internal bleeding because he was denied

EXHIBIT 3

appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

489.    As a result of these deliberately indifferent actions and failures to act, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

490.    As a result of these deliberately indifferent actions and failures to act, Gregory died prematurely because he was denied appropriate psychiatric care, denied appropriate medical care, and denied appropriate monitoring of his condition.

**Defendants John/Jane Doe 1-5**

337.    Each of John/Jane Doe 1-5 were involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

338.    Each of John/Jane Doe 1-5 were aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339.    Each of John/Jane Doe 1-5 were aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him

109

**EXHIBIT 3**

persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340.    Each of John/Jane Doe 1-5 observed and were aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341.    Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, each of John/Jane Doe 1-5 did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

342.    It was unreasonable for each of John/Jane Doe 1-5 to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343.    It was unreasonable for each of John/Jane Doe 1-5 to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

344.    The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the

110

EXHIBIT 3

obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

345. As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

346. As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

347. As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Anderson**

337. Anderson was involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

111

**EXHIBIT 3**

338.     Anderson was aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339.     Anderson was aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340.     Anderson was aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341.     Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, Anderson did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

342.     It was unreasonable for Anderson to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343.     It was unreasonable for Anderson to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

344.  At approximately 6:45 a.m. on August 12, 2021, Defendant Anderson, with Defendant Morris, clearly recognized that Gregory was in need of urgent medical attention and failed to obtain such attention for him or to notify any other jailer or medical professional of Gregory's urgent medical needs.

112

**EXHIBIT 3**

345.   The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

346.   As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

347.   As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

348.   As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Morris**

337.   Morris was involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently

113

EXHIBIT 3

pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

338.    Morris was aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339.    Morris was aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340.    Morris was aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341.    Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, Morris did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

342.    It was unreasonable for Morris to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343.    It was unreasonable for Morris to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

114

EXHIBIT 3

344. At approximately 6:45 a.m. on August 12, 2021, Defendant Anderson, with Defendant Morris, clearly recognized that Gregory was in need of urgent medical attention and failed to obtain such attention for him or to notify any other jailer or medical professional of Gregory's urgent medical needs.

345.      The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

346.      As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

347.      As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

348.      As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Kallos**

115

EXHIBIT 3

337.    Kallos was involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

338.    Kallos was aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339.    Kallos was aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340.    Kallos was aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341.    Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, Kallos did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

116

EXHIBIT 3

342.     It was unreasonable for Kallos to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343.     It was unreasonable for Kallos to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

344.     The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

345.     As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

346.     As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

347.     As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

117

EXHIBIT 3

**Defendant Mullanax**

337.     Mullanax was involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

338.     Mullanax was aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339.     Mullanax was aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340.     Mullanax was aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341.     Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, Mullanax did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

EXHIBIT 3

342.    It was unreasonable for Mullanax to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343.    It was unreasonable for Mullanax to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

344.    The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

345.    As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

346.    As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

347.    As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

119

EXHIBIT 3

**Defendant Harvey**

337. Harvey was involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

338. Harvey was aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339. Harvey was aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340. Harvey was aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341. Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, Harvey did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

120

**EXHIBIT 3**

342.    It was unreasonable for Harvey to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343.    It was unreasonable for Harvey to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

344.    The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

345.    As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

346.    As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

347.    As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

EXHIBIT 3

**Defendant Dean**

337.     Dean was involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

338.     Dean was aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339.     Dean was aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340.     Dean was aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341.     Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, Dean did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

122

**EXHIBIT 3**

342.     It was unreasonable for Dean to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343.     It was unreasonable for Dean to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

344.     The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

345.     As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

346.     As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

347.     As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

123

EXHIBIT 3

**Defendant Carter**

337.    Carter was involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

338.    Carter was aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339.    Carter was aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340.    Carter was aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341.    Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, Carter did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

124

EXHIBIT 3

342.     It was unreasonable for Carter to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343.     It was unreasonable for Carter to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

344.     The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

345.     As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

346.     As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

347.     As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

125

**EXHIBIT 3**

**Defendant Depee**

337.    Depee was involved in the monitoring and performance of medical observation sight checks of Gregory during the period of his detention, specifically during the period from August 3rd through 12th, 2021, when Gregory was exhibiting clear signs of psychosis that were left untreated and, subsequently, when Gregory was persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life as his physical condition obviously deteriorated.

338.    Depee was aware of Gregory's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

339.    Depee was aware of the serious medical needs and deteriorating condition as they Gregory's physical condition deteriorate and heard him persistently pleading for medical assistance and complaining of persistent, worsening severe abdominal pain for the last few days of his life.

340.    Depee was aware that nothing was being done for Gregory to treat the persistent, worsening severe abdominal pain for the last few days of his life.

341.    Despite being aware of the obvious, serious medical need and risk Gregory presented, and despite being aware that medical staff was not doing anything to treat the persistent, worsening severe abdominal pain for the last few days of his life, Depee did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Gregory's obvious serious condition and lack of medical care.

126

EXHIBIT 3

342. It was unreasonable for Depee to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Gregory exhibited.

343. It was unreasonable for Depee to simply defer to jail medical staff when it was obvious that Gregory was not receiving any treatment for his obvious medical needs.

344. The decision to not seek outside or emergency medical attention for Gregory, to raise concerns about the complete lack of treatment of Gregory to medical staff or the jailers' supervisors, was made with full knowledge of Gregory's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Gregory and the obvious risk of harm presented to Gregory by his untreated conditions.

345. As a result of these decisions not to act, made with deliberate indifference, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, including severe and persistently worsening, because he was denied appropriate medical care and monitoring of his condition.

346. As a result of these decisions not to act, made with deliberate indifference, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

347. As a result of these decisions not to act, made with deliberate indifference, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

127

EXHIBIT 3

## COUNT II: DELIBERATELY INDIFFERENT POLICIES, PRACTICES, AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983

### (Against County, Trust, and Turn Key)

491. Plaintiff incorporates all previous allegations and statements as if fully restated herein.

**Defendant Trust**

492. Defendant Trust, to the extent that it is responsible for overseeing the operation of the Oklahoma County Detention Center, supervising and training staff, and overseeing the provision of medical and mental health services to inmates, is liable for its deliberate indifference to longstanding, well-known deficient conditions, training, practices, policies, and customs pertaining to the provision of medical care to detainees.

493. The above-described conduct reflects established policies, practices, customs, or decisions, officially adopted or informally accepted, ratified, or condoned by Defendant Trust, and its officials and employees, that consists of:

    a. Perpetually understaffing the Oklahoma County Detention Center in regard to detention officers, which results in a lack of supervision of inmates/detainees, and leaves detention officers to respond to multiple calls and responsibilities at once, causing them to skip or delay certain tasks such as sight checks on inmates, reporting medical emergencies, and responding to inmates's/detainees' requests for medical/mental health attention;

    b. Widespread deficient sight checks of inmates/detainees, whereby detention officers rely solely on a "wand" placed in a small hole at the door of the cell, to count the number of inmates in the cell, without ever laying eyes on the inmates/detainees to check if they are in medical distress or otherwise in need of medical/mental health attention;

128

EXHIBIT 3

c.  Widespread failures to perform sight checks at all, with whole pods going substantial periods of time with no actual officer present in the pod for a sight check or to respond to any requests or needs for emergency medical/mental health attention and provide access to needed medical providers;

d.  Widespread failures to provide necessary medical treatment to inmates/detainees with mental health and/or psychiatric needs, inclusive of failing to perform medical intakes or assessments of these individuals, failing to obtain any psychiatric care for such detainees while detained despite knowing of their condition and the risks posed to their health and safety, failing to provide access to appropriate, qualified medical professionals for evaluation, assessment and treatment, as well as failure to transfer such inmates to outside facilities for care when detention officers and medical staff were aware of the need for such transfer and the inability of the Oklahoma County Detention Center's inability to care for those inmates;

e.  Failure to monitor the post where inmate/detainee in-cell phone/intercom calls, requesting emergency help, are routed, resulting in calls for emergency medical/mental health attention going unanswered and not responded to and preventing inmates/detainees from access to needed medical providers;

f.  Failure to maintain the inmate/detainee in-cell phone/intercom system in working order, despite knowing of widespread problems and inoperable phones/intercoms, resulting in many cells and many inmates having no ability to call detention officers or medical staff for emergency medical/mental health attention and preventing access to needed medical providers;

129

EXHIBIT 3

g. Failing to provide inmates/detainees with required and necessary instructions how to use the in-cell phone/intercom system to call for emergency medical/mental health assistance, which was of great importance to the safety of inmates/detainees and their only opportunity to request such necessary emergency medical/mental health assistance given the absence of detention officers in whole pods and even on entire floors for substantial periods of time and prevented inmates/detainees having access to needed medical providers;

h. Failure to supervise detention officers in the performance of their duties, specifically including sight checks, when County, Trust, and Administrator knew of the ongoing, widespread failures to conduct sight checks on inmates/detainees as required, including failing to conduct more frequent sight checks on inmates/detainees who were placed on heightened observation due to their medical/mental health needs which caused undue delay in the provision of medical/mental health care in emergencies and prevented inmates from having access to needed medical providers;

i. Failure to supervise detention officers in the performance of their duties in regard to manning the proper post, answering, and responding to inmate calls for emergency assistance for medical/mental health needs;

j. Failure to train detention officers regarding the importance of conducting sight checks in a timely manner – and at all – during initial new-hire training, during annual in-service training or and failure to perform any remedial training after becoming acutely aware of the widespread, repeated, and continuing failures of detention officers to sight checks;

130

EXHIBIT 3

k. Repeatedly failing to report, and attempting to cover up, serious injuries to and repeated deprivations of medical care to inmates/detainees at the Oklahoma County Detention Center;

l. Continuing to contract with Defendant Turn Key to be the sole provider of medical and mental health/psychiatric care at the jail, given the ongoing, repeated and widespread failures to provide screenings and assessments of inmates with serious mental health/psychiatric needs

494. The understaffing and lack of supervision of detention officers resulting in complete failures to supervise inmates and leaving whole floors with no detention officer(s) present for long periods of time, when paired with the failure to keep the in-cell phone/intercom system working and the failure to have any officer(s) monitoring and answering those calls, left inmates such as Gregory no opportunity to receive emergency medical/mental health assessment beyond screaming out in pain and distress begging for medical attention, even in the medical observation unit Gregory was placed in.

495. The Oklahoma County Detention Center has a long history of failing to provide access to adequate medical care such that Defendant Trust was on notice of the systemic issues within the Oklahoma County Detention Center well before Gregory's detention and death, as set out herein.

496. The Oklahoma County Jail has a long history of failing to properly supervise inmates (and failing to train and supervise its staff to ensure sight checks are actually being performed and being performed correctly), including while under the control of Defendant Trust, prior to Gregory's detention and death, as set out herein.

131

EXHIBIT 3

497.    As a part of the ongoing and repeated failures to supervise inmates and provide access to medical care for serious medical needs, the Oklahoma County Detention Center has a long history of failing to train its jail staff, as set out herein.

498.    Prior to Gregory's detention and death, Defendant Trust was aware that, pursuant to OAC 310:670-5-1(1)(C), the admission process of new inmates shall include an intake screening by trained facility personnel or by a physician or other licensed medical personnel.

499.    Prior to Gregory's detention and death, the Oklahoma County Detention Center and Defendant Trust, were notified by the OSDH by at least July of 2021 that they were not in compliance with this regulatory requirement and were not ensuring that medical intakes were being performed upon admission of a detainee.

500.    At the time of Gregory's death, the Oklahoma County Detention Center and Defendant Trust, continued to fail to perform medical intakes upon admission of detainees.

501.    In October 2021, in a surprise inspection of the Oklahoma County Jail by the OSDH which was performed in part as a response to the incident report of Gregory's death, the Oklahoma County Jail and Defendants County, Trust, and Administrator, were found to still be in non-compliance with this regulatory requirement by failing to perform medical intakes upon admission of detainees.

502.    Each of Defendants County, Trust, and Administrator, were aware, prior to Gregory's detention, that jail staff were repeatedly and consistently failing to conduct inmate counts at the beginning of each shift, with each count expected to verify that each and every inmate in the jail is alive and breathing before counting the inmate.

132

EXHIBIT 3

503.   At the time of Gregory's detention, these counts, along with periodic sight checks, were not being performed.

504.   Each of Defendants County, Trust, and Administrator, were made aware of the failures to perform these checks by the OSDH by at least July 2021.

505.   Had such checks been properly performed by properly trained jailers, Gregory might have been provided basic medical care which could have saved his life.

506.   In July 2021, prior to Gregory's detention, each of Defendants County, Trust, and Administrator, were made aware by the OSDH that numerous inmates did not have working intercoms in their cells through which they could request emergency medical assistance and were made aware that numerous inmates reported that their calls for help went unanswered; further, many inmates had not even been provided the inmate handbook which contained this vital, necessary information.

507.   In July 2021, prior to Gregory's death, each of Defendants County, Trust, and Administrator, were made aware by the OSDH that at times whole floors of the jail had no officer assigned to them.

508.   In July of 2021, prior to Gregory's death, each of Defendants County, Trust, and Administrator, were made aware by the OSDH that inmates reported they only see staff in their housing pods at meal time.

509.   In July of 2021, prior to Gregory's death, each of Defendants County, Trust, and Administrator, were made aware by the OSDH that detention staff reported that the need to perform additional duties on multiple floors resulted in minimal direct inmate supervision in the pods, missed sight checks, late meals, lack of medical care, and poor sanitation.

EXHIBIT 3

510.    In July of 2021, the OSDH noted that the facility administrator, believed to be Administrator at that time, could not provide a policy and procedure for medical and health care services, including emergencies, sick call, clinical referrals and medication, when requested the Department of Health for review.

511.    In July 2021, each of Defendants County, Trust, and Administrator, were made aware by the OSDH that one inmate had a medical referral for transfer due to "medical and psychiatric necessity" six months after admission noting that the inmate was continuing to decline physically due to severe mental illness and had become unfit to stay at the Oklahoma County Jail. Additional referral notices were entered for the following several months with no documentation of any follow-up.

512.    In July of 2021, each of Defendants County, Trust, and Administrator, were made aware by the OSDH that medical intake screenings, required to be performed upon the admission of a detainee, were repeatedly not being performed as required.

513.    Despite already having failed to produce the policies and procedures of the facility for provision of medical care in July of 2021, Defendants County, Trust, and Administrator, were each aware that the Health Services Policy and Procedure Manual used in the jail, by Defendant Turn Key, was to be reviewed annually by the "Facility Administrator."

514.    In disregard of this, as of October 2021, the Health Services Policy and Procedure Manual had not been reviewed or revised since August 31, 2018 by any of Defendants County, Trust, and Administrator.

515.    Despite having already been notified that the Jail was in continued non-compliance with Oklahoma regulations for failing to ensure medical intake screenings were performed upon the

EXHIBIT 3

admission of each detainee, each Defendants County, Trust, and Administrator, failed to take any corrective action, which resulted in the failure to perform a medical intake screening on Gregory.

516. In October 2021, the Oklahoma County Jail was still found to be failing to perform medical intake screenings upon the admission of each detainee.

517. Despite notice of each of the serious deficiencies regarding providing medical care to inmates, each of Defendants County, Trust, and Administrator, failed to take any steps to rectify these issues through either additional training or through implementation of corrective policies, procedures, and customs.

518. The complete failure of each of Defendants County, Trust, and Administrator, with the substantial notice they had of each of these issues which are related to Gregory's death prior to his death, constitutes deliberate indifference to the need for more or better training, the need for adopted policies and procedures in identified categories, and the continued operation of a custom of failing to provide adequate medical care to inmates, including simply performing medical intake screenings and performing sight checks.

519. This deliberate indifference of each of Defendants County, Trust, and Administrator was the moving force behind the constitutionally-violative and deficient actions of the individual defendants identified herein.

520. This deliberate indifference of each of Defendants County, Trust, and Administrator, was the cause of Gregory's death.

521. Furthermore, each of Defendants County, Trust, and Administrator were or should have been aware the Defendant Turn Key has a pattern and practice of providing constitutionally

EXHIBIT 3

insufficient medical care, including, but not limited to, awareness of Turn Key's extensive history of being sued for incompetent medical care prior to this incident.

522.   The choice to continue to retain Turn Key with its lengthy record of denying inmates necessary medical care and detainee-patient abuse, was made with deliberate indifference to the known and obvious risk Turn Key poses to the safety and health of detainees unfortunate enough to be left under its care.

523.   As a result of his choice to continue to use Turn Key in the Oklahoma County Jail, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, because he was denied appropriate medical care and monitoring of his condition, specifically including being deprived of *any* medical intake screening or medical treatment during the entire time he was present in the Oklahoma County Jail.

524.   As a result of his choice to continue to use Turn Key in the Oklahoma County Jail, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

525.   As a result of his choice to continue to use Turn Key in the Oklahoma County Jail, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

526.   Defendant Administrator, is the final policy and decisionmaker for Defendant Trust as to operations of the detention center, such that his decisions and actions are attributable to Defendant Trust.

136

EXHIBIT 3

527.   Defendant Administrator was aware of persistent problems within the Oklahoma County Detention Center, and continued and/or promulgated the following policies/customs/practices:

a.   Perpetually understaffing the Oklahoma County Detention Center in regard to detention officers, which results in a lack of supervision of inmates/detainees, and leaves detention officers to respond to multiple calls and responsibilities at once, causing them to skip or delay certain tasks such as sight checks on inmates, reporting medical emergencies, and responding to inmates's/detainees' requests for medical/mental health attention;

b.   Widespread deficient sight checks of inmates/detainees, whereby detention officers rely solely on a "wand" placed in a small hole at the door of the cell, to count the number of inmates in the cell, without ever laying eyes on the inmates/detainees to check if they are in medical distress or otherwise in need of medical/mental health attention;

c.   Widespread failures to perform sight checks at all, with whole pods going substantial periods of time with no actual officer present in the pod for a sight check or to respond to any requests or needs for emergency medical/mental health attention and provide access to needed medical providers;

d.   Widespread failures to provide necessary medical treatment to inmates/detainees with mental health and/or psychiatric needs, inclusive of failing to perform medical intakes or assessments of these individuals, failing to obtain any psychiatric care for such detainees while detained despite knowing of their condition and the risks posed to their health and safety, failing to provide access to appropriate, qualified medical professionals for evaluation, assessment and treatment, as well as failure to transfer such inmates to outside

137

**EXHIBIT 3**

facilities for care when detention officers and medical staff were aware of the need for such transfer and the inability of the Oklahoma County Detention Center's inability to care for those inmates;

e. Failure to monitor the post where inmate/detainee in-cell phone/intercom calls, requesting emergency help, are routed, resulting in calls for emergency medical/mental health attention going unanswered and not responded to and preventing inmates/detainees from access to needed medical providers;

f. Failure to maintain the inmate/detainee in-cell phone/intercom system in working order, despite knowing of widespread problems and inoperable phones/intercoms, resulting in many cells and many inmates having no ability to call detention officers or medical staff for emergency medical/mental health attention and preventing access to needed medical providers;

g. Failing to provide inmates/detainees with required and necessary instructions how to use the in-cell phone/intercom system to call for emergency medical/mental health assistance, which was of great importance to the safety of inmates/detainees and their only opportunity to request such necessary emergency medical/mental health assistance given the absence of detention officers in whole pods and even on entire floors for substantial periods of time and prevented inmates/detainees having access to needed medical providers;

h. Failure to supervise detention officers in the performance of their duties, specifically including sight checks, when County, Trust, and Administrator knew of the ongoing, widespread failures to conduct sight checks on inmates/detainees as required, including

138

EXHIBIT 3

failing to conduct more frequent sight checks on inmates/detainees who were placed on heightened observation due to their medical/mental health needs which caused undue delay in the provision of medical/mental health care in emergencies and prevented inmates from having access to needed medical providers;

i.  Failure to supervise detention officers in the performance of their duties in regard to manning the proper post, answering, and responding to inmate calls for emergency assistance for medical/mental health needs;

j.  Failure to train detention officers regarding the importance of conducting sight checks in a timely manner – and at all – during initial new-hire training, during annual in-service training or and failure to perform any remedial training after becoming acutely aware of the widespread, repeated, and continuing failures of detention officers to sight checks;

k.  Repeatedly failing to report, and attempting to cover up, serious injuries to and repeated deprivations of medical care to inmates/detainees at the Oklahoma County Detention Center;

l.  Continuing to contract with Defendant Turn Key to be the sole provider of medical and mental health/psychiatric care at the jail, given the ongoing, repeated and widespread failures to provide screenings and assessments of inmates with serious mental health/psychiatric needs

528.  Prior to and during Gregory's detention, Administrator permitted these deficient practices to continue with full knowledge of their existence, the reasoning behind such practices, and the substantial risk of harm such practices posed to the safety of inmates/detainees in the

139

EXHIBIT 3

Oklahoma County Detention Center. Accordingly, Administrator ratified the these practices such that they are attributable to Defendant Trust.

529.   After Gregory's death, Defendant Trust and/or Defendant Administrator conducted a review and investigation of Gregory's detention and death, and in doing so chose not to take any action to discipline, retrain, terminate, or otherwise correct the conduct of the Jailer Defendants such that the actions of those employees is attributed to Defendant Trust.

530.   The ratification of the actions of Trust and/or Administrator's subordinates, with the knowledge set out above of those actions, the reasons for those actions, and the risks of constitutional violations presented by those actions, evidences Trust's policies and procedures that Trust's subordinates followed in their failures to supervise, monitor, and obtain medical care for Gregory, that those policies and procedures were the moving force behind denying Gregory adequate medical care and evidences deliberate indifference to the risks of constitutional violations presented by those policies and procedures.

531.   In an effort to prioritize cost-cutting over ensuring detainees at the Oklahoma County Detention Center receive constitutionally-sufficient and humane medical care, Trust has continually renewed its contract with Turn Key Health Clinics, LLC, ignoring Turn Key's record of deliberate indifference to the serious medical needs of inmates at the Oklahoma County Detention Center and at numerous other jails where Turn Key operates, as set out herein.

532.   The choice to continue to retain Turn Key with its lengthy record of denying inmates necessary medical care and detainee-patient abuse, was made with deliberate indifference to

140

EXHIBIT 3

the known and obvious risk Turn Key poses to the safety and health of detainees unfortunate enough to be left under its care.

533.   As a result of this choice to continue to use Turn Key in the Oklahoma County Detention Center, Gregory suffered prolonged psychosis, prolonged persistent severe and worsening abdominal pain, loss of chance of survival, and death because he was denied appropriate medical care and monitoring of his condition.

534.   As a result of this choice to continue to use Turn Key in the Oklahoma County Detention Center, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

535.   As a result of this choice to continue to use Turn Key in the Oklahoma County Detention Center, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

536.   Further, Trust is complicit in Turn Key's deliberately indifferent policies and procedures that focus on cost-saving over providing constitutionally-required medical care, as evidenced by the provision of County's contract with Turn Key wherein County is responsible for outside medical care costs in excess of $1,450,000.00, with Turn Key being responsible for that portion.

537.   This policy encourages Turn Key to under-utilize necessary outside medical care costs in order to prevent costing Trust more money than they already pay Turn Key under the contract.

141

EXHIBIT 3

538.  This policy further encourages Turn Key to under-utilize necessary outside medical care costs in order to limit County's financial exposure for outside medical costs in excess of $1,450,000.00.

539.  In its efforts to prioritize cost-cutting over ensuring detainees at the Oklahoma County Detention Center receive constitutionally-required medical care, Trust encourages and ratifies Turn Key's policies and acts which purposefully under-utilize outside medical care and specialty care for seriously ill inmates and inmates with serious mental health/psychiatric needs at the Oklahoma County Detention Center.

540.  As a result of this policy of deliberately under-utilizing outside and specialty medical care, Gregory suffered prolonged psychosis, prolonged persistent severe and worsening abdominal pain, loss of chance of survival, and death because he was denied appropriate medical care and monitoring of his condition.

541.  As a result of this policy of deliberately under-utilizing outside and specialty medical care, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

542.  As a result of this policy of deliberately under-utilizing outside and specialty medical care, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant County**

543.  Defendant County retains supervisory and final authority over the contracting for medical services at the Oklahoma County Detention Center, with any contract for such services at the jail requiring approval of the Board of County Commissioners.

EXHIBIT 3

544.   In exercise of this role, County is responsible for the effects of its own policy decisions which violate the Constitutional rights of citizens, including detainees at the Oklahoma County Detention Center.

**Maintaining a policy, practice, and/or custom with deliberate indifference to the violation of detainees' constitutional right to medical care**

545.   In an effort to prioritize cost-cutting over ensuring detainees at the Oklahoma County Detention Center receive constitutionally-sufficient and humane medical care, County has continually renewed its contract with Turn Key Health Clinics, LLC, ignoring Turn Key's record of deliberate indifference to the serious medical needs of inmates at the Oklahoma County Detention Center and at numerous other jails where Turn Key operates, as set out herein.

546.   The choice to continue to retain Turn Key with its lengthy record of denying inmates necessary medical care and detainee-patient abuse, was made with deliberate indifference to the known and obvious risk Turn Key poses to the safety and health of detainees unfortunate enough to be left under its care.

547.   As a result of this choice to continue to use Turn Key in the Oklahoma County Detention Center, Gregory suffered prolonged psychosis, prolonged persistent severe and worsening abdominal pain, loss of chance of survival, and death because he was denied appropriate medical care and monitoring of his condition.

548.   As a result of this choice to continue to use Turn Key in the Oklahoma County Detention Center, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

143

EXHIBIT 3

549.    As a result of this choice to continue to use Turn Key in the Oklahoma County Detention Center, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

550.    Further, County is complicit in Turn Key's deliberately indifferent policies and procedures that focus on cost-saving over providing constitutionally-required medical care, as evidenced by the provision of County's contract with Turn Key wherein County is responsible for outside medical care costs in excess of $1,450,000.00, with Turn Key being responsible for that portion.

551.    This policy encourages Turn Key to under-utilize necessary outside medical care costs in order to prevent costing County more money than they already pay Turn Key under the contract.

552.    This policy further encourages Turn Key to under-utilize necessary outside medical care costs in order to limit County's financial exposure for outside medical costs in excess of $1,450,000.00.

553.    In its efforts to prioritize cost-cutting over ensuring detainees at the Oklahoma County Detention Center receive constitutionally-required medical care, County encourages and ratifies Turn Key's policies and acts which purposefully under-utilize outside medical care and specialty care for seriously ill inmates and inmates with serious mental health/psychiatric needs at the Oklahoma County Detention Center.

554.    As a result of this policy of deliberately under-utilizing outside and specialty medical care, Gregory suffered prolonged psychosis, prolonged persistent severe and worsening abdominal

144

EXHIBIT 3

pain, loss of chance of survival, and death because he was denied appropriate medical care and monitoring of his condition.

555.    As a result of this policy of deliberately under-utilizing outside and specialty medical care, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

556.    As a result of this policy of deliberately under-utilizing outside and specialty medical care, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Turn Key**

557.    Plaintiff incorporates all previous allegations and statements herein.

558.    Defendants County, Trust, and/or Administrator delegated final authority to establish policies at the Oklahoma County Detention Center regarding detainee healthcare to Defendant Turn Key.

559.    Defendant Turn Key, acting on behalf of County, Trust, and/or Administrator, as decisionmaker with final authority to establish municipal policy regarding detainee healthcare, deprived Gregory of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution – specifically freedom from deprivation of adequate medical care constituting cruel and unusual punishment.

560.    The policies, practices, and customs, which were promulgated, created, implemented, and/or utilized by Defendant Turn Key represent the official policies and/or customs of County, Trust, and/or Administrator with regard to detainee health and safety.

145

EXHIBIT 3

561.    Turn Key and its executives have a business model that generates revenue through governmental contracts. Through these contracts, Turn Key assumes responsibility for the government's obligation to provide healthcare services to people who are not free to seek out healthcare for themselves.

562.    To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

563.    There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of healthcare services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Oklahoma County Detention Center to benefit Turn Key's investors in a manner that deprives inmates at the Oklahoma County Detention Center from receiving adequate medical care.

564.    Under the contract, Turn Key is responsible for paying for all pharmaceuticals and outside medical care costs up to a specific limit of financial liability, after which those costs are passed on to County and/or Trust. These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications to keep inmates, even inmates with serious, chronic medical needs, at the Oklahoma County Detention Center to avoid off-site medical costs.

565.    These financial incentives create risks to the health and safety of inmates like Gregory, who require specialty or outside psychiatric care and who require emergency medical care that requires transfer to an outside facility such as a hospital.

146

EXHIBIT 3

566.   Defendant Turn Key was directly involved in the violation of Gregory's constitutional rights in the following manners:

**Maintaining a policy, practice, and/or custom with deliberate indifference to the violation of detainees' constitutional right to medical care**

567.   Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with clear, severe mental health/psychiatric needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with clear, severe mental health/psychiatric needs.

568.   Further, Turn Key has no clear policy on how to identify inmates'/detainees' mental and/or medical symptoms and conditions which require lower-level nursing staff to contact a higher-level provider, refer an inmate/detainee to a higher level provider, or refer an inmate/detainee for care at an outside facility.

569.   During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care and/or nursing protocols specific to detainees' mental health, inclusive of psychosis. It is common knowledge that mental health issues are prevalent in the detainee/inmate population and it is vital that jail medical providers have policies and protocols in place establishing a constitutionally permissible standard of care for jail medical personnel in order to properly provide for those detainees' medical and mental health needs.

570.   Further, Turn Key's constitutionally-deficient policies, practices, and/or customs include:

a. Widespread failure to perform medical screening/evaluation of inmates/detainees with obvious, serious mental health/psychiatric conditions across multiple jails and multiple years, as set out in herein.

147

EXHIBIT 3

b. Turn Key has an established practice of failing to adequately assess and treat – and ignoring and disregarding – obvious or known symptoms of emergent and life-threatening conditions, such as Gregory's persistent complaints of worsening severe abdominal pain and the deterioration of his physical condition;

c. Turn Key does not review the policies and procedures of jails it operates in to ensure their own policies and procedures align with those facilities, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;

d. Turn Key asks each jail it operates in to review Turn Key's policies to ensure their own policies and procedures align with those of the facility but does nothing to follow up on that comparison or verify that it was done, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;

e. The failure to promulgate, implement, or enforce adequate policies and nursing protocols responsive to the serious medical and mental health/psychiatric needs of detainees like Gregory, inclusive of treating and managing mental health/psychiatric needs and identifying and responding to inmates/detainees' whose symptoms/condition require emergency medical care and/or transfer to an outside facility;

148

**EXHIBIT 3**

f. Not seeing detainees for follow-up by the proper level of medical provider in a timely manner as set out by the orders of treating physicians outside of the jail;

g. Detention of detainees with serious mental health/psychiatric needs, and/or serious emergency medical needs in the Oklahoma County Detention Center without access to the equipment, services, and specialty knowledge obviously needed to manage those conditions;

h. Only having *one* physician on staff, Dr. Cooper, for the entirety of several jails and thousands of persons under Turn Key's care throughout Oklahoma, leaving it practically impossible for that single physician to supervise and evaluate the care of detainees and the actions of lower-level providers, nurses, and jail medical staff;

i. Improperly and illegally delegating medical care tasks to jail medical staff beyond the legally-defined scope of their credentials and beyond their training and skill;

j. Having LPNs as the highest-trained medical provider at the jail the majority of the time, with other providers only on-call, even though Turn Key is aware that LPNs cannot assess or diagnose any medical condition, and Turn Key admittedly does nothing to train those LPNs to assess a medical condition, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;;

k. Severe limitation of or failure to utilize off-site medical and diagnostic service providers, even in emergent situations;

149

EXHIBIT 3

l.   Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees, as admitted by Turn Key Medical Director, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

571.   These failures stem from the chronic unavailability of an on-site or responsible, reviewing physician, financial incentives to avoid the costs of off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with serious mental health/psychiatric needs and inmates/detainees with obvious emergency medical needs, such as Gregory.

572.   Turn Key knew or should have known that jailers and medical personnel, including Defendants Turn Key Medical Staff, frequently encounter and detain individuals with serious mental health/psychiatric needs.

573.   Turn Key knew or should have known that jailers and medical personnel, including Defendants Turn Key Medical Staff, frequently encounter and detain individuals with emergency medical needs requiring care beyond that which is capable of being provided in the Oklahoma County Detention Center.

574.   Turn Key knew or should have known that jailers and medical personnel, including Defendants Turn Key Medical Staff, frequently encounter and detain individuals at heightened risk of injury or death.

150

EXHIBIT 3

575.    Turn Key knew and understood that discrepancies between Turn Key's policies and procedures and a jail's policies and procedures could lead to confusion and mistakes in the provision of care to detainees, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

576.    Turn Key knew that because their LPNs are not trained to assess a medical condition, they may not know that an inmate is suffering a medical/mental health/psychiatric condition that should be referred to a higher-level provider, as admitted by Turn Key Medical Director, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

577.    Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

**Deliberate indifference to the failure to train**

578.    Defendant Turn Key also failed to adequately train subordinates including each of Defendants Turn Key Medical Staff, in relation to the tasks they must perform, pursuant to the policies, practices, and or customs outlined above.

579.    As noted previously, Defendants County, Trust, and/or Administrator delegated policy-making authority to Defendant Turn Key and, therefore, the training and supervision policies, customs, and practices – or lack thereof – of Turn Key are the official policies, practices, and customs of Defendants County, Trust, and/or Administrator.

EXHIBIT 3

580. Turn Key's failures in training include:

    a. Not training its employees/nurses as to the specific policies and procedures of each jail it operates in, specifically including the Oklahoma County Detention Center, despite Turn Key's training materials indicating that such training is to be performed;

    b. Failing to train each of Defendants Turn Key Medical Staff on when and what conditions warrant contacting a higher-level on-call or outside medical provider for the assessment, diagnosis, and treatment of detainees with serious, emergency medical needs and with mental health/psychiatric and accompanying medical conditions and complications;

    c. Failing to train medical intake personnel at the jail to perform medical evaluations of inmates with ongoing mental health/psychiatric conditions so those inmates are not deprive of care while not able to communicate all of their medical needs due to their ongoing mental health/psychiatric condition;

    d. Detention of seriously ill detainees in the Oklahoma County Detention Center without access to the diagnostic equipment and laboratory services obviously needed to manage those conditions, such as Gregory's condition manifested as persistent complaints of worsening severe abdominal pain and obviously deteriorating physical condition;

    e. Detention of inmates/detainees with serious mental health/psychiatric needs in the Oklahoma County Detention Center when medical staff is fully aware that they

152

EXHIBIT 3

are not able to properly care for such inmate/detainee, such as with Gregory and with Christa Sullivan, as discussed herein;

f.   The failure to train jail medical employees on when and how to obtain assessment and evaluation of an inmate's serious medical needs from more qualified medical providers as dictated by both the standard of care within the field of nursing and within the specific field of correctional health care;

g.   The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as performing a medical evaluation of an inmate with serious mental health/psychiatric needs, are not being completed or left undone for days or weeks at a time; and

h.   Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees.

581.   These failures stem from the chronic unavailability of an on-site or responsible, reviewing physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex serious medical needs.

582.   Turn Key knew or should have known that jailers and medical personnel, including Defendants Turn Key Medical Staff, require training in order to adequately identify, evaluate, and treat serious mental health/psychiatric conditions and to adequately identify, evaluate,

153

EXHIBIT 3

and treat emergency medical needs of inmates, such as persistent complaints of worsening severe abdominal pain for days accompanied by an obviously deteriorating physical condition.

583. Turn Key knew or should have known that its failure to adequately train jailers and medical personnel under its exercise of control, including Defendants Turn Key Medical Staff, posed a substantial and excessive risk to the health and safety of detainees, including Gregory, and would inevitably result in unconstitutional deprivation of medical of the type that Gregory suffered.

**Deliberate indifference to the need for supervision**

584. As noted previously, Defendants County, Trust, and/or Administrator delegated policymaking authority to Defendant Turn Key and therefore the supervision policies and/or customs adopted by Defendant Turn Key are the official policies and/or customs of Defendants County, Trust, and/or Administrator.

585. Defendant Turn Key knew or should have known that jailers and medical personnel at the jail frequently encounter detainees with severe mental health/psychiatric needs, and encounter detainees with emergency medical issues which require transfer to an outside facility for the provision of treatment;

586. Defendant Turn Key knew or should have known that jailers and medical personnel at the jail require supervision in order to adequately identify, respond to, and detain individuals with severe mental health/psychiatric needs, and detainees with emergency medical issues which require transfer to an outside facility for the provision of treatment;

587. Defendant Turn Key knew or should have known that its failure to adequately supervise jailers and medical personnel under its exercise of control posed a substantial and excessive

154

EXHIBIT 3

risk to the health and safety of detainees such as Gregory and would inevitably result in unconstitutional deprivations of medical care of the type Gregory suffered.

588.    Defendant Turn Key's failures in supervision include:

a.  The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as to perform a medical evaluation of an inmate with mental health/psychiatric needs, are not being followed by nursing staff at all;

b.  Failing to supervise nursing staff's care of detainees to ensure that serious mental health/psychiatric needs are being properly referred to more qualified providers for assessment, diagnosis, and treatment of accompanying conditions and/or complications;

c.  Failing to supervise nursing staff's care of detainees to ensure that life-threatening emergency medical needs are being properly referred to more qualified providers for assessment, diagnosis, and treatment of accompanying conditions and/or complications;

d.  Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees;

e.  Failing to supervise the care of detainees under Turn Key's care to ensure that detainees are seen for follow up treatment and evaluations by properly qualified medical providers in a timely manner;

155

EXHIBIT 3

    f.   The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as performing a medical evaluation of an inmate with known mental health/psychiatric problems, are not being followed by nursing staff at all; and

    g.   Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees.

589.   These failures stem from the chronic unavailability of an on-site or responsible, reviewing physician and financial incentives to avoid the costs of off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with serious mental health/psychiatric needs and with life-threatening emergency medical needs.

590.   Turn Key's inadequate or non-existent policies, practices, and customs as described herein have resulted in deaths or negative medical outcomes in numerous cases, in addition to Gregory's.

591.   Defendant Dr. William Cooper, the Medical Director and responsible/supervising physician for Defendant Turn Key, is the final policy and decisionmaker for Defendant Turn Key on the medical protocols and treatment of patients under Turn Key's care and the hiring and firing of medical staff, such that his decisions and actions are attributable to Defendant Turn Key.

592.   In the alternative, Defendant Turn Key retained policy and decision-making authority on the medical protocols and treatment of patients under Turn Key's care.

EXHIBIT 3

593.    Defendant Cooper and/or Defendant Turn Key were aware of and reviewed the medical records and (almost non-existent) treatment for Gregory throughout the time he was detained, pursuant to the responsibility to review and supervise the actions of all lower-level providers in the provision of care. Throughout that time and after Gregory's death, Cooper and/or Turn Key ratified the actions and decisions of lower-level personnel and chose not to take any action to discipline, retrain, terminate, or otherwise correct the conduct of Defendants Turn Key Medical Staff, such that the actions of those employees are attributable to Defendant Turn Key.

594.    After Gregory's death, Defendant Cooper and/or Defendant Turn Key conducted a mortality review of Gregory's treatment and conditions, and in doing so chose not to take any action to discipline, retrain, terminate, or otherwise correct the conduct of Defendants Turn Key Medical Staff, such that the actions of those employees is attributed to Defendant Turn Key.

595.    This ratification of the actions of Turn Key's medical staff in the jail by Defendant Cooper and/or Defendant Turn Key was made with full knowledge of each of the actions and failures of the Turn Key Medical Staff set out herein.

596.    The ratification of the actions of Turn Key's subordinates, with the knowledge set out above of those actions, the reasons for those actions, and the risks of constitutional violations presented by those actions, evidences Turn Key policies and procedures that Turn Key's subordinates followed in their failures to treat Gregory, that those policies and procedures were the moving force behind denying Gregory adequate medical care and evidences

157

EXHIBIT 3

deliberate indifference to the risks of constitutional violations presented by those policies and procedures.

## COUNT III: INDIVIDUAL SUPERVISOR LIABILITY FOR DEPRIVATION OF MEDICAL CARE

### (Against Defendants Administrator and Cooper)

**Defendant Administrator**

597.    Defendant Administrator, to the extent he was the final policymaker and decisionmaker for Defendant Trust for overseeing the operation of the Oklahoma County Detention Center, supervising and training staff, and overseeing the provision of medical and mental health services to inmates, is liable for his deliberate indifference to longstanding, well-known deficient conditions, training, practices, policies, and customs pertaining to the provision of medical care to detainees.

598.    The above-described conduct reflects established policies, practices, customs, or decisions, officially adopted or informally accepted, ratified, or condoned by Defendant Administrator that consists of:

 a.   Perpetually understaffing the Oklahoma County Detention Center in regard to detention officers, which results in a lack of supervision of inmates/detainees, and leaves detention officers to respond to multiple calls and responsibilities at once, causing them to skip or delay certain tasks such as sight checks on inmates, reporting medical emergencies, and responding to inmates's/detainees' requests for medical/mental health attention;

 b.   Widespread deficient sight checks of inmates/detainees, whereby detention officers rely solely on a "wand" placed in a small hole at the door of the cell, to count the number of

158

EXHIBIT 3

inmates in the cell, without ever laying eyes on the inmates/detainees to check if they are in medical distress or otherwise in need of medical/mental health attention;

c.  Widespread failures to perform sight checks at all, with whole pods going substantial periods of time with no actual officer present in the pod for a sight check or to respond to any requests or needs for emergency medical/mental health attention and provide access to needed medical providers;

d.  Widespread failures to provide necessary medical treatment to inmates/detainees with mental health and/or psychiatric needs, inclusive of failing to perform medical intakes or assessments of these individuals, failing to obtain any psychiatric care for such detainees while detained despite knowing of their condition and the risks posed to their health and safety, failing to provide access to appropriate, qualified medical professionals for evaluation, assessment and treatment, as well as failure to transfer such inmates to outside facilities for care when detention officers and medical staff were aware of the need for such transfer and the inability of the Oklahoma County Detention Center's inability to care for those inmates;

e.  Failure to monitor the post where inmate/detainee in-cell phone/intercom calls, requesting emergency help, are routed, resulting in calls for emergency medical/mental health attention going unanswered and not responded to and preventing inmates/detainees from access to needed medical providers;

f.  Failure to maintain the inmate/detainee in-cell phone/intercom system in working order, despite knowing of widespread problems and inoperable phones/intercoms, resulting in many cells and many inmates having no ability to call detention officers or medical staff

159

EXHIBIT 3

for emergency medical/mental health attention and preventing access to needed medical providers;

g.  Failing to provide inmates/detainees with required and necessary instructions how to use the in-cell phone/intercom system to call for emergency medical/mental health assistance, which was of great importance to the safety of inmates/detainees and their only opportunity to request such necessary emergency medical/mental health assistance given the absence of detention officers in whole pods and even on entire floors for substantial periods of time and prevented inmates/detainees having access to needed medical providers;

h.  Failure to supervise detention officers in the performance of their duties, specifically including sight checks, when County, Trust, and Administrator knew of the ongoing, widespread failures to conduct sight checks on inmates/detainees as required, including failing to conduct more frequent sight checks on inmates/detainees who were placed on heightened observation due to their medical/mental health needs which caused undue delay in the provision of medical/mental health care in emergencies and prevented inmates from having access to needed medical providers;

i.  Failure to supervise detention officers in the performance of their duties in regard to manning the proper post, answering, and responding to inmate calls for emergency assistance for medical/mental health needs;

j.  Failure to train detention officers regarding the importance of conducting sight checks in a timely manner – and at all – during initial new-hire training, during annual in-service

160

EXHIBIT 3

training or and failure to perform any remedial training after becoming acutely aware of the widespread, repeated, and continuing failures of detention officers to sight checks;

k. Repeatedly failing to report, and attempting to cover up, serious injuries to and repeated deprivations of medical care to inmates/detainees at the Oklahoma County Detention Center;

l. Continuing to contract with Defendant Turn Key to be the sole provider of medical and mental health/psychiatric care at the jail, given the ongoing, repeated and widespread failures to provide screenings and assessments of inmates with serious mental health/psychiatric needs

599.   The understaffing and lack of supervision of detention officers resulting in complete failures to supervise inmates and leaving whole floors with no detention officer(s) present for long periods of time, when paired with the failure to keep the in-cell phone/intercom system working and the failure to have any officer(s) monitoring and answering those calls, left inmates such as Gregory no opportunity to receive emergency medical/mental health assessment beyond screaming out in pain and distress begging for medical attention, even in the medical observation unit Gregory was placed in.

600.   The Oklahoma County Detention Center has a long history of failing to provide access to adequate medical care such that Defendant Administrator was on notice of the systemic issues within the Oklahoma County Detention Center well before Gregory's detention and death, as set out herein.

601.   The Oklahoma County Jail has a long history of failing to properly supervise inmates (and failing to train and supervise its staff to ensure sight checks are actually being performed and

161

EXHIBIT 3

being performed correctly), including while under the control of Defendants Trust and Administrator, prior to Gregory's detention and death, as set out herein.

602. As a part of the ongoing and repeated failures to supervise inmates and provide access to medical care for serious medical needs, the Oklahoma County Detention Center has a long history of failing to train its jail staff, as set out herein.

603. Prior to Gregory's detention and death, Defendant Administrator was aware that, pursuant to OAC 310:670-5-1(1)(C), the admission process of new inmates shall include an intake screening by trained facility personnel or by a physician or other licensed medical personnel.

604. Prior to Gregory's detention and death, the Oklahoma County Detention Center and Defendant Administrator, were notified by the OSDH by at least July of 2021 that they were not in compliance with this regulatory requirement and were not ensuring that medical intakes were being performed upon admission of a detainee.

605. At the time of Gregory's death, the Oklahoma County Detention Center and Defendant Trust, continued to fail to perform medical intakes upon admission of detainees.

606. In October 2021, in a surprise inspection of the Oklahoma County Detention Center by the OSDH, which was performed in part as a response to the incident report of Gregory's death, the Oklahoma County Detention Center was found to still be in non-compliance with this regulatory requirement by failing to perform medical intakes upon admission of detainees.

607. Administrator was aware, prior to Gregory's detention, that jail staff were repeatedly and consistently failing to conduct inmate counts at the beginning of each shift, with each count expected to verify that each and every inmate in the jail is alive and breathing before counting the inmate.

162

EXHIBIT 3

608.    At the time of Gregory's detention, these counts, along with periodic sight checks, were not being performed.

609.    Administrator was made aware of the failures to perform these checks by the OSDH by at least July 2021.

610.    Had such checks been properly performed by properly trained jailers, Gregory might have been provided basic medical care which could have saved his life.

611.    In July 2021, prior to Gregory's detention, Administrator was made aware by the OSDH that numerous inmates did not have working intercoms in their cells through which they could request emergency medical assistance and were made aware that numerous inmates reported that their calls for help went unanswered; further, many inmates had not even been provided the inmate handbook which contained this vital, necessary information.

612.    In July 2021, prior to Gregory's death, Administrator was made aware by the OSDH that at times whole floors of the jail had no officer assigned to them.

613.    In July of 2021, prior to Gregory's death, Administrator was made aware by the OSDH that inmates reported they only see staff in their housing pods at meal time.

614.    In July of 2021, prior to Gregory's death, Administrator was made aware by the OSDH that detention staff reported that the need to perform additional duties on multiple floors resulted in minimal direct inmate supervision in the pods, missed sight checks, late meals, lack of medical care, and poor sanitation.

615.    In July of 2021, the OSDH noted that Administrator could not provide a policy and procedure for medical and health care services, including emergencies, sick call, clinical referrals and medication, when requested by the Department of Health for review.

EXHIBIT 3

616.    In July 2021, each of Administrator was made aware by the OSDH that one inmate had a medical referral for transfer due to "medical and psychiatric necessity" six months after admission noting that the inmate was continuing to decline physically due to severe mental illness and had become unfit to stay at the Oklahoma County Jail. Additional referral notices were entered for the following several months with no documentation of any follow-up.

617.    In July of 2021, Administrator was made aware by the OSDH that medical intake screenings, required to be performed upon the admission of a detainee, were repeatedly not being performed as required.

618.    Despite already having failed to produce the policies and procedures of the facility for provision of medical care in July of 2021, Administrator was aware that the Health Services Policy and Procedure Manual used in the jail, by Defendant Turn Key, was to be reviewed annually by the "Facility Administrator."

619.    In disregard of this, as of October 2021, the Health Services Policy and Procedure Manual had not been reviewed or revised since August 31, 2018 by Administrator.

620.    Despite having already been notified that the Jail was in continued non-compliance with Oklahoma regulations for failing to ensure medical intake screenings were performed upon the admission of each detainee, Administrator failed to take any corrective action, which resulted in the failure to perform a medical intake screening on Gregory.

621.    In October 2021, the Oklahoma County Jail was still found to be failing to perform medical intake screenings upon the admission of each detainee.

164

EXHIBIT 3

622. Despite notice of each of the serious deficiencies regarding providing medical care to inmates, Administrator failed to take any steps to rectify these issues through either additional training or through implementation of corrective policies, procedures, and customs.

623. The complete failure of Administrator, with the substantial notice he had of each of these issues which are related to Gregory's death prior to his death, constitutes deliberate indifference to the need for more or better training, the need for adopted policies and procedures in identified categories, and the continued operation of a custom of failing to provide adequate medical care to inmates, including simply performing medical intake screenings and performing sight checks.

624. This deliberate indifference of each of Administrator was the moving force behind the constitutionally-violative and deficient actions of the individual defendants identified herein.

625. This deliberate indifference of Administrator was the cause of Gregory's death.

626. Furthermore, Defendants Administrator was or should have been aware that Defendant Turn Key has a pattern and practice of providing constitutionally insufficient medical care, including, but not limited to, awareness of Turn Key's extensive history of being sued for incompetent medical care prior to this incident.

627. The choice to continue to retain Turn Key with its lengthy record of denying inmates necessary medical care and detainee-patient abuse, was made with deliberate indifference to the known and obvious risk Turn Key poses to the safety and health of detainees unfortunate enough to be left under its care.

628. As a result of his choice to continue to use Turn Key in the Oklahoma County Jail, Gregory suffered significant and substantial pain and suffering as a result of his worsening condition, because he was denied appropriate medical care and monitoring of his condition,

165

EXHIBIT 3

specifically including being deprived of *any* medical intake screening or medical treatment during the entire time he was present in the Oklahoma County Jail.

629.   As a result of his choice to continue to use Turn Key in the Oklahoma County Jail, Gregory suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

630.   As a result of his choice to continue to use Turn Key in the Oklahoma County Jail, Gregory died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Cooper – Individual Capacity**

631.   Defendant Cooper, to the extent he was the final policymaker and decisionmaker for Defendant Trust and Defendant Turn Key for overseeing the provision of medical and mental health services to inmates, is liable for his deliberate indifference to longstanding, well-known deficient conditions, training, practices, policies, and customs pertaining to the provision of medical care to detainees.

632.   The above-described conduct reflects established policies, practices, customs, or decisions, officially adopted or informally accepted, ratified, or condoned by Defendant Cooper that consists of:

   a.   Perpetually understaffing the Oklahoma County Detention Center in regard to medical staff, which results in a lack of timely access to needed medical care even in emergencies, and leaves detention officers to respond to respond to medical emergencies and make medical decisions without any medical training.

166

EXHIBIT 3

b. Widespread failures to provide necessary medical treatment to inmates/detainees with mental health and/or psychiatric needs, inclusive of failing to perform medical intakes or assessments of these individuals, failing to obtain any psychiatric care for such detainees while detained despite knowing of their condition and the risks posed to their health and safety, failing to provide access to appropriate, qualified medical professionals for evaluation, assessment and treatment, as well as failure to transfer such inmates to outside facilities for care when medical staff were aware of the need for such transfer and the inability of the Oklahoma County Detention Center's inability to care for those inmates;

c. Widespread failure to perform medical screening/evaluation of inmates/detainees with obvious, serious mental health/psychiatric conditions across multiple jails and multiple years, as set out herein.

d. Turn Key has an established practice of failing to adequately assess and treat – and ignoring and disregarding – obvious or known symptoms of emergent and life-threatening conditions, such as Gregory's persistent complaints of worsening severe abdominal pain and the deterioration of his physical condition;

e. Turn Key does not review the policies and procedures of jails it operates in to ensure their own policies and procedures align with those facilities, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021,;

f. Turn Key asks each jail it operates in to review Turn Key's policies to ensure their own policies and procedures align with those of the facility but does nothing to follow up

167

EXHIBIT 3

on that comparison or verify that it was done, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;

g. The failure to promulgate, implement, or enforce adequate policies and nursing protocols responsive to the serious medical and mental health/psychiatric needs of detainees like Gregory, inclusive of treating and managing mental health/psychiatric needs and identifying and responding to inmates/detainees' whose symptoms/condition require emergency medical care and/or transfer to an outside facility;

h. Not seeing detainees for follow-up by the proper level of medical provider in a timely manner as set out by the orders of treating physicians outside of the jail;

i. Detention of detainees with serious mental health/psychiatric needs, and/or serious emergency medical needs in the Oklahoma County Detention Center without access to the equipment, services, and specialty knowledge obviously needed to manage those conditions;

j. Only having *one* physician on staff, Dr. Cooper, for the entirety of several jails and thousands of persons under Turn Key's care throughout Oklahoma, leaving it practically impossible for that single physician to supervise and evaluate the care of detainees and the actions of lower-level providers, nurses, and jail medical staff;

k. Improperly and illegally delegating medical care tasks to jail medical staff beyond the legally-defined scope of their credentials and beyond their training and skill;

168

EXHIBIT 3

l.  Having LPNs as the highest-trained medical provider at the jail the majority of the time, with other providers only on-call, even though Turn Key is aware that LPNs cannot assess or diagnose any medical condition, and Turn Key admittedly does nothing to train those LPNs to assess a medical condition, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;;

m. Severe limitation of or failure to utilize off-site medical and diagnostic service providers, even in emergent situations;

n.  Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees, as admitted by Turn Key Medical Director, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

633.   The Oklahoma County Detention Center has a long history of failing to provide access to adequate medical care such that Defendant Cooper was on notice of the systemic issues within the Oklahoma County Detention Center well before Gregory's detention and death, as set out herein.

169

EXHIBIT 3

634.    Prior to Gregory's detention and death, Defendant Cooper was aware that, pursuant to OAC 310:670-5-1(1)(C), the admission process of new inmates shall include an intake screening by trained facility personnel or by a physician or other licensed medical personnel.

635.    Prior to Gregory's detention and death, the Oklahoma County Detention Center and Defendants Turn Key and Cooper, were notified by the OSDH by at least July of 2021 that they were not in compliance with this regulatory requirement and were not ensuring that medical intakes were being performed upon admission of a detainee.

636.    At the time of Gregory's death, the Oklahoma County Detention Center and Defendants Turn Key and Cooper, continued to fail to perform medical intakes upon admission of detainees.

637.    In October 2021, in a surprise inspection of the Oklahoma County Detention Center by the OSDH, which was performed in part as a response to the incident report of Gregory's death, the Oklahoma County Detention Center – and thus Defendants Turn Key and Cooper – were found to still be in non-compliance with this regulatory requirement by failing to perform medical intakes upon admission of detainees.

638.    In July of 2021, the OSDH noted that the Oklahoma County Detention Center could not provide a policy and procedure for medical and health care services, including emergencies, sick call, clinical referrals and medication, when requested by the Department of Health for review. Such policies would have been the responsibility of and under the control of Defendants Turn Key and Cooper.

639.    In July 2021, each of Defendants Cooper and Turn Key were made aware by the OSDH that one inmate had a medical referral for transfer due to "medical and psychiatric necessity" six months after admission noting that the inmate was continuing to decline physically due to severe

170

EXHIBIT 3

mental illness and had become unfit to stay at the Oklahoma County Jail. Additional referral notices were entered for the following several months with no documentation of any follow-up. That inmate died in the jail in April 2021. Defendants Cooper and Turn Key surely had knowledge of that inmate and the failure to provide necessary care before July 2021, but were certainly made aware of it no later than July of 2021.

640.    In July of 2021, Defendants Cooper and Turn Key were made aware by the OSDH that medical intake screenings, required to be performed upon the admission of a detainee, were repeatedly not being performed as required.

641.    Despite already having failed to produce the policies and procedures of the facility for provision of medical care in July of 2021, Defendants Cooper and Turn Key were aware that the Health Services Policy and Procedure Manual used in the jail, by Defendant Turn Key, was to be reviewed annually by the "Facility Administrator."

642.    In disregard of this, as of October 2021, the Health Services Policy and Procedure Manual had not been reviewed or revised since August 31, 2018 by Defendants Cooper and Turn Key.

643.    Despite having already been notified that the Jail was in continued non-compliance with Oklahoma regulations for failing to ensure medical intake screenings were performed upon the admission of each detainee, Defendants Cooper and Turn Key failed to take any corrective action, which resulted in the failure to perform a medical intake screening on Gregory.

644.    In October 2021, the Oklahoma County Jail was still found to be failing to perform medical intake screenings upon the admission of each detainee.

645.    Despite notice of each of the serious deficiencies regarding providing medical care to inmates, Defendants Cooper and Turn Key failed to take any steps to rectify these issues

171

EXHIBIT 3

through either additional training or through implementation of corrective policies, procedures, and customs.

646.    The complete failure of Defendant Cooper, with the substantial notice he had of each of these issues which are related to Gregory's death prior to his death, constitutes deliberate indifference to the need for more or better training, the need for adopted policies and procedures in identified categories, and the continued operation of a custom of failing to provide adequate medical care to inmates, including simply performing medical intake screenings.

647.    This deliberate indifference of Cooper was the moving force behind the constitutionally-violative and deficient actions of the individual Turn Key Medical Staff defendants identified herein.

648.    This deliberate indifference of Cooper was the cause of Gregory's death.

## COUNT IV: NEGLIGENCE

649.    Defendant Turn Key and its on-site medical personnel were negligent and reckless in the medical assessment, diagnosis, and treatment administered to Gregory. The conduct of Turn Key and its on-site medical personnel fell below the acceptable standards of medical care and treatment.

650.    Defendant Turn Key and its on-site medical personnel negligently and recklessly failed to perform their duty to provide medical care to Gregory. Their repeated disregard of Gregory's psychiatric and medical needs caused and exacerbated Gregory's pain and suffering and his emotional distress.

172

EXHIBIT 3

651.    At all material times mentioned herein, Defendant Turn Key and its on-site medical personnel were acting within the scope of their employment and/or authority as employee, agent and/or servant for Defendant Turn Key and/or Defendants Trust and County.

652.    In the alternative, Defendant Turn Key and/or its on-site medical personnel failed to act in good faith in carrying out the duties of their employment and abused their power, while still acting under the pretense and color of state law. As such, Defendant Turn Key and/or its on-site medical personnel were outside the scope of their employment, such that they can be held individually liable notwithstanding the limitations, exemptions or exclusions in the Oklahoma Governmental Tort Claims Act.

653.    The injuries and damages sustained by Gregory, described herein, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendants' violation of the above-described independent duties of ordinary care for the safety of Gregory.

## COUNT V: NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION

654.    Defendant Turn Key was negligent in failing to hire and employ competent medical personnel, including the nurses on-site at the times of the events described herein.

655.    Defendant Turn Key knew or should have known of their employee's carelessness, recklessness, and incompetence documented in inmates' medical records, including Gregory's, which Defendant Cooper, the policymaker and final decisionmaker for Turn Key, reviewed. In so doing, Cooper and Turn Key were aware:

   a.   That medical intake screenings of incoming inmates were not being performed;

173

EXHIBIT 3

b.  That inmates in need of specialty care, such as those with psychiatric/mental health needs like Gregory, were not being timely referred to a higher-level provider for evaluation and assessment; and

c.  That inmates in need of specialty care, specifically psychiatric and mental health needs, were not able to be properly cared for or treated in the Oklahoma County Detention Center and its medical facilities, but Turn Key's medical staff, specifically including Defendants Turn Key Medical Staff, were not referring those inmates/detainees to appropriate outside medical facilities.

656.  Defendant Turn Key negligently failed to train and supervise their employee on how to assess, diagnose, and treat patients like Gregory, as set out herein.

657.  The injuries and damages sustained by Gregory, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendants' violation of the above described independent duties of ordinary care for the safety of the Gregory.

## COUNT VI: CONDITIONS OF CONFINEMENT

658.  Plaintiff incorporates all previous allegations and statements herein.

659.  Under the Eighth Amendment of the United States Constitution, inmates held in American prisons have a fundamental right to prison conditions that do not constitute "cruel and unusual punishment."

660.  In *Lopez v. LeMaster*, 172 F .3d 756 (10th Cir 1999), the Tenth Circuit held that a plaintiff states a claim for deliberate indifference against a county's legislative body by producing evidence from which a reasonable inference can be drawn that "county commissioners failed

174

EXHIBIT 3

to provide funding for correction of deficiencies..." *Id.* at 763 ("Appellant has shown the requisite deliberate indifference ... there is evidence that the county's legislative body was itself deliberately indifferent to conditions at the jail.").

661.   At a minimum, prison officials must provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care. They cannot deprive prisoners of the basic elements of hygiene or the minimal civilized measure of life's necessities.

662.   Oklahoma law requires every Board of County Commissioners in Oklahoma to provide a jail "for the safekeeping of prisoners lawfully committed." 57 Okla. Stat. § 41. This duty is constitutional as well as statutory. *See Bryson Okl. Cty. ex rel. Okl. Cty. Detention Center,* 261 P.3d 627, 637 (Okla. Civ. App. 2011). Also, "because the necessary maintenance of a jail is a constitutional duty, a county must first appropriate funds for such duty and any other constitutional duties before any county funds are expended for statutory duties or other functions." Okla. A.G. Opin., No. 07-35, 2007 WL 4699709 (Oct. 23, 2007).

663.   Contrary to this obligation, County routinely prioritized spending on travel and other non-essential items instead of correcting deficiencies at the Oklahoma County Detention Center.

664.   The conditions at the Oklahoma County Detention Center denied Plaintiff access to necessary medical and psychiatric care as set out herein. The result of those known conditions exposed Plaintiff to a known substantial risk of serious harm.

665.   The deplorable conditions were easily observable by Defendants and all Defendants were aware that the conditions imposed upon Plaintiff denied him of his constitutional rights.

175

**EXHIBIT 3**

666.   No unforeseeable, exigent circumstances existed which would have prevented Defendants from mitigating the risks associated with Plaintiff's conditions of confinement prior to his death.

## PUNITIVE DAMAGES

667.   Plaintiff incorporates all previous allegations and statements herein.

668.   Plaintiff is entitled to punitive damages on the claims brought against the individual Defendants pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts, and omissions alleged herein constitute intentional, reckless, or callous indifference to Plaintiff's Constitutionally-protected rights.

669.   Further, Plaintiff is entitled to punitive damages on the claims brought against Defendant Turn Key pursuant to 42 U.S.C. § 1983 as Turn Key's conduct, acts, and omissions alleged herein constitute intentional, reckless, or callous indifference to Plaintiff's Constitutionally-protected rights.

## DEMAND FOR JURY TRIAL

670. Plaintiff demands a jury trial for all issues of fact presented by this action.

## RESERVATION OF ADDITIONAL CLAIMS

671. Plaintiff reserves the right to plead further upon completion of discovery, to state additional claims and to name additional parties to this action.

## CONCLUSION

WHEREFORE, Plaintiff, Kizzie Sims, individually and as Personal Representative of the Estate of Gregory N. Davis, prays for judgment against Defendants in a sum of $50,000,000.00 plus interest, attorneys fee, costs, and all such other relief as to which Plaintiff may be entitled.

176

EXHIBIT 3

Respectfully submitted,

LAIRD, HAMMONS, LAIRD, PLLC

Chris Hammons, OBA # 20233
Jason M. Hicks, OBA# 22176
Jonathan R. Ortwein, OBA # 32092
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone:    (405) 703-4567
Facsimile:    (405) 703-4061
E-mail: chris@lhllaw.com
        jason@lhllaw.com
        jonathan@lhllaw.com
ATTORNEYS FOR PLAINTIFF

**ATTORNEY LIEN CLAIMED**

177

**EXHIBIT 3**