## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KIZZIE SIMS, individually and as** | ) | |
| **Special Administrator of the Estate of** | ) | |
| **Gregory Neil Davis,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  CIV-23-780-R** |
| | ) | |
| **BOARD OF COUNTY** | ) | |
| **COMMISSIONERS FOR OKLAHOMA** | ) | |
| **COUNTY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Gregory Neil Davis died from a perforated duodenal ulcer while in pretrial custody at the Oklahoma County Detention Center. The administrator of Mr. Davis's estate brought this action under 42 U.S.C. § 1983 alleging that numerous medical and jail defendants were deliberately indifferent to Mr. Davis's serious medical needs in violation of the Fourteenth Amendment and acted negligently under state law. Defendants have each moved for summary judgment[1] and the motions are fully briefed and at issue [Doc. Nos. 111, 113, 115, 117, 118, 119, 121, 122, 124, 126, 127, 128, 129, 150, 151, 152, 153, 154, 155, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168].[2]

---

[1] A Clerk's Entry of Default [Doc. No. 77] pursuant to Fed. R. Civ. P. 55(a) was entered as to Defendant Morris, a Stipulation of Dismissal [Doc. No. 88] was entered as to Defendant Gage, and a Stipulation of Dismissal [Doc. No. 142] was entered as to Defendants Carter, Mulanax, Harvey, Anderson-Depee, and Dean.

[2] By separate order, the Court resolved the parties' *Daubert* motions and granted Plaintiff's Motion for Sanctions as to Defendant Oklahoma County Criminal Justice Authority and

## I.     Background

### A.  Factual Background[3]

Mr. Davis was arrested by the Oklahoma City Police Department for Indecent Exposure and Public Indecency after he was found walking in the street completely naked. *See* Doc. No. 121-11, OCDC Booking Information; Doc. No. 119-13, Probable Cause Affidavit. He was booked into the Oklahoma County Detention Center on August 3, 2021 at approximately 11:00 pm. Around that time, a Pre-Booking Screening was completed. *See* Doc. No. 121-13, Pre-Booking Screening. The Pre-Booking Screening form documented that that Mr. Davis had an elevated heart rate and denied any immediate health needs or problems. *Id.*

---

Jail Administrator in his official capacity. The curative measures described in the order granting Plaintiff's request for sanctions are not imputed to any other defendant.

[3] Plaintiff's response to Defendants' statement of undisputed facts is needlessly prolix and does not concisely admit or deny the facts as required by LCvR56.1. A particularly egregious example is Plaintiff's response to Fact No. 31 in Defendant Turn Key's Statement of Uncontroverted Facts. In Fact No. 31, Turn Key straightforwardly asserts that an autopsy confirmed that Plaintiff died from a perforated duodenal ulcer. Rather than admit this fact, which is confirmed by the autopsy report and death certificate, Plaintiff objects that the statement is misleading and lacks context, but then admits the statement in part. She then launches into a paragraph long explanation that injects additional facts, argues for inferences to be drawn in her favor, and cites to other factual statements and a string of exhibits in support. It should go without saying that "opposing almost every paragraph with a narrative statement" followed by string citations is "not helpful to the Court." *Neill v. State Farm Fire & Cas. Co.*, No. CIV-13-627-D, 2016 WL 4384793, at *2 (W.D. Okla. Aug. 16, 2016). The jail defendants have likewise needlessly complicated the factual record by including immaterial facts, failing to support certain facts with evidentiary citations, or providing evidentiary citations that are inaccurate. *See, e.g.*, Doc. No. 119, Fact 4-5, Fact 11(C).

The next morning, Misty Williams,[4] a Licensed Practical Nurse employed by Turn Key Health Clinics, attempted to perform an intake medical assessment, also called a screening, on Mr. Davis. Nurse Williams could not complete the screening because Mr. Davis was repeatedly chanting "OU, OU, OU," displaying bizarre behavior, and not answering questions. There is no genuine dispute that Mr. Davis was displaying obvious mental health symptoms, the cause of which was unknown, at the time of the attempted screening.

After multiple failed attempts to complete the screening, Nurse Williams placed Mr. Davis on the Mental Health Observation floor of the jail, made a referral for him to be seen by the mental health team, and noted that he needed to receive a full medical screening. See Doc. No. 121-13, Pre-Booking Screening; Doc. No. 150-5, M. Williams Depo, 64:1-66:11; Doc. No. 121-14, Turn Key Medical Records; Doc. No. 150-21, Medical Summary; Doc. No. 121-12, OCDC Inmate Moved Form. Nurse Williams testified that inmates needing medical screenings are tracked in Turn Key's electronic medical records system and that medical staff member was assigned to perform follow-up screenings. Doc. No. 121-3, M. Williams Depo, 39:8-20. On the Mental Health Observation floor, inmates are supposed to be observed every thirty minutes by detention staff. Doc. No. 121-26, Anderson Depo., 106:4-7.

Mr. Davis was housed on Mental Health Observation floor of the jail from August 4, 2021 until his death on August 12, 2021. He did not receive any medical assessment or

---

[4] She has since married and changed her last name. To maintain consistency with the medical records, the Court refers to her as Nurse Williams.

treatment while at the jail. On August 5, 2021, Mr. Davis's cellmate was moved after having an altercation with Mr. Davis. Ex. 121-17, SIU Report. Mr. Davis did not have a cellmate for the remainder of his incarceration.

On August 6, 2021,[5] Sanaria Okongor, a Licensed Professional Counselor employed by Turn Key Health, conducted a mental health assessment on Mr. Davis. Counselor Okongor's chart notation indicates that she overheard Mr. Davis chanting "OU, OU, OU" and observed that he was naked, his speech and thought process was delusional, and he had overt signs of psychosis. She further noted that he maintained eye contact for extended periods and engaged upon verbal prompting. Ex. 121-14, Turn Key Health Medical Records. Three days later, on August 9, 2021, Counselor Okongor conducted a second assessment. *Id.* Her chart notation states that Ms. Davis was cooperative, had clear speech, and maintained eye contact but continued to display signs of psychosis in speech and thought process. *Id.* Apart from his mental health issues, she did not observe any immediate concern for his welfare. Doc. No. 150-6, Okongor Depo, 45:3-46:7; 87:2-5. Also on August 9, 2021, a Turn Key nurse, who has not been identified, submitted a referral stating that Mr. Davis "needs to be mentally evaluated by MH team." Ex. 121-14, Turn Key Health Medical Records. However, the next visit was another assessment, three days later, with a counselor as part of routine rounds. *See* Doc. No. 121-5 Oparaku Depo, 69:14-25; Doc. No. 121-14.

---

[5] Dr. Irvin's motion asserts that the assessment was initially scheduled for August 5, 2021, but was rescheduled to August 6, 201 by Dr. Irvin. *See* Doc. No. 126 at p. 24. Neither party references specific evidence in support of this factual assertion.

At her deposition, Ms. Okongor testified that it was not uncommon to see inmates like Mr. Davis and that "[m]ore information would need to be derived" about his history, diagnosis, and medications. Ms. Okongor stated that she did not follow up with obtaining that information because there were other people, including a psychiatrist and nurse practitioner, who were responsible for meeting with everyone on the mental health unit. Ms. Okongor typically reviews the notes from other providers before meeting with a patient, including the intake screening. If the intake screening is not in existence, she tries to figure out why it was not completed, including by asking the intake coordinator. She further testified that the intake screening is important because it provides information about the inmate's history and "what's going on with them mentally." If the intake screening is not completed, "it's up to [her]" to try to obtain additional information or to learn more about the inmate." Doc. No. 150-6, Okongor Depo, 45:3-46:23; 53:11-56:3.

Mr. Davis attempted nearly 900 phone calls from his cell during his detention. None of the calls were completed because Mr. Davis's housing classification was improperly recorded at the jail. However, the improper housing classification would not have prevented him from using the phone to contact the emergency line.[6] Doc. No. 121-17, SIU Report; Doc. No. 121-39, Whittington Depo. 76:19-77:25.

Another inmate at the jail testified that Mr. Davis started complaining about three to four days after arriving at the jail, he was screaming in pain, and he was beating on the

---

[6] Although Plaintiff has introduced some deposition testimony suggesting that the phone system at the jail experienced chronic failures, there is no evidence that Mr. Davis's phone could not contact the jail's emergency services.

5

door. Doc. No. 150-19, Schlicker Depo, 19:10-20:17, 48:18-49:23. The inmate further testified that he reported Mr. Davis's distress to jail staff but they did not check on him and that Mr. Davis stopped screaming around 4:00 p.m. on August 11, 2021. *Id.* at 22:8-22, 48:7-17.

On August 12, 2021 at 6:45 a.m., the day of Mr. Davis's death, Sgt. Ronald Anderson and Lt. Birdie Morris conducted a sight check on Mr. Davis. Doc. No. 150-12, Anderson Depo, 32:1-21. They asked for his name and whether he was alright and he responded by stating his name. *Id.* Detention Officer Anderson testified that he thought Mr. Davis "might need medical attention" because he was naked and would not keep his clothes on. Doc. No. 121-26, Anderson Depo, 128:8-25, 130:3-15-131:25. Officer Anderson, who was the only officer assigned to the 12th floor on that day, did not tell anyone that he believed Mr. Davis might need medical attention. *Id.*; Doc. No. 150-22, SIU Report, p. 2.

The next sight check occurred approximately ninety minutes later, around 8:11 a.m. Doc. No. 150-17, Kallas Depo, 28:13-29:25, 52:13-53:13. The Detention Services Team, which included Cpt. Daniel Kallos, was making rounds to change out items for laundering. Detention Officer Kallos looked through the cell door's food port and window, knocked a few times, and asked Mr. Davis if he wanted his blanket washed. *Id.* The cell was dark and Mr. Davis was fully covered by his blanket. Mr. Davis did not respond to Officer Kallos's question but saw breathing so they moved on to the next cell. *Id.* He did not open the door to check on Mr. Davis because they had two floors to do that day. *Id.*

At 9:03 a.m. that day, a Turn Key mental health provider, escorted by a detention officer, went to Mr. Davis's cell as part of their routine rounds. Doc. No. 121-5 Oparaku

Depo, 69:14-25; Doc. No. 121-14. They found Mr. Davis unresponsive and called for assistance. Detention officers removed Mr. Davis from his cell and a nurse started CPR. Doc. No. 121-14, Turn Key Health Medical Records; Doc. No. 22, jail surveillance video. Mr. Davis was transported by ambulance to the hospital, where he was pronounced dead.

Plaintiff's medical expert testified that an unperforated duodenal ulcer is not typically a medical emergency, it can be symptomatic or asymptomatic, and symptoms can include abdominal discomfort, nausea, and decreased appetite. Doc. No. 150-8, Borislow Depo, 46:9-47:13, 58:5-21; 65:13-66:8. However, a perforated duodenal ulcer is a medical emergency and it causes severe pain that even a lay person would recognize as requiring prompt attention. *Id*. at 61:25-62:4, 120:14-121:6. Plaintiff's medical expert further opined that Mr. Davis likely had symptoms – specifically dehydration or decreased oral intake – three to eight days prior to his death, and the ulcer most likely perforated two days prior to his death (i.e. August 10th), or somewhere "in that vicinity." *Id.* at 46:14-48:9, 56:2-23, 72:7-25. Individuals suffering from psychosis are able to indicate when they are in pain, however, there is also evidence that Mr. Davis's ability to communicate about himself was limited by his mental state. *Id*. at 58:22-59:25; Doc. No. 150-6, Okongor Depo, 80:7-12. Plaintiff's expert on correctional nursing standards and operations was critical of the fact that no medical professional attempted to complete the intake screening and that, if the intake screening could not be completed due to Mr. Davis's mental state, no medical provider ever evaluated his condition to determine the cause of his psychosis. Doc. No. 150-7, Roscoe Depo, 48:13-51:12.

Turn Key's written policy required that a receiving screening take place for all inmates "as soon as possible" upon acceptance into custody. Doc. No. 121-24. The screening is intended to "ensure that emergent and urgent health needs are met." *Id.* The policy states that if an inmate was "unscreenable" due to mental health or other conditions, the inmate would be held at intake housing or placed on medical observation until the screening could be completed. *Id.* Turn Key's written policy further provides that inmates with chronic health conditions may receive an initial health assessment no later than fourteen days, which is consistent with national correctional care guidelines, and that complex or acutely ill patients can be referred to a provider prior to the fourteen-day deadline. Doc. No. 156.

Dr. William Cooper is Turn Key's Chief Medical Officer and is responsible for supervising the nursing and mental health staff and writing policies. Doc. No. 121-4, Cooper Depo, 9:17-23, 90:24-91:7. He conducts annual performance reviews and chart reviews to ensure that staff are performing their duties and proving "good care." *Id.* at 10:5-20. Dr. Cooper testified that he trains his staff to place inmates on mental health observation if an inmate is unable to complete the intake screening, but that it is also up to the clinical judgment of the intake employee as to where the inmate is placed. Doc. No. 150-3, Cooper Depo, 66:13-67:24; 77:14-20. He conceded that Turn Key staff could not determine the cause of Mr. Davis's behavior during the intake process, his behavior could indicate a very serious condition, he was placed on mental health observation so he could be monitored, and the risk of a medical or mental health emergency was present. *Id.* at 77:14-20, 81:3-8. He also testified that one of the duties of the mental health staff at Turn Key is to look for

8

and relay information about the medical and mental health needs of the inmates. Doc. No. 121-4 at 9:17-23, 26:22-25. Dr. Cooper further indicated that Turn Key relies, in part, on detention officers to timely and accurately relay information about the medical needs of inmates and that a failure to relay that information can result in serious problems. Doc. No. 150-3 at 27:11-29:17. Prior to this incident, he was aware that the jail experienced staffing shortages that prevented medical staff from having access to patients and that Turn Key had threatened to terminate its contract with the jail because of insufficient staffing levels. *Id.* at 32:17-33:4, 50:1-21, 54:21-55:5. However, he was told by Turn Key employees that the staffing problems had been remedied. *Id.* at 50:17-22, 80:10-18, 102:6-11.

Dr. Alicia Irvin is the Director of Psychological Services for Turn Key. Doc. No. 150-2, Irvin Depo, 10:13-19. She testified that there is communication between the medical and mental health personnel at Turn Key, that the medical personnel are responsible for the intake screening process, and that mental health counselors could alert the medical personnel that a medical screening is needed if they were aware that a screening had not been completed. Doc. No. 121-6, Irvin Depo, 72:25-72:25. Neither Dr. Cooper nor Dr. Irvin personally treated or evaluated Mr. Davis.

The Oklahoma County Detention Center is operated by the Oklahoma County Criminal Justice Authority, a public trust. Oklahoma County, acting through the Board of County Commissioners, is the sole beneficiary of the trust. Gregory Williams was the Jail Administrator during the events at issue. Jail policy provides that each inmate should receive a health care screening upon arrival at the facility, inmates that are unable to adequately answer questions should be observed until the screening can be completed, and

9

inmates that appear to need immediate medical care should not be accepted at the facility. Doc. No 150-31, OCDC Policy 701. Prior to this incident, the Oklahoma State Department of Health cited the Oklahoma County Detention Center for certain deficiencies, including inadequate staffing, missed sight checks, and no staff presence on floors on a regular basis. Doc. No. 150-30, OSDH Inspection Report, p. 4-7, 16-19. The OSDH report also identified one instance where an inmate did not receive a medical or mental health screening. *Id.* at p. 1-2.[7] Detention staff would sometimes falsify the record books that documented sight checks. Doc. No. 150-4, Williams Depo, 22:9-23, 44:2-12, 138:24-139:3.

Administrator Williams was aware of the staffing shortages, missed sight checks, and forged record books and acknowledged that those issues create a major concern for inmate safety. *Id*.; 150:4-25. He further acknowledged that inmates on the mental health observation floor are at risk of not being able to communicate their own needs, the facility relies on the jail staff to monitor them for problems, and failing to properly monitor can result in missing medical issues. *Id.* at 70:4-24; 83:19-84:18. He attempted to address the staffing shortages by offering pay raises and making more efforts to recruit staff, but at least some detention staff reported that they did not observe any changes in staffing. Doc.

---

[7] Plaintiff contends that "the claim that OSDH found only one screening infraction is false." *See* Doc. No. 145 at ECF p. 23. As evidentiary support for this assertion, she cites to the single screening infraction noted above. She also appears to rely on an OSDH report from November 9, 2021 that found deficient screening practices at the jail during an October 22, 2021 visit. *See* Doc. No. 150-28. Because the November 9, 2021 report post-dates this incident, it could not have provided notice of the deficiences. *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1289 (10th Cir. 2019) (concluding that plaintiff did not state a plausible municipal liability claim based on findings from a report issued after the constitutional violation).

No. 119-22, Williams Depo, 189:4-190:3; Doc. No. 150-16, Lazar Depo, 32:5-12; Doc. No. 150-11, Stewart Depo, 30:18-34:20; Doc. No. 150-9, Depee Depo, 34:9-35:18.

### B. Procedural Background

Plaintiff contends that the failure to provide Mr. Davis with psychiatric and medical care despite the severity of his psychosis and his ongoing complaints of worsening physical pain violated his Fourteenth Amendment right to receive adequate medical attention while incarcerated as a pretrial detainee. She asserts individual capacity claims pursuant to 42 U.S.C. § 1983 for deliberate indifference to serious medical needs against Detention Officer Kallos, Detention Officer Anderson, Administrator Williams, Nurse Williams, Counselor Okongor, Dr. Cooper, and Dr. Irvin. She also asserts a claim for municipal liability pursuant to § 1983 against the Board of County Commissioners, the OCCJA, the Jail Administrator in his official capacity, and Turn Key, alleging that their deliberately indifferent policies, customs, training, and/or supervision was the moving force behind the violation of Mr. Davis's constitutional rights. Last, she asserts a claim for negligence under state law against Turn Key, alleging that its medical personnel negligently and recklessly failed to provide adequate medical care.

All defendants have moved for summary judgment, contending that the undisputed material facts show that they did not violate Mr. Davis's constitutional rights. Turn Key additionally moves for summary judgment on the negligence claim, contending that it is immune from liability pursuant to the Oklahoma Governmental Tort Claims Act.

To resolve these motions, the Court will first set out the standard on summary judgment and the law governing claims of deliberately indifferent medical care,

supervisory liability, municipal liability, and qualified immunity. The Court will then separately address the arguments asserted by the medical defendants and the county defendants.

## II.    Standard of Decision

Federal Rule of Civil Procedure 56(a) provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.... An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Id*. at 670–71 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id*. at 671 (citing Fed. R. Civ. P. 56(e)).

Importantly, at this stage, the court's role is not "to weigh the evidence and determine the truth of the matter," but to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." *Anderson*, 477 U.S. at 249–52. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

### III.    Legal Framework

#### A. Deliberate Indifference to Serious Medical Needs

To recover under § 1983, a plaintiff must establish that a person acting under color of state law "violated his constitutional or statutory rights." *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010). Plaintiff claims that Defendants violated Mr. Davis's constitutional rights by acting with deliberate indifference to his serious medical needs. "[A] prison official's deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). A pretrial detainee, such as Mr. Davis, is "entitled to the same standard of medical care under the Due Process Clause of the Fourteenth Amendment." *Id*.

The deliberate indifference standard "contains both an objective and subjective component." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023). "The objective component examines whether the medical condition or harm claimed by the inmate was 'sufficiently serious[.]'" *Prince*, 28 F.4th at 1044 (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). "[A] medical need is considered sufficiently serious if the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotation

marks and ellipses omitted). "Deliberate indifference toward an inmate's risk of death certainly satisfies this standard[,]" although "a life-threatening condition" is not required. *Prince*, 28 F.4th at 1044-45 (quotation marks omitted). Further, "[w]here a prisoner claims that harm was caused by a delay in medical treatment, he must show that the delay resulted in substantial harm[,]" which may include "lifelong handicap, permanent loss, or considerable pain." *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (internal quotation marks omitted).

> The subjective component of deliberate indifference standard is satisfied if
>
> the official knows of and disregards an excessive risk to inmate health or safety. The official must be aware of the facts from which the inference of a substantial risk of serious harm could be drawn and also draw that inference. A plaintiff need not show that a prison official acted or failed to act believing that harm actually would befall an inmate, but rather that the official merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence such as whether the risk was obvious. An official disregards risk when he fails to take reasonable measures to abate the risk.

*Lucas*, 58 F.4th at 1137 (quotation marks and citations omitted).

Medical professionals operating in a prison may also be liable for deliberately indifferent conduct, which can include the failure to treat a serious medical condition properly or a failure to fulfill their role as a gatekeeper for other medical personnel. *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). However, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give

rise to a constitutional violation." *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006) (internal quotation marks omitted).

### B.  Individual and Supervisory Liability Under § 1983

"A § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability." *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). "Supervisory liability" generally encompasses claims against defendant-supervisors based on their deficient promulgation/implementation of a policy or supervision of subordinates. Supervisory liability should not, however, "be misunderstood as implying vicarious liability" for the actions of subordinates. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). "Instead, just as with any individual § 1983 defendant," a plaintiff seeking to impose liability on a supervisor "must establish a deliberate, intentional act by the supervisor to violate constitutional rights." *Jenkins v. Wood*, 81 F.3d 988, 994–95 (10th Cir. 1996) (quotation omitted). "[I]t is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation[,]" *id.*, nor is it sufficient to show a "supervisor's mere knowledge of his subordinate's conduct." *Schneider*, 717 F.3d at 767 (quotation omitted).

Rather, to hold a defendant liable under § 1983 based on his supervisory responsibilities, a plaintiff must establish three elements: personal involvement, causation, and state of mind. *Burke v. Regalado,* 935 F.3d 960, 997 (10th Cir. 2019). A supervisor's personal involvement may be shown "by establishing the supervisor promulgated, created, implemented, or possessed responsibility for the continued operation of a policy, or the establishment or utilization of an unconstitutional policy or custom, provided the policy or

15

custom resulted in a violation of the plaintiff's constitutional rights." *Id.* (internal quotation marks, brackets, and citations omitted).

"The second element requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id.* (quoting *Est. of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014)). The final element requires the plaintiff to show that the supervisor acted with a culpable state of mind, which in this case is deliberate indifference. *Id.* at 997. In this context, deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).

### C. Municipal Liability

To succeed on a claim under § 1983 against local government entity,[8] the plaintiff must, in addition to establishing an underlying constitutional violation, prove that (1) a government's official policy or custom (2) caused a constitutional injury and (3) the policy was enacted or maintained with the requisite state of mind. *Schneider*, 717 F.3d at 769. An official policy or custom may take one of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of

---

[8] Municipal liability "has been extended to private entities acting under color of state law, such as medical contractors." *Lucas v*, 58 F.4th at 1144 (quotation omitted).

16

> subordinates to whom authority was delegated subject to these
> policymakers' review and approval; or (5) the failure to adequately train
> or supervise employees, so long as that failure results from deliberate
> indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation and

alteration marks omitted).

   "To establish the causation element, the challenged policy or practice must be

closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717

F.3d at 770 (quotation omitted). Put another way, "[t]he policy or custom must be 'the

moving force behind the injury alleged.'" *Buchanan v. Turn Key Health Clinics, LLC*, No.

22-7029, 2023 WL 6997404, at *8 (10th Cir. Oct. 24, 2023) (quoting *Schneider*, 717 F.3d

at 770) (unpublished).

   Last, the requisite state of mind is deliberate indifference. "In the municipal liability

context, deliberate indifference is an objective standard." *Barney v. Pulsipher*, 143 F.3d

1299, 1307 n. 5 (10th Cir. 1998). The standard "may be satisfied when the municipality

has actual or constructive notice that its action or failure to act is substantially certain to

result in a constitutional violation, and it consciously or deliberately chooses to disregard

the risk of harm." *Id*. at 1307. Typically, notice is "established by proving the existence of

a pattern of tortious conduct." *Id*. However, deliberate indifference may also "be found

absent a pattern of unconstitutional behavior if a violation of federal rights is a highly

predictable or plainly obvious consequence of a municipality's action or inaction." *Id*.

(quotation marks and citation omitted).

Additionally, and pertinent to the claims in this case, "municipal liability may exist without individual liability" where there has been a "systemic failure" of policies and procedures that causes a "systemic violation carried out by multiple actors." *Lucas*, 58 F.4th at 1144. Such claims are unusual and "ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020). But "[w]here the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable." *Id.*

### D. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "A defendant's motion for summary judgment based on qualified immunity imposes on the plaintiff "the burden of showing both (1) a violation of a constitutional right; and (2) that the constitutional right was clearly established at the time of the violation." *Burke,* 935 F.3d at 1002 (internal quotation marks omitted). "The plaintiff must satisfy both prongs to overcome a qualified immunity defense." *Est. of Taylor v. Salt Lake City*, 16 F. 4th 744, 757–58 (10th Cir. 2021) (internal quotation marks omitted).

"For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Crowson*, 983 F.3d at 1178 (10th

Cir. 2020) (internal quotation marks and brackets omitted). This inquiry requires careful attention to the specific facts of the case:

> The Supreme Court has warned against defining a clearly established right at a high level of generality. Instead, the clearly established law must be particularized to the facts of the case. This is not to say that there must be a case directly on point for a right to be clearly established. But the existing precedent must have placed the statutory or constitutional question beyond debate. A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

*Est. of Ceballos v. Husk*, 919 F.3d 1204, 1214-15 (10th Cir. 2019) (internal quotation marks and citations omitted).

## IV.  Discussion

### A.  Medical Defendants

#### 1.  Objectively Serious Harm

Turn Key and the individual medical Defendants argue that they are entitled to summary judgment because Mr. Davis's death from a perforated ulcer does not satisfy the objective component of the deliberate indifferent standard. Turn Key interprets Plaintiff's claim, and the controlling law, far too narrowly. In a deliberate indifference case, "the prisoner selects the harm" and, once they have done so, the sole focus of the objective component is "whether that harm is sufficiently serious." *Mata v. Saiz,* 427 F.3d 745, 753 (10th Cir. 2005).

Here, Plaintiff has selected two possible harms that she argues are sufficiently serious to satisfy the objective component: (1) failing to medically screen, treat, or refer Mr. Davis for additional evaluation despite his acute psychosis and (2) Mr. Davis's severe

abdominal pain and deteriorating physical condition. *See* Am. Pet. [Doc. No. 1-7] ¶¶ 333-336 (asserting that the "total failure" to provide "psychiatric and medical care given the clear severity of his psychosis and ongoing complaints of worsening several abdominal pain" violated Mr. Davis's constitutional rights). *See also* Pl.'s Br. [Doc. No. 145] at p 24-25 (arguing that the perforated ulcer and "pronounced behavioral and psychological" symptoms satisfy the objective prong); Pl.'s Br. [Doc. No 148] at p. 27 (arguing that Mr. Davis's presentation as an "acutely psychotic, unscreenable detainee whose condition was 'unknown'" and his "days of audible, excruciating pain culminating in collapse" satisfy the objective component); Pl.'s Br. [Doc. No. 149] at p. 24 (arguing that Mr. Davis's ongoing psychosis without any medical evaluation satisfies the objective standard); Pl.'s Br. [Doc. No. 147] at p. 28 (arguing that Mr. Davis's excruciating pain and death from a perforated ulcer satisfy the objective component); Pl.'s Br. [Doc. No. 154] at p. 26-28 (arguing that the objective component is satisfied "twice over: first, with his acute, florid psychosis upon arrival, and second, with the agonizing symptoms of a fatal perforated ulcer that developed while in custody"). Having selected the harm, the analysis turns to whether there are facts from which a reasonable juror could conclude that the harm was sufficiently serious to satisfy the objective component

As to the first harm, the undisputed material facts establish that, throughout his detention, Mr. Davis was experiencing a serious mental health problem that was so obvious even a lay person would easily recognize the need for further medical attention. Indeed, at least some detention staff recognized exactly that. *See* Doc. No. 121-26, Depo. of Anderson, 128:8-25, 131:8-25 (testifying that he thought Mr. Davis "might need medical

attention" because he was naked and would not keep his clothes on). Further, the Tenth Circuit has found a triable issue of fact sufficient to preclude summary judgment on the objective component of the deliberate indifference standard where a pretrial detainee presented with mental health symptoms that were far less serious than the obvious psychosis Mr. Davis was experiencing. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1316 (10th Cir. 2002) (finding that a jury could conclude that pretrial detainee's "OCD-induced panic attack during the ride to jail was 'sufficiently serious'"); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 513 (7th Cir. 2005) (finding that prisoner experiencing hallucinations and defecating on himself presented evidence of a serious medical need even though he was not in "pain or extreme distress") (cited with approval in *Prince*, 28 F.4th at 1045).

Turn Key and the medical defendants do not genuinely dispute that Mr. Davis was experiencing a serious mental health issue but nevertheless argue that the objective component is not satisfied because there is no connection between Mr. Davis's psychosis and his ultimate cause of death from a perforated ulcer. But Plaintiff's claimed harm is not limited solely to Mr. Davis's death. Rather, Plaintiff argues that the failure to secure timely access to medical care, despite Mr. Davis's obvious psychosis, resulted in substantial harm. As explained by the Tenth Circuit,

> [w]hen the prisoner's Eighth Amendment claim is premised on an alleged delay in medical care, the prisoner must show that the delay resulted in substantial harm. That substantial harm can be the ultimate physical injury caused by the prisoner's illness, so long as the prisoner can show that the more timely receipt of medical treatment would have minimized or prevented the harm. The substantial harm can also be an intermediate injury, such as the pain experienced while waiting for treatment and analgesics. Although

not every twinge of pain suffered as a result of delay in medical care is actionable, when the pain experienced during the delay is substantial, the prisoner sufficiently establishes the objective element of the deliberate indifference test.

*Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006) (internal quotation marks and citations omitted) (overruled on other grounds).

Plaintiff has submitted sufficient evidence to create a triable issue of fact as to whether Mr. Davis suffered a substantial intermediate harm from the delay in providing medical care. The evidence, construed in Plaintiff's favor, indicates that Mr. Davis was in a state of obvious psychosis, the etiology of which was unknown, throughout his detention. Expert medical testimony indicates that he was severely dehydrated for several days prior to his death and more likely than not had symptoms of abdominal pain and nausea in the days preceding the perforation of his ulcer. Although the parties agree that psychotic individuals are able to express pain, there is evidence that Mr. Davis's mental state limited his ability to report his other medical symptoms. This evidence is sufficient to survive summary judgment. A reasonable juror, viewing the evidence in Plaintiff's favor, could conclude that Mr. Davis suffered a substantial intermediate harm, in the form of prolonged pain and suffering, that was caused by Defendants delay in medically screening or treating his psychosis. *See Prince*, 28 F.4th at 1044 (finding that inmate's psychosis, fecal incontinence, and catatonia were sufficiently serious harms, even if it was not obvious that they would lead to his death); *Sealock*, 218 F.3d at 1210 n.5 (10th Cir. 2000) (rejecting "causation-based argument" that Defendant did not cause inmate's heart attack because there was "factual evidence from which a jury could conclude that the delay occasioned by

his inaction unnecessarily prolonged appellant's pain and suffering"); *Encinias v. New Mexico Corr. Dep't*, 659 F. Supp. 3d 1227, 1240 (D.N.M. 2023) (finding that prisoner's "mental health diagnosis and attendant suffering (e.g., hallucinations, self-harm, anxiety, depression) were also sufficiently serious because they were diagnosable (and diagnosed) medical conditions requiring treatment and likely recognizable by even a lay person"); *Dominguez v. Colfax Cnty.*, No. CV 14-875 MV/KRS, 2018 WL 3621018, at *11 (D.N.M. July 30, 2018) (concluding that pretrial detainee, who was disruptive during the booking process and repeatedly found nude in his cell, suffered substantial harm from four-day delay in psychiatric treatment that "prolonged his mental disturbance and attendant suffering").

Plaintiff's second claimed harm is that Mr. Davis's perforated ulcer caused severe pain and ultimately death. In support, Plaintiff points to testimony from another inmate that Mr. Davis was screaming in pain for several days and expert testimony testified that the pain from a perforated ulcer would be severe and obvious. Evidence of "several hours of untreated severe pain" is "sufficient to satisfy the objective prong of the deliberate indifference test." *Al-Turki*, 762 F.3d at 1194; *see also Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 653–54 (10th Cir. 2017) (rejecting defendant's argument that delay in medical care did not cause substantial harm because there was evidence that that inmate experienced "substantial pain while he waited for medical attention"). Moreover, the failure to timely treat the perforated ulcer is causally connected to Mr. Davis's death, a harm which is obviously "sufficiently serious for purposes of the objective component of deliberate indifference." *Prince*, 28 F.4th at 1045.

Thus, viewing the evidence in Plaintiff's favor, Defendants have not established that they are entitled to judgment as a matter of law as to the objective component of the deliberate indifference standard.

### 2. Nurse Williams

Plaintiff's claim against Nurse Williams is premised on her alleged failure to refer Mr. Davis for psychiatric care, failure to complete a medical intake assessment, and/or failure to refer him to a medical professional for an evaluation. *See* Am. Pet. [Doc. No. 1-7] ¶¶ 394-398. Nurse Williams contends that she is entitled to summary judgment because Plaintiff lacks sufficient evidence to establish either the objective or the subjective component of the deliberate indifference standard.

As explained above, Nurse Williams' argument as to the objective component is not well-taken. However, as to the subjective component, Nurse Williams's argument fairs better. In considering this element, it is worth emphasizing that the subjective component "presents a high evidentiary hurdle" and requires showing that the defendant knew about and disregarded "a substantial risk of serious harm." *Self*, 439 F.3d at 1232. "Arguments that more could have been done, that one or more personnel were negligent, or that medical malpractice allegedly occurred do not by themselves rise to the level of the deliberate indifference standard required for a violation of the Constitution." *Johnson v. Davis Cnty.*, No. 1:18-CV-00080-DBB, 2021 WL 615325, at *9 (D. Utah Feb. 17, 2021), aff'd, No. 21-4030, 2022 WL 830202 (10th Cir. Mar. 21, 2022).

Here, the facts concerning Nurse Williams' knowledge of Mr. Davis's condition and her response to those conditions are not genuinely in dispute. Nurse Williams was the

intake nurse at the jail the morning after Mr. Davis was booked. She made multiple attempts to complete a medical intake screening with Mr. Davis and noted his bizarre and uncooperative behavior. She referred him for an urgent mental health evaluation and noted that he still needed to have a full medical intake assessment. Following the failed attempts to complete the intake screening, Mr. Davis was placed on the mental health observation floor, where he was supposed to be monitored by jail staff every thirty minutes.

These undisputed facts do not permit the inference that Nurse Williams acted with deliberate indifference to Mr. Davis's serious medical needs, either with respect to his psychosis or his subsequent abdominal pain and eventual death. In response to Mr. Davis's obvious mental health needs and inability to complete the medical screening, Nurse Williams's exercised her clinical judgment to place Mr. Davis on the mental health observation floor, issued an urgent referral for a mental health evaluation, and noted that Mr. Davis was still in need of a full medical screening. She testified that inmates in need of follow up screenings were tracked by the electronic medical records system and assigned to a nurse for completion. These actions do not reflect a conscious disregard of Mr. Davis's mental health needs or a failure to fulfill her gatekeeping role to refer Mr. Davis's serious mental health symptoms for further evaluation by an appropriate provider. *See Est. of Beauford v. Mesa Cnty., Colorado,* 35 F.4th 1248, 1272 (10th Cir. 2022) (finding that the mental health supervisor's "decision about [inmate's] housing placement was an exercise of professional medical judgment and thus does not satisfy the subjective component of the deliberate indifference test"); *Crowson*, 983 F.3d at 1180 (nurse that referred inmate to a physician's assistant for a psychological examination, rather than a physiological one,

based on belief he was suffering from psychological issues did not act with deliberate indifference). Further, apart from Mr. Davis's mental health symptoms, there is no evidence indicating that Nurse Williams was subjectively aware that Mr. Davis was experiencing pain or had any other medical needs that presented a serious risk to his health.

In addition to her constitutional claim, Plaintiff asserts that Nurse Williams acted negligently under state law. On this claim, Nurse Williams asserts that she is immune from liability pursuant to the Oklahoma Governmental Tort Claims Act, Okla. Stat. tit. § 152.1, which provides that state employees are generally immune for torts committed with the scope of their employment. This immunity extends to "licensed medical professionals" that "are under contract, including when under contract as an independent contractor, with city, county, or state entities and providing medical care to inmates or detainees in the custody or control of law enforcement agencies." *Sanders v. Turn Key Health Clinics*, 566 P.3d 591, 610 (Okla. 2025); *see also Neal v. Oklahoma Cnty. Crim. Just. Auth.,* No. CIV-24-00575-JD, 2025 WL 928825, at *1 (W.D. Okla. Mar. 27, 2025) (finding that the holding of *Sanders* applies to Turn Key and it is entitled to immunity under the OGTCA).

Here, Plaintiff argues that there are fact questions as to whether Nurse Williams was acting within the scope of her employment that preclude summary judgment.[9] "Scope of employment" is defined by the OGTCA as "performance by an employee acting in good faith within the duties of the employee's office or employment." Okla. Stat. tit. 51, §

---

[9] Plaintiff also argues, repeatedly, that the immunities available under the OGTCA do not supply a defense to a claim asserted pursuant to § 1983. This argument is totally misplaced as the medical defendants never suggested that their state law immunity should apply to anything other than Plaintiff's state law claims.

152(13). Thus, "[a]n act of the employee is not in the scope of employment if the employee acted maliciously or in bad faith." *Pellegrino v. State ex rel. Cameron Univ.*, 63 P.3d 535, 537 (Okla. 2003). Although Plaintiff contends that Nurse Williams could have and should have done more for Mr. Davis, the record is devoid of any evidence from which a reasonable juror could conclude that Nurse Williams acted maliciously or in bad faith. She is therefore immune under the OGCTA with respect to the negligence claim.

Nurse Williams' is therefore entitled to summary judgment in her favor.

### 3. Counselor Okongor

Plaintiff's claim against Counselor Okongor is premised on her failure to refer Mr. Davis for psychiatric care or "outside hospital care" despite her knowledge that he was suffering from ongoing psychosis and had not been medically screened. *See* Am. Pet. [Doc. No. 1-7] ¶¶ 387-388. Counselor Okongor argues that summary judgment is warranted because Mr. Davis's psychosis did not prevent him from communicating that he was in severe pain and there is no evidence that she was aware of and disregarded symptoms of physical distress. However, construing the evidence in Plaintiff's favor, the Court concludes that there are factual disputes as to whether Counselor Okongor fulfilled her gatekeeping role and whether that failure caused substantial harm.

"A prison medical professional who serves 'solely ... as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role.'" *Mata*, 427 F.3d at 751 (quoting *Sealock*, 218 F.3d at 1211). The critical inquiry "is not whether the prison official provided some care but rather whether they fulfilled their sole obligation to

refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Lucas*, 58 F.4th at 1139. Because "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment[,]" a claim is "actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Self*, 439 F.3d at 1232. Importantly, to establish the subjective component, a plaintiff does "not need to show [the clinician] was consciously aware that [the plaintiff] suffered from a specific ailment, but 'rather that he was aware [that the plaintiff] face a substantial risk of harm to his health and safety.'" *Buchanan*, 2023 WL 6997404, at *6 (unpublished) (quoting *Lucas*, 8 F.4th at 1141).

Here, Ms. Okongor's chart notes and deposition indicate that she was aware that Mr. Davis was in a prolonged state of psychosis and his ability to communicate his own needs was limited by his mental state. Although she testified that she did not observe any immediate concern for his welfare, the evidence, viewed in Plaintiff's favor, permits the inference that she was aware Mr. Davis had not been medically screened, did not have a diagnosis for his mental health status, and had not been evaluated by a medical practitioner capable of diagnosing or treating his condition. Despite being aware of his ongoing psychosis and the absence of any diagnosis or treatment, she made no effort to refer him for further evaluation. Further, although Ms. Okongor may have assumed someone else would provide the evaluation, a reasonable juror could conclude that, at least by the time she completed her second evaluation, which was several days into his incarceration, such an assumption was not reasonable.

Under the deliberate indifference standard, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Although Counselor Okongor may not have expressly intended harm, there is sufficient evidence to suggest that Mr. Davis's need for psychiatric or medical treatment was obvious and she failed to fulfill her gatekeeper role by not referring him to medical personnel capable of providing evaluation or treatment. Additionally, as previously explained, there is sufficient evidence to create a triable issue as to whether the delay in treating Mr. Davis's psychiatric needs resulted in substantial harm by causing pain and suffering from his prolonged psychosis and the emergent symptoms of his ulcer. *See Blackmon*, 734 F.3d at 1244 (denying summary judgment to mental health counselor on qualified-immunity grounds because there were facts suggesting he failed to fulfill his gatekeeper role by delaying or denying "access to mental health care by qualified professionals" despite prisoner's "grave mental health problems").

Apart from the constitutional claim, Counselor Okongor argues that she is entitled to summary judgment on the negligence claim because, like Nurse Williams, she is immune under the Oklahoma Governmental Tort Claims Act. Plaintiff counters that the immunity for state employees acting within the scope of their employment extends to "licensed medical professionals," which does not include a licensed professional counselor like Ms. Okongor.

In *Barrios v. Haskell Cnty. Pub. Facilities Auth.*, 432 P.3d 233, 236 n.5 (Okla. 2018), the Oklahoma Supreme Court stated that "[g]enerally speaking, the staff of a healthcare contractor at a jail are employees who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25)." Subsequently, in *Sanders,* 566 P.3d at 608-09, which involved a claim against Turn Key based on its failure "to provide access to medical and mental health personnel", the Oklahoma Supreme Court affirmed the trial court's finding that Turn Key was immune from liability under the OGTCA. More specifically, the *Sanders* court concluded that the immunity for "licensed medical professionals" under contract with the city, county, or state codified in §152(7)(b)(7) includes those who are under contract as an independent contractor.

Here, Turn Key contracted to provide medical and psychiatric services at the Oklahoma County Detention Center. To fulfill that contractual obligation, Turn Key relied, in part, on licensed professional counselors like Counselor Okongor. Given that "the staff of a healthcare contractor at a jail" are "employees who are entitled to tort immunity under the GTCA," and Counselor Okongor was working as a licensed mental health staff member for a healthcare contractor at a jail, the Court concludes that she falls within the scope of §152(7)(b)(7) and is entitled to immunity as to the state law claims. Additionally, to the extent Plaintiff argues that she was acting outside the scope of her employment, the Court is not persuaded that the evidence would support a finding that she acted maliciously or in bad faith.

Accordingly, Ms. Okongor is not entitled to summary judgment as to the § 1983 claim but is immune as to the negligence claim.

### 4. Dr. Irvin

Plaintiff's claim against Dr. Irvin is premised on her allegedly deficient supervision of the mental health staff at the jail and her personal failure to refer Mr. Davis for a proper evaluation. Am. Pet. ¶ 364. Dr. Irvin argues that summary judgment is warranted because she did not personally evaluate Mr. Davis and there is insufficient evidence to show that she was deliberately indifferent in performing her supervisory responsibilities.

Plaintiff has failed to meet her burden of coming forward with sufficient evidence from which a reasonable juror could conclude that Dr. Irvin took actions in a deliberately indifferent manner that caused a violation of Mr. Davis's constitutional rights. Her direct involvement with his care was limited to moving his initial mental health appointment by one day. Plaintiff has not argued or identified evidence showing that delaying Mr. Davis's initial mental health evaluation by one day caused substantial harm. Further, even assuming Dr. Irvin was aware at the time she moved the appointment that Mr. Davis was having a mental health issue and had not yet been medically screened, there is no evidence indicating that she had reason to believe the medical screening would not be performed by the medical staff or that the mental health counselors she supervised would not appropriately refer inmates for further evaluation and treatment. To the extent such a failure occurred in this case, Plaintiff has not identified evidence showing that Dr. Irvin promulgated a policy preventing or discouraging her subordinates to make referrals or was aware of prior, similar failures and did not appropriately respond. Plaintiff has not identified any deliberate act or failure to act by Dr. Irvin that "set in motion a series of events that the defendant knew or

31

reasonably should have known would cause others to deprive" Mr. Davis of his constitutional rights. *Dodds*, 614 F.3d at 1195–96 (internal quotation marks omitted).

As for the negligence claim asserted against Dr. Irvin, Plaintiff does not develop any argument in response to Dr. Irvin's assertion that she is immune under the Oklahoma Governmental Tort Claims Act. Plaintiff has therefore confessed this argument. But regardless, the Court concludes that Dr. Irvin is entitled to immunity under the OGTCA with respect to the negligence claim.

Accordingly, Dr. Irvin is entitled to summary judgment.

### 5. Dr. Cooper and Turn Key

Plaintiff's claim against Dr. Cooper, the medical director for Turn Key, is premised on Dr. Cooper's personal participation in the failure to provide adequate medical care to Mr. Davis and in his role as supervisor of the Turn Key medical staff. Am. Pet. ¶¶ 338. She alleges that Dr. Cooper had knowledge of Mr. Davis's condition and his subordinates' failure to refer Mr. Davis for a medical evaluation or appropriately monitor his condition. *Id*. ¶¶ 345-351. She further alleges that Dr. Cooper, as the final policymaker for Turn Key, was deliberately indifferent to several longstanding deficiencies that are causally related to the violation of Mr. Davis's right to adequate medical care, including understaffing of medical personnel, failing to provide treatment to inmates with mental health needs, failing to perform medical screening, failing to assesses and treat life-threatening conditions requiring emergency care, and failing to train medical staff. *Id.* at ¶ 609. Dr. Cooper argues that summary judgment is warranted because he had no personal knowledge of Mr. Davis's

condition or treatment and there is insufficient evidence to show that he was deliberately indifferent in performing his supervisory responsibilities.

Initially, there is no evidence that Dr. Cooper was personally involved in Mr. Davis's care, personally aware of his condition, or personally aware of the medical staff's actions in connection with Mr. Davis. Plaintiff's response brief concedes as much and instead argues that Dr. Cooper's personal involvement is established by his adoption and maintenance of polices and customs that caused the failures alleged in this case. *See* Pl's Br. [Doc. No. 147] at p. 25. Because the claims against Dr. Cooper are premised on his maintenance of policies and customs, as opposed to his personal participation in the underlying constitutional violation, the elements of the claim largely overlap with the municipal liability claim asserted against Turn Key. *See Burke*, 935 F.3d at 998-99. For both claims, Plaintiff must identify evidence from which a reasonable could find "(1) a causal relationship between the policy or custom and the underlying violation and (2) deliberate indifference." *Id.* at 999.

For her claim against Turn Key, Plaintiff alleges widespread failures to provide necessary medical treatment, perform medical screenings, or adequately train its employees. Am. Pet. ¶¶ 543-546; 555. Turn Key, like Dr. Cooper, argues that summary judgment is warranted because there is no evidence that any policy or custom of Turn Key was the moving force behind Mr. Davis's claimed constitutional violation or that any policy or custom was enacted with deliberate indifference.[10]

---

[10] Turn Key also argues that Plaintiff's claim fails because none of Turn Key's employees committed a constitutional violation. However, as previously explained, there is a genuine

Plaintiff first contends that Turn Key, and Dr. Cooper, maintained a practice of failing to ensure that unscreenable detainees received a medical evaluation. The evidence, even construed in Plaintiff's favor, does not support this contention. Turn Key's written policies require a screening to be completed as soon as possible, Nurse Williams testified that Turn Key tracks inmates in need of a medical screening and has a medical provider monitor the list,[11] and Dr. Cooper testified that medical and mental health staff are trained to relay concerns about the needs of inmates. To be sure, there is evidence that this system did not function properly in this case as Mr. Davis never received a medical screening or any medical treatment. But a reasonable factfinder could not infer that Turn Key maintains a widespread practice of failing to medically screen inmates or that Dr. Cooper's supervision was deficient based solely on the alleged failures in this case. *See Burke,* 935 F.3d at 997 ("Section 1983 does not authorize respondeat superior liability for a supervisor based solely on the actions of his subordinates."). And apart from Mr. Davis, Plaintiff has only identified one prior instance where an inmate did not receive a timely medical or mental health screening. Evidence of "only one similar incident …fall[s] far short of plausibly alleging a 'widespread practice'" or of raising the inference that the defendant was deliberately indifferent to a pattern of constitutionally deficient conduct. *Waller,* 932 F.3d at 1287, 1290. *See also Johnson v. Davis Cnty.,* No. 21-4030, 2022 WL 830202, at *4

---

dispute of material facts as to whether Counselor Okongor performed her gatekeeping role in a deliberately indifferent manner.

[11] Plaintiff's nurse expert criticizes Dr. Cooper for failing to describe this system. However, Plaintiff has not identified deposition testimony or other evidence showing that Dr. Cooper was asked about the system and was either unable to describe it or provided an explanation that was inconsistent with Nurse Williams's testimony.

(10th Cir. Mar. 21, 2022) (unpublished) (rejecting municipal liability claim where there were "no prior similar constitutional violations that would have put defendants on notice that their screening practices were deficient"). Additionally, although Plaintiff suggests that medical staff must have observed Mr. Davis during their routine rounds, she did not identify evidence showing that Turn Key personnel were present when Mr. Davis was purportedly screaming out in pain from his impending or perforated ulcer. *See Lance v. Morris*, 985 F.3d 787, 795 (10th Cir. 2021) ("[A] claim of deliberate indifference cannot be based on speculation about what [the defendant] might have seen or heard.").

Plaintiff next faults Turn Key and Dr. Cooper for promulgating or relying on "a custody-gated, passive-notification access model that depended on officers to open doors, escort clinicians, and carry messages to medical" despite knowing that the jail frequently experienced staff shortages and missed sight checks. Pl.'s Br. [Doc. No. 147] at p. 33; *see also* Pl.'s Br. [Doc. No. 145] at p. 29. There is evidence that Dr. Cooper and Turn Key were aware, prior to this incident, that the jail experienced detention staff shortages and missed sight checks.[12] But this case does not involve a denial of adequate medical care because detention officers were not available to escort medical personnel or open a cell door for treatment. To the extent Plaintiff faults the medical personnel for placing Mr. Davis on the mental health observation floor without a medical screening, despite

---

[12] Dr. Cooper (in his individual capacity and not as a corporate representative for Turn Key) testified that the only defect he knew of was that periodically there were not enough detention officers to provide medical personnel with access to patients. He further testified that he believed that problem was remedied and that he was not aware of problems where inmates were suffering from long-term medical issues that went undetected.

knowledge that his ability to self-advocate was limited and the detention staff were not appropriately performing their sight checks, there is insufficient evidence to permit the inference that Dr. Cooper or Turn Key were aware that medical staff was customarily failing to provide appropriate screenings, monitoring, or treatment to patients on the mental health observation floor.

Plaintiff's operative pleading alleges several additional deficient policies and customs and Turn Key moves for summary judgment on each. Plaintiff does not develop a specific argument in a response and has therefore waived further reliance on those theories. Alternatively, looking at the issue on the merits, Turn Key's arguments are persuasive. Plaintiff alleges that Turn Key, and Dr. Cooper in his individual supervisory capacity, do not provide adequate medical staff at the jail, fail to provide appropriate medical treatment for inmates with psychiatric needs, fail to adequately assess and treat life-threatening conditions, fail to ensure its policies align with the jail facilities, utilize unqualified medical staff or permit staff to operate outside their scope of practice, and fail to adequately train its staff. There is insufficient evidence to show these alleged deficiencies were the policies, customs, or widespread practices of Turn Key. Further, Plaintiff has failed to explain how some of the alleged deficient practices, such as the failure to review jail policies and medical understaffing, have a causal connection to the injuries in this particular case. The problem was not a lack of medical personnel, but that the medical personnel, rightly or wrongly, did not provide a medical screening or treatment for Mr. Davis. *See Buchanan* v, 2023 WL 6997404, at *10. As to the failure to train claim, Turn Key has identified evidence indicating that its employees receive training and that Dr. Cooper conducts employee

reviews. Plaintiff has not identified more than a scintilla of evidence in opposition and has therefore failed to create a triable issue of fact as to this claim.

Last, Turn Key and Dr. Cooper argue that they are immune from negligence liability under the Oklahoma Governmental Tort Claims Act. Plaintiff has not developed an argument in opposition and the Court concludes that Turn and Dr. Cooper are entitled to immunity pursuant to § 152(7)(b)(7) of the OGTCA.

Accordingly, Turn Key and Dr. Cooper are entitled to summary judgment in their favor.

### B.  County Defendants

#### 1.  Constitutional Right to Medical Care

The individual County Defendants (Detention Officer Anderson, Detention Officer Kallos, and Administrator Williams) first argue that a pretrial detainee does not have a constitutional right to medical care. The Supreme Court and the Tenth Circuit have "long held that a prison official's deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment" and that pretrial detainees "are entitled to the same standard of medical care under the Due Process Clause of the Fourteenth Amendment." *Prince*, 28 F.4th at 1043. "[T]his Court's role is to apply Tenth Circuit precedent, not to reconsider it[,]" *United States v. Hay*, 601 F. Supp. 3d 943, 952 (D. Kan. 2022), and this argument is therefore rejected.

The Board of County Commissioners and the OCCJA also argue that Plaintiff's claim asserting that Mr. Davis's constitutional rights were violated as the result of systemic failures impermissibly seeks the implementation of a federal constitutional tort regime and

runs afoul of the Tenth Amendment. The Tenth Circuit has recognized that "while unusual, municipal liability may exist without individual liability: for example, for a systemic failure of medical policies and procedures." *Lucas*, 58 F.4th at 1144. The Court will apply controlling Tenth Circuit precedent to Plaintiff's systematic failure claim and rejects Defendants' argument that the claim violates the Tenth Amendment.

### 2.  Objectively Serious Harm

Like the medical defendants, the county defendants all argue that Plaintiff cannot satisfy the objective component of the deliberate standard because Mr. Davis did not suffer from a sufficiently serious medical need. In making this argument, the county defendants contend that Plaintiff is merely speculating that Mr. Davis displayed observable symptoms of an ulcer and that there is a lack of evidence indicating that detention or medical staff ever suspected that Mr. Davis was suffering from a more serious condition other than psychosis. This is a mischaracterization of the record evidence.

Plaintiff has introduced expert testimony indicating that Mr. Davis's ulcer most likely perforated around August 10th and that he would have experienced severe and obvious pain. Dr. Cooper agreed that a perforated ulcer would cause extreme pain over the course of hours or days. Doc. No. 150-3, Cooper Depo, 84:4-86:9. Plaintiff has also introduced testimony from another inmate indicating that Mr. Davis was screaming in pain and beating on the door. There is evidence that Mr. Davis attempted nearly 900 phone calls during his brief incarceration. This is more than mere speculation and is sufficient evidence to create a triable issue of fact as to whether Mr. Davis had a serious medical need that was so obvious that even a lay person would easily recognize the necessity for a doctor's

attention. *See Rife*, 854 F.3d at 652 (concluding that there there affidavit from another inmate stating that the plaintiff was repeatedly moaning in pain was sufficient to create a triable issue of fact as to whether there was an obvious need for medical attention)

Summary judgment is therefore not warranted with respect to the objective component.

### 3.  Detention Officer Anderson

Plaintiff asserts that Detention Officer Anderson observed Mr. Davis's distress – including his psychosis and worsening physical condition – but failed to take any action in response. Am. Pet. ¶¶ 337-345. Officer Anderson contends there is no evidence that he acted in a deliberately indifferent manner.

The undisputed facts indicate that Officer Anderson, along with another detention officer, conducted a sight check on Mr. Davis. During the sight check, Mr. Davis provided his name in response to the officer's inquiry.[13] At that time, Officer Anderson thought Mr. Davis "might need medical attention" because he was naked and would not keep his clothes on. Officer Anderson did not report his concerns to anyone, left the floor to perform other duties, and missed several subsequent sight checks.

Although Plaintiff makes much of Officer Anderson's observation that Mr. Davis might need medical attention, the only reasonable inference to be drawn from Officer Anderson's statement and deposition testimony is that he believed Mr. Davis needed to be

---

[13] Officer Anderson also responded to the emergency call after Mr. Davis was found unresponsive. But Plaintiff does not argue that his actions at this point were deliberately indifferent.

seen by a provider because he was continuing to take his clothes off. There is no evidence indicating that he subjectively inferred that Mr. Davis's condition presented an excessive or urgent risk to his health. The evidence is also insufficient to support an inference that Officer Anderson was present during the time period that Mr. Davis was allegedly screaming in pain or showing signs of physical distress. Officer Anderson testified that he did not observe any concerning physical symptoms and Plaintiff has not offered any evidence that might permit a reasonable inference to the contrary. The evidence does not support the finding that Officer Anderson was consciously aware of an excessive risk to Mr. Davis's health and disregarded it. *See Martinez v. Beggs,* 563 F.3d 1082, 1090 (10th Cir. 2009) (granting summary judgment to detention officers who failed to complete multiple sight checks of inmate that was intoxicated, had not been medically screened, and was alone in cell because they did not subjectively know that he faced a risk of imminent heart attack); *Heidel v. Mazzola*, 851 F. App'x 837, 840–41 (10th Cir. 2021) ("Especially when considering the lack of evidence regarding the officers' subjective awareness, the alleged deviations from timely cell checks and proper booking do not amount to deliberate indifference in these circumstances.").

Accordingly, Officer Anderson is entitled to summary judgment in his favor.

### 4. Detention Officer Kallos

Plaintiff asserts that Detention Officer Kallos had knowledge of an obvious risk of serious harm when he failed to conduct a proper sight check and acted with deliberate

indifference by not verifying Mr. Davis's condition. Officer Kallos contends there is no evidence that he acted in a deliberately indifferent manner.[14]

The undisputed facts indicate that on August 12, 2021 at 8:11 a.m., approximately ninety minutes after Officer Anderson completed his sight check, the Detention Services Team made rounds on Mr. Davis's section of the jail to change out the laundry. Officer Kallos was part of the Detention Services Team.[15] Officer Kallos testified that he looked through the cell door's food port and window, knocked a few times, and asked Mr. Davis if he wanted his blanket washed. Mr. Davis was fully covered by his blanket and did not respond. Officer Kallos testified that he saw Mr. Davis breathing, assumed he was sleeping, and moved on to the next cell.

Plaintiff faults Officer Kallos for assuming Mr. Davis was asleep and not verifying his responsiveness, particularly given that the cell was dark, he did not have a flash light, and he only looked in for a few seconds.[16] Crediting these facts and drawing inferences in

---

[14]Officers Anderson and Kallos also raise the defense of qualified immunity. Because the evidence is insufficient to find that Officer Anderson or Kallos violated Mr. Davis's constitutional rights, there is no need to addresses whether the alleged violation violated the clearly established law.

[15] The evidence also shows that Officer Kallos performed a sight check or clothing change out at Mr. Davis's cell on August 5. This interaction does not form the basis of Plaintiff's claim against Officer Kallos. *See* Pl.'s Br. [Doc. No. 156] at p. 12 ("[T]the August 5 encounter is irrelevant to the constitutional violation at issue.")

[16] Plaintiff specifically criticizes Officer Kallos for not verifying "flesh and movement" as required by jail policy. This language appears to be derived from the jail's policy on performing an inmate count at least three times per day for the purpose of ensuring all inmates are accounted for. *See* Doc. No. 150-37. The policy on performing "safety checks" does not include the language about verifying "flesh and movement" and instead provides that the checks shall be "sufficient to determine whether the inmate is experiencing any stress or trauma." *See* Doc. No. 150-48. The policy on performing "sight checks" states that staff should "pay close attention to any sign of unusual behavior or distress displayed

Plaintiff's favor, the Court is not persuaded that a reasonable juror could conclude that Officer Kallos was aware of a serious risk to Mr. Davis and consciously disregard it. There is no evidence indicating that Officer Kallos was aware that Mr. Davis had previously been screaming in pain or showing distressing physical symptoms. There is no evidence that Officer Kallos knew that Mr. Davis was in a prolonged state of untreated psychosis or that earlier that morning detention officers had concluded that Mr. Davis needed medical attention for his erratic behavior. There is no evidence that Officer Kallos saw any signs of distress at the time he performed the sight check. What the evidence does show is that Officer Kallos saw Mr. Davis breathing, assumed he was sleeping, and moved on. Although his failure to conduct a more thorough sight check might suggest he was negligent in performing his duties, the evidence here does not rise to the level of deliberate indifference. *See Est. of Beauford*, 35 F.4th at 1264 (detention officer's failure to perform required sight check after previously observing inmate "under his blanket and grunting" did not amount to deliberate indifference because detention officer did not have actual knowledge that inmate was experiencing seizure).

Obviously, with the benefit of hindsight, it is easy to say that more could have or should have been done for Mr. Davis by the detention officers named in this case. But that is not the relevant inquiry. Rather, to survive summary judgment, there must be evidence from which a reasonable juror could conclude that the individual defendants knew of and

---

by the inmate and take proper action in accordance with provided training." *See* Doc. No. 150-35. In any event, a policy violation does not necessarily equate with a constitutional violation.

disregarded an excessive risk to Mr. Davis's health. The evidence, construed in Plaintiff's favor, does not support such a finding with respect to these individual defendants. The Court recognizes that there is evidence from which a reasonable juror could conclude that Mr. Davis was in severe and obvious pain for an extended period of time during his incarceration and did not receive any medical treatment. This is troubling, to say the least. But Plaintiff has not shown that the jail or medical staff named in this action were present during this time period.

Accordingly, Officer Kallos is entitled to summary judgment in his favor.

### 5. Administrator Williams and the OCCJA

For her claim against Administrator Williams in his individual capacity, Plaintiff contends that he maintained and tolerated practices that were the moving force behind Mr. Davis's death, including placing unscreened inmates into housing, missing sight checks, and ignoring a recognized need for medical care.[17] Plaintiff's claim against the OCCJA (and Administrator Williams in his official capacity) is essentially the same and relies on deficient screening practices and a widespread failure to complete required sight checks. Administrator Williams and the OCCJA argue that Plaintiff has failed to present evidence showing an underlying constitutional violation and, additionally, failed to create a triable

---

[17] Plaintiff's brief in response to Administrator Williams's motion references alleged statements or opinions by "defense expert Adler." Doc. No. 155 at p. 37. However, Plaintiff has not attached the expert report or deposition testimony of Adler in her response brief. Although these supporting documents might appear elsewhere in the record, it is not the responsibility of the Court to search the record in support of the underlying exhibits.

issue of fact as to whether a municipal policy or custom was the moving force behind the constitutional violation.

As to Plaintiff's claim that the jail maintained a policy or custom of failing to provide medical screenings to inmates, there is insufficient evidence to support a finding that the jail maintained such a policy in a deliberately indifferent manner. Similar to the claim against Turn Key, the jail's written policies require medical screening and, apart from one prior instance, Plaintiff has not identified evidence showing that the jail was routinely neglecting to complete medical screenings prior to this incident.

Plaintiff's claim that the jail maintained a widespread practice of understaffing the jail and failing to monitor inmates presents a closer question. Generally, supervisory or municipal liability claims require individual liability by a subordinate employee. *See Burke*, 935 F.3d at 998; *Strain*, 984 F.2d at 997. However, in limited circumstances, municipal liability may exist absent the individual liability of a specific employee. "[W]here 'the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.'" *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1033 (10th Cir. 2020) (quoting *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 310 (10th Cir. 1985)). "Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Id.* at 308; *see also Crowson*, 983 F.3d at 1185-86.

Although Plaintiff has not identified sufficient evidence to create a triable issue of fact that Detention Officers Anderson and Kallos were deliberately indifferent to Mr. Davis's serious medical needs, there is sufficient evidence to create a genuine issue of fact as to whether gross deficiencies in staffing and procedure were the moving force behind a violation of Mr. Davis's constitutional rights. Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that the jail had chronic, widespread, and grossly deficient practices regarding the monitoring of inmates. In addition to deficiency notices from the state health department, there is deposition testimony from detention officers that sight checks were routinely missed as a result of insufficient staffing levels. Administrator Williams was aware of these deficiencies and candidly acknowledged that failing to monitor inmates presents a risk to inmate safety, particularly for inmates on mental health observation. Although Administrator Williams testified that he attempted to remedy the staffing shortages by offering pay increases and engaging in recruitment efforts, a jury could discount the reasonableness of these efforts given the longstanding nature of the problem. Further, there is a genuine factual dispute as to whether these deficient practices were the moving force behind a violation of Mr. Davis's constitutional rights, i.e. that the failure to monitor caused a delay in medical care that resulted in substantial harm to Mr. Davis. There is evidence that Mr. Davis experienced severe pain over the course of multiple days and the symptoms would have been obvious to a lay person, but detention officers did not report his pain to medical personnel. There is also evidence that in the hours prior to Mr. Davis being found unresponsive, detention officer missed numerous sight checks due, at least in part, to a lack of adequate staff. In

short, Plaintiff's have presented evidence sufficient to raise a genuine factual dispute as to whether Administrator Williams, and the OCCJA, were deliberately indifferent to the risk that inadequate monitoring and staffing would result in a constitutional violation like the one Mr. Davis experienced. *See Winton v. Bd. of Comm'rs of Tulsa Cnty.,* 88 F. Supp. 2d 1247, 1269 (N.D. Okla. 2000) ("A jury could, therefore, find an affirmative link between the Sheriff's maintenance or acquiescence in an inadequate watch tour policy and the delay in discovering Mr. Winton's injuries.").

Administrator Williams contends that summary judgment is nevertheless warranted because he is entitled to qualified immunity. As previously noted, "[a] defendant's motion for summary judgment based on qualified immunity imposes on the plaintiff the burden of showing both (1) a violation of a constitutional right; and (2) that the constitutional right was clearly established at the time of the violation." *Burke* v, 935 F.3d at 1002 (internal quotation marks omitted). As to the first prong, for the reasons explained above, there is a genuine factual dispute concerning whether jail employees violated Mr. Davis's constitutional right to adequate medical care by failing to report his obvious pain or summon medical attention and whether Administrator Williams tolerated a widespread practice that was the moving force behind that violation. As to the second prong, Administrator Williams contends only that there is no constitutional right to medical care, an argument that contravenes binding Supreme Court and Tenth Circuit precedent. Moreover, the Tenth Circuit has previously recognized that a jail administrator can be liable under § 1983 for a violation of a pretrial detainee's right to adequate medical care

based on widespread and chronic understaffing, inadequate training, and failure to timely address medical issues. *See Burke*, 935 F.3d at 997-1000.

Summary judgment is therefore denied for Administrator Williams in his individual capacity and the OCCJA.

### 6.  Board of County Commissioners

Plaintiff's claim against the Board of County Commissioners is premised on its authority over the contracting for medical services at the jail and its alleged prioritization of cost-cutting measures over sufficient medical care. Am Pet. ¶¶ 518-531. The BOCC argues that it is entitled to summary judgment because, as a matter of law, it has no authority over the jail. Additionally, the BOCC argues that Plaintiff has no evidence to support her theory that a lack of funding caused a constitutional violation.

The BOCC's contention that it is "legally impossible" for it to be held liable for a constitutional violation at the jail likely overstates its case. *See, e.g., Miller v. Oklahoma Cnty. Crim. Just. Auth., No.* CIV-22-00665-JD, 2025 WL 2325184, at *10 (W.D. Okla. Aug. 12, 2025). But the Court nevertheless concludes that summary judgment is warranted because Plaintiff has not identified sufficient evidence to support its theory that the BOCC's funding decisions were the moving force behind the alleged constitutional violation. Although Plaintiff complains of understaffing and other operational deficiencies at the jail, she has not adequately connected those deficiencies to a policy or custom of the BOCC. In these circumstances, the BOCC is entitled to summary judgment in its favor.

### C.  Defendants Eastman, Hallock, Horn, and Merriott

Defendants Eastman, Hallock, Horn, and Merriott are Turn Key nurses that either responded to the request for emergency medical assistance or completed documentation after Mr. Davis was found unresponsive. Plaintiff has not identified any evidence indicating that these defendants were directly involved with Mr. Davis's care, had awareness of his medical conditions or symptoms, or were deficient in the way they responded to the request for medical assistance after he was found unresponsive. Based on this lack of evidence, the nurses move for summary judgment on Plaintiff's claim.

In response, Plaintiff requests that she be permitted to dismiss her claims against these defendants with prejudice pursuant Fed. R. Civ. P. 41(a)(2). The nurses object and contend they are entitled to judgment in their favor such that they may pursue recoverable attorney fees and costs as prevailing parties.

"Rule 41(a)(2) controls voluntary dismissals after an opposing party answers or files a motion for summary judgment." *Phillips USA, Inc. v. Allflex USA, Inc*., 77 F.3d 354, 357 (10th Cir. 1996). The rule permits a voluntary dismissal "only by court order, on terms that the court considers proper." Fed.R.Civ.P. 41(a)(2). "The rule is designed primarily to prevent voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions." *Phillips USA*, 77 F.3d 354, 357 (10th Cir. 1996) (quotation omitted). "Absent legal prejudice to the defendant, the district court normally should grant such a dismissal." *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997). Several factors may bear on whether the defendant will suffer legal prejudice, including "the opposing party's effort and expense in preparing for trial; excessive delay and lack of

48

diligence on the part of the movant; insufficient explanation of the need for a dismissal; and the present stage of litigation." *Id.* However, "[t]hese factors are neither exhaustive nor conclusive." *Brown v. Baeke*, 413 F.3d 1121, 1124 (10th Cir. 2005).

The Court notes that some of these factors weigh against dismissal. Defendants spent considerable time preparing for and filing their dispositive motion, which raises a substantive challenge to Plaintiff's claims, and the case is an advanced procedural posture. Further, Plaintiff made no effort to respond to the motion and has not adequately explained why she rejected the nurses' post-discovery but pre-dispositive motion request for dismissal.

However, unlike the majority of Rule 41 dismissals, Plaintiff is requesting a dismissal of the claims *with prejudice*. When that is the case, "the normal analysis will result in the district court granting the plaintiff's motion to dismiss with prejudice." *Cnty. of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico*, 311 F.3d 1031, 1049 (10th Cir. 2002). Additionally, although counsel for the nurses appears to have expended considerable time and effort litigating this case, much of that work overlapped with the work performed for the other medical defendants. Given that position, and the fact that Plaintiff is requesting a dismissal with prejudice, the Court concludes that her request for dismissal under Rule 41(a)(2) should be granted and the nurses' motion for summary judgment denied as moot. The Court further declines to award the nurses' attorneys' fees as a condition of the dismissal. *See AeroTech, Inc. v. Estes,* 110 F.3d 1523, 1528 (10th Cir. 1997) ("In contrast, when a plaintiff dismisses an action with prejudice, attorneys' fees are usually not a proper condition of dismissal because the defendant cannot be made to defend again.").

Accordingly, Defendants Eastman, Hallock, Horn, and Merriott are dismissed with prejudice pursuant to Rule 41(a)(2) and their Motion for Summary Judgement is denied as moot.

## V.    Conclusion

As set out above, the motions for summary judgment filed by Defendants Williams [Doc. No. 119]; OCCJA [Doc. No. 111], and Okongor [Doc. No. 129] are denied. The motions for summary judgment filed by Defendants BOCC [Doc. No. 118], Kallos [Doc. No. 115], Anderson [Doc. No. 113], Turn Key [Doc. No. 122], Cooper [Doc. No. 127], Irvin [Doc. No. 126], and Misty Williams [Doc. No. 128] are granted.

The motion for summary judgment filed by Defendants Eastman, Hallock, Horn, and Merriott [Doc. No. 124] is denied as moot and these defendants are dismissed with prejudice pursuant to Rule 41(a)(2).

Last, in accordance with the Stipulation of Dismissal [Doc. No. 142] dismissing the claims against Defendants Carter, Mulanax, Harvey, Anderson-Depee, and Dean without prejudice, the motion for summary judgment [Doc. No. 117] filed by these defendants is denied as moot.

**IT IS SO ORDERED** this 3rd day of February, 2026.

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**